**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

SILVER AIRWAYS LLC, *et al.*[1]

                Debtors-in-Possession.

_____/

Chapter 11

Case No. 24-23623-PDR
(Jointly Administered)

## DECLARATION OF STEVEN A. ROSSUM
## IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS

**Introduction**

    1.    I am the President, Chief Executive Officer, General Counsel, and Secretary of Silver Airways LLC ("Silver") and the Chief Executive Officer of Seaborne Virgin Islands, Inc. ("Seaborne") and of their affiliates (together with Silver and Seaborne, collectively, the "Debtors" or the "Company"). I have continuously served as Silver's Chief Executive Officer since August 2017 and Seaborne's since March 2018. I have more than three decades of experience in leadership roles at passenger and cargo airlines in the United States, or serving as a legal, financial, or restructuring advisor to airlines and those doing business with airlines. Some of the roles I served in prior to joining Silver include: Executive Vice President positions (Corporate Development and General Counsel) at AirTran Airways; Chief Financial Officer and General Counsel at freight forwarder and airline National Air Cargo; Chief Corporate Officer, Chief Financial Officer, and General Counsel at ASTAR Air Cargo; Chief Restructuring Officer of Pinnacle Airlines (now Endeavor Air) in the successful Chapter 11 restructuring of the 200+ aircraft regional airline and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SILVER AIRWAYS LLC (6766), and SEABORNE VIRGIN ISLANDS, INC. (1130). The mailing address and principal place of business of Silver is 2850 Greene Street, Hollywood, FL 33020. The mailing address and principal place of business of Seaborne is 2850 Greene Street, Hollywood, FL 33020.

SGR/72268638.1

the court-approved sale to Delta Air Lines in bankruptcy; and other executive and leadership positions at Reno Air, US Airways, and World Airways. I have been licensed to practice law continuously since 1987. From 2013 to 2017, I was an aviation and corporate law partner in the Atlanta office of Smith Gambrell & Russell LLP and concurrently chief executive officer of that firm's airline consulting division (SGR Aviation Consulting). Since 2014, I have been an Adjunct Professor at the Dwayne O. Andreas Barry University of Law in Orlando teaching electives in aviation law and in ethics and professionalism. I hold B.S. and B.A. degrees from Binghamton University of the State University of New York in Accounting and Romance Languages, respectively, and a JD degree from the Emory University School of Law in Atlanta. I have also been an adjunct law professor at Emory teaching commercial law.

2.      As the Chief Executive Officer of both Silver and Seaborne, I am generally familiar with their day-to-day operations, businesses, and financial affairs, and the circumstances leading up to the Chapter 11 Cases. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors in support of their petitions for immediate relief (the "First Day Motions"), each of which I reviewed or had their contents explained to me. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and/or professional advisors to the Debtors, and/or my opinion based upon experience, knowledge, and information concerning Silver and Seaborne's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      On December 30, 2024, the Debtors each filed voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court").

SGR/72268638.1

**Executive Summary** Certain of the contributing factors to the Chapter 11 Cases are discussed below:

      4.     <u>Transition to ATRs Failed to Meet the Expectations Promised by ATR</u>

The determination by Silver to acquire twenty ATR -600 series aircraft – a technologically advanced, customer-friendly and fuel efficient turboprop aircraft with a superb safety record – was expected to be transformational for the independent regional airline in providing a better product with superior economics and the opportunity for significant growth. It was the cornerstone of the turnaround plan led by new investors who installed a new management team with major airline bona fides. It was also intended to be the renaissance for the return to the US by Avions de Transports Regional ("ATR"), a leading aircraft manufacturer in the regional airline sector, after a long sales drought in America.  Regrettably, the program got off to a slow start with delays in certification, training, parts procurement issues, and aircraft delivery concerns that resulted in challenges, disappointments and missed opportunities for Silver.

            i.     In 2017 and 2018, Silver, ATR, and Nordic Aviation Capital ("NAC"), a European leasing company and one of the largest owners of ATR aircraft in the world, entered into a series of agreements (the "ATR Transaction") for the leasing of twenty firm ATR-42-600s (a 46-seat aircraft) with the flexibility to substitute ATR72-600 aircraft, a larger model with 70 seats in Silver's configuration.  ATR also committed to provide up to fifty option aircraft for future growth. Other material elements of the ATR Transaction included: (a)  significant product support commitments by ATR, (b) a promised seamless transition from Silver's then existing Saab fleet to ATRs, (c) full parts and training support, (d) interface obligations with ATR's sub-contractors, and (e) flexibility to add aircraft to fulfill

3

Silver's growth potential. Silver was the launch customer for the -600 series in the US after ATR passenger aircraft had largely disappeared from the American skyline.  These contractually agreed-to plans fell short of the mark- in some cases, promised events did not occur (e.g. ATR did not implement a favorable turnkey parts solution) and in other cases, the execution failed to meet the expectations of Silver and its stakeholders.

ii.     Silver's efforts to obtain certification by the Federal Aviation Administration for the ATRs was, from my perspective, unnecessarily complex, lengthier and more expensive than promised. Despite diligent efforts and the commitment of resources by Silver and investments by its stakeholders, certification took well more than a year in excess of the time we had planned to occur and with significant expense and disruption to Silver and its franchise. In my judgment, ATR- who had been absent from the US marketplace for quite some time- was just not ready to efficiently introduce airplanes in the US at that time as it lacked recent experience. For example, certain manuals were incomplete according to your regulators and some had passages partially in French. ATR had training resource constraints such as too few experienced instructors resulting in unproductive Silver pilots for whom training periods were excessively extended or delayed. This reduced pilot productivity (50% of Silver's pilots were in training at one point – an exorbitantly high number) because of the transition discrepancies and it raised crew costs for Silver. The introduction of the -600s at Silver was off to a rocky start even before the first flight.

iii.    Despite these difficulties, in March 2019, Silver was the first airline to fly

ATR's -600s in the US in commercial service.

iv.     There were other areas of concern that caused problems and financial losses for Silver: (a) ATR failed on multiple occasions to fulfill comprehensive parts support agreements that were, from Silver's perspective, an integral part of the support package, and which would have dramatically lowered costs for Silver and improved operations, (b) NAC directed ATR to divert aircraft to other operators in contravention of agreed-upon schedules and only 10 ATR aircraft were delivered to Silver from the up to seventy aircraft outlined by the parties, (c)  after the NAC bankruptcy occurred, ATR failed to arrange a substitute lessor to give Silver the benefit of the committed twenty aircraft deal, and (d) during COVID, ATR ceased replacing most spare parts in the US and admittedly re-allocated parts from the US to France.

v.     Silver won a highly competitive "beauty contest" among several airlines to fly cargo for Amazon using ATR aircraft. The expectation was to grow potentially to 20 or more aircraft for Amazon. However, ATR- the supplier of the ATR freighters to Amazon-  elected to provide aircraft to Amazon without cargo systems and doors compatible with Amazon's jet fleet and ground equipment. This resulted in markedly higher costs for both Amazon and Silver and from Silver's viewpoint, may have been a factor in the early termination of the ATR test program.

vi.     As noted above, ATR customers have faced a systemic global parts shortage that began during COVID and still hinders operators. The ATR supply chain and after-market parts supplies are insufficient and in the case of Silver, shortages have impeded operations, added costs, reduced reliability, and retarded growth for

5

Silver. Parts are limited for both routine and heavy maintenance and Silver's planned growth with used airplanes at favorable lease rates was stymied by shortages of critical components. The price for parts and components (when available) skyrocketed, exacerbating Silver's costs to operate and making it even more difficult to compete against jet operators with larger aircraft and sufficient stock of parts. Silver has contractual covenants from ATR specifically relating to the availability of parts and components from ATR and other contractors.

vii.    Design defects on air conditioning systems significantly affecting operators in hot climates and systems have gone largely unremedied by ATR causing significant delays and cancellations and causing discomfort to passengers and crew.

viii.    **All of the foregoing increased costs, impacted revenues, caused reputational harm and materially-adversely impacted liquidity.**

ix.    The acquisition of the ATR fleet in the ATR/NAC/Silver transaction was a material and important aspect that justified the significant investments and loans by Versa.

Silver's customers and flight crews view ATR aircraft favorably and they can be operated efficiently in short-haul markets with the proper resources and support infrastructure. The airplane's safety record is admirable and in recent months, Silver's operations have improved significantly after making allowances for the dearth of parts.

The shortcomings enumerated above- in particular the long certification delays, the parts shortages, and aircraft availability- vitiated the competitive advantage that Silver had as a "first mover" being the launch customer for the ATR -600 series

SGR/72268638.1

aircraft in the United States. Transactions with major airlines in the US did not get off the ground because of, *inter alia*, uncertainty regarding the numbers of aircraft ATR could produce and support. Significant sums were lost by Silver as well as significant value to the stakeholders in these Chapter 11 Cases.

x.     Silver has made repeated claims (and is contemplating further claims in this proceeding) against ATR **for** significant sums with respect to the foregoing and otherwise. Although numerous discussions have occurred, to date, ATR has denied responsibility, and no commercial solution is imminent.

5.     <u>ATR Resource Constraints Hindered Silver</u>. The lack of an adequate number of aircraft and the unavailability and scarcity of parts undermined Silver's growth-oriented business plan, reducing potential revenues and increasing the cost of operations.

i.     Higher costs rendered Silver less competitive and frustrated the airline's ability to grow.

ii.     The inability to achieve scale prevented Silver from covering overhead and creating the necessary operational density to optimize revenues and operational reliability.

iii.     Inefficiencies in crew planning and logistics increased costs and undermined reliability.

iv.     Silver's commercial plan suffered from constantly being in flux. When Silver failed to receive planned aircraft, last-minute schedule changes and customer disruptions occurred. The lack of market frequencies caused operational unreliability (one flight a day versus many) and the loss of consumer and employee confidence in operations.

v.      The increased need for spare aircraft to cover for parts procurement shortages and maintenance check delays further reduced the opportunity for revenue producing flying.

vi.      Frustration from our employees caused higher attrition and increased recruitment and training costs with the loss of "know how."

6.      <u>Capital Raising Constraints</u>. Losses and unreliable operations attributable to the foregoing have complicated Silver's ability to attract additional capital on reasonable terms and/or strategic partners.

7.      <u>Other Liquidity Challenges.</u>

i.      Menzies's ground handling negligence caused damage to one of Silver's ATR72 aircraft, rendering it unflyable for approximately six months. On November 25, 2024, Silver filed suit against Menzies Aviation in the Circuit Court of Broward County, Florida arising out of Menzies's negligent failure to secure a baggage cart while servicing flights for another airline. The bag cart was blown across the tarmac at FLL and seriously damaged a leased Silver ATR-72-600 aircraft rendering it unusable. The repair costs exceeded $900,000 and the claim for lost revenues in litigation exceeds $1.7 million.

ii.      NAC Bankruptcy Settlement and Other Lessor Issues- As an inducement for Silver to enter a series of transactions relating to NAC's bankruptcy proceedings, NAC agreed to reduce engine maintenance reserves on all the aircraft delivered to Silver by NAC. NAC and its transferees have to date failed to honor these obligations resulting in over-payments by Silver of approximately $1.375 million. In addition, as of the Petition Date, Silver has

outstanding aircraft reserve reimbursement claims with NAC and Azorra of $294,478.00 and $842,055.33, respectively. Silver has other potential claims with NAC's non-performance and commercial interference as noted above

8.    **Despite the many challenges Silver has faced in the recent past, Silver is experiencing significant operational, financial, and commercial improvements.**

i.    Silver and Seaborne are in the midst of a strong operational, financial, and commercial turnaround. The Debtors and their management teams have engaged in on-going initiatives to increase revenues, reduce costs, and enhance liquidity to remain competitive and create investable airlines attractive for capital and other investments. Recent results in commercial and operational improvements demonstrate success in these areas. Customers are coming back to Silver and new customers are giving Silver a try, our customer service is superior and with increased reliability, we are a more attractive choice for consumers.

ii.    Safety and Regulatory Compliance – The safety of our customers, Team Members, and the communities we serve is our most important objective and is paramount. Debtors and their boards ensure SAFETY FIRST with zero tolerance for actions compromising safety or regulatory compliance. The Debtors are continuously seeking to implement best industry practices and to improve safety procedures and awareness including by working in concert with our employee groups and regulators.

iii.    A revised business plan that increases revenues and reduces costs is underway.

a.    Silver is committed to an aggressive overhead reduction plan by shedding fixed costs and continuing to lower the cost of providing airline

services. An integral part of the overhead reduction will be evaluating the size of the existing operating fleet to determine whether to reject, assign, or sublease certain aircraft under lease (and other material vendor contracts). Silver has recently restructured its operational and commercial operations. The "Back to our Routes" initiative re-focuses Silver on favorable (higher performing) markets within: (a) Florida to the Bahamas, (b) higher yielding intra-Florida flying, and (c) Caribbean flying with San Juan as the focal point. Silver has cut and will continue to evaluate unprofitable routes and/or airports with unfavorable cost structures. Silver has added frequencies in better performing markets. Silver will continue to refine its network and geographic footprint to enhance reliability, simplify operations, increase employee productivity, and reduce facilities costs. Silver will also pursue charter flying at both Silver and Seaborne and may again seek opportunities in the Essential Air Service program of the United States Department of Transportation with the two carriers.

b.      As a result of capacity reductions by Silver and others in the regions where Silver flies, recent revenue trends are positive with markedly higher load factors and higher total revenue. Through the first three quarters of 2024, sales lagged in year-over-year comparators, but started mid-October, and in November and December recorded sales surged with year-over-year comparisons, which were better by 20-40%. Early bookings for 2025 appear similarly favorable with bookings up 30% (See Attachment B).

c.      <u>Continuing Operational Improvement</u> – By focusing on people

SGR/72268638.1

(customers and Team Members) and processes, Silver is completing a higher percentage of flights and derivatively higher on-time performance, resulting in more revenue with a reduction in expenses relating to irregular operations and overtime. Attrition numbers are down dramatically resulting in lower recruiting and training costs and inefficiencies from "learning curve" turnover. Baggage delivery and customer complaint metrics are improving steadily. The foregoing and other factors have resulted in higher "Net Promoter Scores" – a measure of customer satisfaction (See Attachment C).

d.      Collaborating with Existing Partners- Silver has unique commercial relationships and capabilities for a regional carrier of its size. Silver will seek to leverage these relationships for revenue enhancement and cost reduction opportunities. jetBlue began selling Silver standalone flights using the jetBlue code in mid-October, in addition to the historical connections between Silver flights and jetBlue flights showing an estimated increase of $4.8 million per annum because of this relationship (See Attachment D). Further, United will be increasing the number of flights at FLL from 20 to 35 in 2025 and United has also begun to fly larger aircraft (including widebody aircraft) into that market. jetBlue has noted its commitment to FLL and SJU, Silver's two most important gateways. These factors allow for significantly greater connecting opportunities and higher revenues.

e.      Results of Improvements- As a result of the foregoing initiatives,

SGR/72268638.1

costs are trending downward, revenues are improving, and liquidity expectations are increasing. Operating costs per departure are down 10% from 2023 to 2024 despite an inflationary environment including a material reduction in overhead expenses. Fuel is down 12% in 2024 versus 2023. In the fourth quarter of 2024, Silver improved forecasted cash by over $18 million. A sizable portion was expense containment ($7.3 million) and increased revenues ($3.5 million) (See Attachment E.)

iv.        Industry Outlook and Florida Capacity Changes – In key Silver markets industry capacity was up through much of 2024, but in the fourth quarter of 2024, despite an uptick in leisure travel, airlines reduced capacity by 3% in comparing Q4 2024 to Q4 2023. As a result, jetBlue and Southwest Airlines have both stated publicly that they are raising guidance on revenue expectations. Southwest has reduced its footprint in FLL by 35% and Spirit has already implemented capacity cuts of 15%.

v.        External Investment, Financing and Potential Mergers/Acquisitions. The Debtors are actively engaged in seeking additional investment and are in current negotiations with third parties regarding debtor-in-possession financing, transactions under Section 363 of the Bankruptcy Code and potential mergers.

**History of Silver and Seaborne**

9.        Silver traces its roots back to Gulfstream International Airlines, a regional airline based in South Florida which began operations in 1990 flying nineteen and thirty seat turboprops within Florida and from Florida to the Bahamas. Gulfstream filed for bankruptcy protection in November 2010. In May 2011, Victory Park Capital, a Chicago- based private equity firm, acquired the assets of Gulfstream International and shortly thereafter launched Silver Airways on

12

December 15, 2011. The airline then began to re-fleet with 34-seat Saab 340 aircraft. In September 2016, funds managed by Versa Capital Management LLC, a Philadelphia-based private equity firm, acquired a controlling interest in Silver including the Victory Park debt obligations.

10.     On August 1, 2017, Silver announced that it had entered into the tri-partite agreement referenced above with ATR and NAC providing for the leasing by NAC to Silver of twenty ATR42-600 aircraft to Silver (with substitution rights to the larger ATR72-600) and fifty option aircraft. The agreement included a comprehensive product support package including ATR-supplied training and manuals, product warranties, and commitments regarding spare parts provisioning and sub-contractor interface (the "ATR Support Package"). As the newly appointed chief executive officer, my responsibilities included introducing the entry-into-service of the ATR fleet and managing this important relationship.

11.     On April 20, 2018, Silver completed the acquisition in a bankruptcy proceeding of a substantial portion of the assets (including the Seaborne name and marks) of Seaborne Virgin Islands, Inc., an independent regional airline based in San Juan, Puerto Rico that operated scheduled service with Saab 340 aircraft and operated a seaplane operation in the United States Virgin Islands with DeHavilland Twin Otter aircraft. The prior Seaborne entity had filed bankruptcy on January 8, 2018, in Delaware. The transaction was facilitated by the acquisition by Versa of certain Seaborne assets.

12.     Silver is a limited liability company organized under the laws of Delaware. Silver is the successor-by-conversion (contemporaneous with the 2017 acquisition by Versa funds) of Silver Airways Corp., a Delaware corporation formed in 2011 by Victory Park Capital, to purchase the Gulfstream assets from the bankruptcy estate of Gulfstream International Airlines. Silver's sole member is Argent Financing, LLC, which is owned by Argent Holdings (2016), LLC. All these

13

entities are controlled by funds managed by Versa Capital Management ("Versa"), Silver's current equity sponsor.

13.     Silver and Seaborne each operate under Part 121 of the Federal Aviation Regulations, the highest standard for commercial airlines with the most stringent requirements for safety, aircraft maintenance, pilot qualifications and training, required equipment, and managerial and regulatory oversight. In addition to regulatory oversight and audits by the FAA and other government agencies such as the TSA, Customs and Border Patrol, OSHA, and the Department of Agriculture, Silver is regularly audited by ICAO (the International Civil Aviation Organization, a division of the United Nations), IOSA (the IATA Operational Safety Audit created by IATA, the International Air Transport Association), and by the United States Department of Defense.

## Business Operations

14.     The senior leadership for Silver and Seaborne (the chief executive officer and the senior executives managing finance, operations, and commercial functions) and Silver's airline operating certificate ("AOC") are located at Silver's headquarters at 2850 Greene Street, Hollywood, Florida 33020 near the Fort Lauderdale-Hollywood International Airport ("FLL"). Seaborne's airline operating certificate is held at the Tirri Building, 150 Carr. Sector Central, Carolina, Puerto Rico 00979 near the San Juan International Airport.

15.     Silver currently has gateways with significant operations and crew bases in Fort Lauderdale, Florida ("FLL"), San Juan, Puerto Rico ("SJU"), Tampa, Florida ("TPA"), and Orlando, Florida ("MCO"). Seaborne's sole crew base and hangar is in St. Croix, USVI ("SSB").

16.     Silver has recently re-designed its flight schedules to enhance profitability and operational simplicity such that substantially all of Silver's operations are concentrated in two networks: the Florida-Bahamas network, which consists of flights within Florida and from Florida

14

to the Bahamas; and the Caribbean network, with its nexus at SJU offering flights to the United States Virgin Islands and other near-international destinations in the Caribbean.

17.     Seaborne's principal business is operating scheduled airline service and charters with two 15-seat seaplane aircraft operating under an exclusive license through 2028 issued by the Government of the United States Virgin Islands. Seaborne has exclusive use of seaports in downtown St. Thomas and downtown St. Croix.



15

SGR/72268638.1

18.     As of the Petition Date, Silver has 646 employees and Seaborne has fifty-three employees with employees spread throughout Florida, Puerto Rico, the U.S. Virgin Islands, the Bahamas, and the British Virgin Islands. There are also a small number of employees that work in remote locations. Silver is a party to collective bargaining agreements with two unions recognized under the Railway Labor Act: The International Brotherhood of Teamsters represents Silver's pilots; and the Silver flight attendants are represented by the Association of Flight Attendants-CWA, AFL-CIO. The labor-management relationship at Silver- with both union and non-union employees- is in my experience one of the best I have seen in my airline career. The relationships are uniquely cooperative, professional, and cordial. For example, during my tenure at Silver, no union grievances proceeded to a System Board arbitration process.

19.     Seaborne has no unions.

**The Debtors' Fleet**

20.     Silver's fleet consists of fourteen ATR-600 series aircraft: (i) eight 46-seat ATR42-600s (the "ATR-42s"; and six 70-seat ATR72-600 (the "ATR-72s").

21.     Seaborne's fleet consists of two 15-seat DeHavilland DH6 Twin Otter Seaplanes (the "Seaplanes").

22.     Of the twenty aircraft originally contracted with NAC for Silver, only ten were delivered. Ten of the original order for twenty aircraft were cancelled when NAC reorganized in bankruptcy and ATR did not lease the additional aircraft to Silver or arrange for a substitute lessor. Six of the airplanes originally delivered by NAC were sold to Azorra Aviation of Ft. Lauderdale,

16

Florida ("Azorra") and one lease was terminated by the parties, leaving three NAC aircraft in the Silver fleet. In addition to the three ATR-42s owned by NAC, Silver currently leases three ATR-42s and three ATR-72s from Azorra; two ATR-42s and one ATR-72 from TrueNoord of the Netherlands ("TrueNoord"); and two ATR-72s from Jetstream Aviation Capital of Miami, Florida ("Jetstream"). The loss of ten planned identically equipped factory-delivered aircraft from NAC – materially adversely impacted Silver's growth and recovery. Certain of those aircraft would have been delivered to Silver had NAC not  directed ATR to deliver Silver- designated aircraft to other NAC customers.

23.    Seaborne leases two Seaplanes from Kenn Borek Air Ltd. of Calgary, Alberta, Canada.

**Interline, Code Share, and Loyalty Agreements**

24.    Silver has a substantial number of interline agreements with domestic and international airlines. These commercial arrangements relate to ticketing and baggage-handling and facilitate flight connections. Silver's interline partners include the leading airlines of the world: United Airlines, jetBlue Airways, American Airlines, Delta Air Lines, Alaska Airlines, Air Canada, Azul, Copa, Avianca, All Nippon Airways, Emirates, and Cape Air. Silver has more comprehensive code sharing agreements with United, jetBlue, Azul, Avianca, and Copa. Loyalty agreements, which allow for earning and/or redemption by frequent flyers are in place with United and jetBlue with negotiations nearly completed on a loyalty agreement with Air Canada's loyalty company. Silver's two largest airline commercial partners are United Airlines and jetBlue Airways, each of which interlines, code shares and/or offers loyalty benefits (United Mileage Plus, jetBlue TrueBlue) on substantially all of Silver's routes with travelers being able to book Silver flights on their respective websites. Ticket sales by Silver's commercial partners account for over

17

35% of Silver's revenue. Attachment "A" to this Declaration illustrates these commercial relationships.

**Brigade Debt**

25.     The Debtors are borrowers under a Convertible Note Purchase Agreement (the "CNPA") with Brigade Capital Management ("Brigade"), as agent. Brigade also holds substantial warrants to acquire equity interests in Silver. The CNPA initially provided funding of $50,000.000. As of December 27, 2024, the outstanding principal and interest obligations under the CNPA were not less than $186,793,159.00 - resulting from both loans by Brigade to Silver and the subsequent effect of payment-in-kind interest obligations which increases the principal amount of a loan if cash interest is unpaid.

26.     Under the CNPA, Brigade, as agent for the lenders, asserts liens on and security interests in substantially all of the Debtors' assets, including cash (the "Cash Collateral"). Since the execution of the CNPA, there have been thirty-one amendments, primarily to increase the amount available to Debtors. The most recent amendment dated October 4, 2024, provided additional funding of $1.7 million. No additional funding has been provided by Brigade since that date.

**Versa-related Secured Debt**

27.     The Companies are borrowers under Credit Agreements with Argent Funding, LLC and Volant SVI Funding, LLC as agents. As of December 27, 2024, the outstanding principal and interest obligations under the Credit Agreements were not less than $211 million. Under the Credit Agreements, Argent, and Volant, as agents for the lenders, assert second priority liens on and security interests in substantially all of Silver's and Seaborne's assets.

SGR/72268638.1

**Unsecured Debt**

28.     As of the Petition Date, the Debtors estimate general unsecured debt of approximately $60.2 million, comprising trade debt, airline lease and maintenance obligations, and governmental or regulatory obligations relating to, among other things, passenger-facility charges, airport-landing fees, customs fees for the inspection of baggage and cargo, Transportation Security Administration security fees, and immigration and health inspection fees.

**Board of Managers/ Board of Directors/ Management**

29.     As of the Petition Date, Silver's board of managers consisted of five members - two from Brigade; two from Versa, and Silver's CEO. Seaborne's board of directors are currently the chief investment officer of Versa and the CEO of Silver. A special director appointed by Brigade under the CNPA acts only in specified circumstances, including the authorization of these proceedings. On January 1, 2025, the Brigade directors resigned from the board as managers of Silver.

30.     The senior leadership of the Debtors have substantial experience with domestic and international passenger and cargo airlines at large and small airlines and the executives are well suited to lead Debtors' restructuring activities. In addition to my experience noted above, the senior executives of the Debtors have had decades of varied managerial and leadership positions including at United Airlines, Delta Airlines, British Airways, Atlantic Coast Airlines, Amtrak, and DHL Airways.

31.     Each airline maintains its own set of operational leaders (the "119s") specified under Part 119 of the Federal Aviation Regulations, whose positions are mandatory for the airlines to maintain their Part 121 Carrier status and conduct commercial operations. The 119s are subject

SGR/72268638.1

matter experts in airline operations and safety and are accountable to the designated Accountable Executive at each of Silver and Seaborne. I am currently the Accountable Executive at Silver and Seaborne.

## Chapter 11 Proceedings

32.     Following a rigorous evaluation of all available options, the board of managers of Silver, and the board of directors of Seaborne (with the unanimous consent of senior lenders) unanimously determined that filing for Chapter 11 protection was the best course of action for both airlines. Brigade and Versa have consented to the use of cash collateral to allow Debtors to operate in the short-term and the parties are finalizing negotiations for debtor-in-possession financing to allow operations to continue throughout the Chapter 11 process. The Companies believe the Chapter 11 process will be inconsequential for its passengers; seamless for its trading partners and vendors; result in minimal disruption to its operations; allow the Debtors to strengthen their financial structure; and position them for significant future growth. As noted above, Debtors have been in active negotiations with third parties to dispose of some of the assets of the Debtors to increase liquidity and shed costs.

## SUMMARY OF FIRST DAY MOTIONS

## Cash Collateral

33.     The Debtors are borrowers under a Convertible Note Purchase Agreement (the "CNPA") with Brigade, as agent. The CNPA initially provided funding of $50,000,000.00. As of December 27, 2024, the outstanding principal and interest obligations under the CNPA were not less than $186,793,158.00 - resulting from the principal owed under the loans by Brigade to Silver and the subsequent effect of payment-in-kind interest obligations which increases the principal

20

amount of a loan if cash interest is unpaid. Since the execution of the CNPA, there have been thirty-one amendments, primarily to increase the amount available to Debtors.  Under the CNPA, Brigade, as agent for the lenders, asserts liens on and security interests in substantially all of the Debtors' assets, including cash (the "Brigade Cash Collateral").

34.     The Debtors are also borrowers under certain Loan Agreements with Argent.  As of December 27, 2024, the outstanding principal and interest obligations under the Loan Agreements were not less than $211,844,643.79.  Argent and Brigade are parties to certain Intercreditor and Subordination Agreements (the "Intercreditor Agreement") pursuant to which, among other things, Argent subordinated its security interests in the Debtors' assets to Brigade's security interests.  Under the Loan  Agreements,  Argent asserts a properly perfected and duly enforceable security interest in and liens on all of the Collateral, including cash collateral, which liens have priority over all other security interests and liens except for those of Brigade as set forth in the Intercreditor Agreement (the "Argent Cash Collateral" together with the Brigade Cash Collateral, the "Cash Collateral").

35.     The Debtors propose to use Cash Collateral in accordance with the Budget to preserve and maximize the value of the Debtors' business operations.  Because the Debtors are operating  businesses which have daily cash needs, use  of Cash Collateral is reasonable and necessary to continue  operations.  The  Debtors request approval to use Cash Collateral for an initial two-week period to allow the Debtors to obtain and finalize debtor in possession financing.

36.     The Debtors propose to use Cash Collateral in accordance with the Budget. The Debtors seek to use Cash Collateral for the initial two-week period until debtor in possession financing can be obtained. The Debtors intend to use Cash Collateral to pay operating expenses of their businesses, which primarily include, payroll, fuel, insurance, aircraft maintenance

expenses, and airport leases.

37.    As security for the payment of all Brigade Secured Debt, the Debtors granted to Brigade security interests in and liens (collectively, the "Brigade Pre-Petition Liens") upon all assets of the Debtors, including, without limitation, all of Debtors' accounts, deposits, and any proceeds of the aforementioned collateral (all such personal property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, the "Pre-Petition Collateral"). As described, Argent also asserts security interests in the Pre-Petition Collateral and executed with Brigade, Intercreditor and Subordination Agreements, subordinating all obligations owed to Argent to the obligations owed by Silver to Brigade.

38.    As of the Petition Date, Brigade's pre-petition collateral included the following assets owned by the Debtors:

| | | |
|---|---|---|
| Cash and Cash Equivalents - Silver: | $ | 530,050 |
| Accounts Receivable - Silver: | $ | 27,311,654 |
| Cash and Cash Equivalents - Seaborne: | $ | 88,274 |
| Accounts Receivable - Seaborne: | $ | 586,917 |

39.    Almost all of the Debtors' accounts receivable consist of passenger receipts which are paid pursuant to agreements with the Debtors' credit card processors.  The credit card processors have reserves approximately equal to the amount of the accounts receivable to guard against any chargebacks by customers which may occur and releases funds to the Debtors after a passenger completes a flight.

40.    Any cash or cash equivalents, funds or proceeds of or derived from certain of the collateral securing the obligations of the Debtors to the Secured Lenders constitute cash collateral

SGR/72268638.1

within the meaning of Section 363 of the Bankruptcy Code. The Cash Collateral includes, without limitation, the Debtors' cash or cash equivalents maintained in the Debtors' bank accounts and proceeds received by the Debtors from the passengers on its aircraft.

41.     The *Debtors' Emergency Motion for Order Authorizing the Debtors to Use Cash Collateral and Provide Adequate Protection* [Doc. No. 24] has been served on any party Silver is aware that asserts a lien.[2]

42.     In connection with the Debtors' proposed use of Cash Collateral hereunder and in order to provide the Secured Lenders with adequate protection for the aggregate diminution of the Cash Collateral resulting from the Debtors' use thereof, the Debtors propose, subject to approval of this Court, that the Secured Lenders, shall have, effective as of the commencement of this Chapter 11 case, a replacement lien pursuant to 11 U.S.C. §§361(2), 363(e), and 506 on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtors securing the prepetition obligations to Secured Lenders under their respective Loan Documents.

43.     The Debtors propose to use the Cash Collateral strictly in accordance with the terms of the Budget prepared by the Debtors, attached as **Exhibit A** to the motion. The Budget covers a 14-day period from the Petition Date through January 14, 2025. The Debtors also request that they be authorized: to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed the total Budget.

44.     The replacement liens granted to the Secured Lenders hereunder in connection with the use of the Cash Collateral shall be valid and perfected without the need for the execution or

---

[2] Although the Debtors believe that no other lender has an interest in the Cash Collateral, to the extent any other lender is deemed secured, Debtors propose to provide a replacement lien to the same extent, validity, and priority as such pre-petition lien of lender.

SGR/72268638.1

filing of any further documents or instruments.

**Cash Management Systems**

45.     In the ordinary course of business, the Debtors maintain an integrated, centralized cash-management system (the "Cash Management System") as more fully described on composite **Exhibit 1** to the proposed Order on the *Debtors' Motion for Order (i) Authorizing Maintenance of Cash Management Systems, Including the Continued Use of Existing Bank Accounts and Prepaid Commercial Card Account, (ii) Authorizing Continued Use of Business Forms, (iii) Authorizing Intercompany Transactions and Affording Administrative Expense Status to Intercompany Claims, and (iv) Granting Related Relief* [Doc. No. 15] (the "Cash Management Motion").  The Cash Management System is comparable to other centralized cash management systems used to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' Controller maintains daily oversight over the Cash Management System and utilizes cash-management controls for entering, processing, and releasing funds, and regularly reconciles the Debtors' books and records to ensure that all transfers are properly accounted for.

    A.  **Bank Accounts**

46.     The Debtors maintain bank accounts (collectively, the "Accounts") with five banking institutions (the "Banks") as more fully described on **Exhibit 2** to the proposed Order on the Cash Management Motion. The Banks are: Truist Bank ("Truist"); CIBC Caribbean Bank (Bahamas) Limited ("CIBC"); FirstBank Puerto Rico ("1 First Bank"); Fidelity Bank ("Fidelity"); and U.S. Bank National Association ("U.S. Bank").  The Debtors utilize the Accounts in the

SGR/72268638.1

ordinary and usual course of their businesses. Under the circumstances, maintenance of the Accounts with minimal disruption is essential to the successful reorganization of the Debtors and is also in the best interests of all parties in interest. The Debtors will continue to maintain strict records with respect to all transfers of cash so that they may readily account for all transfers. The Accounts, with the exception of CIBC, are insured by the Federal Deposit Insurance Corporation (the "FDIC"). Accordingly, the Debtors submit that the Accounts comply with section 345(a) of the Bankruptcy Code and that the Banks are not required to post a bond or a security deposit under section 345(b) of the Bankruptcy Code.

### B. Commercial Card Account

47.     The Debtors also have an entirely prepaid commercial MasterCard account (the "Prepaid Commercial Card Account") issued by Corpay, Inc. ("Corpay") and backed by the treasury services of Regions Bank ("Regions"). The Prepaid Commercial Card Account is accessed by both physical and virtual cards and is, among other things, integrated into the third-party hotel-booking system vital to paying for lodging for crew members and operational staff while traveling. The Prepaid Commercial Card Account is also used to purchase essential aircraft parts necessary to ensure maximum operational capabilities. The amount in prepayment on the Prepaid Commercial Card Account is generally less than $200,000. The Prepaid Commercial Card Account is critical to the day-to-day operations of the Debtors. The Debtors seek authorization to continue to deposit funds into the Prepaid Commercial Card Account in accordance with existing practices, notwithstanding the requirements of section 345(b) of the Bankruptcy Code.

### C. Bank Fees and Obligations

48.     The Debtors incur periodic service charges and other fees in connection with the

SGR/72268638.1

maintenance of the Cash Management System (the "Bank Fees"). Monthly Bank Fees total approximately $6,000 for Silver and $2,000 for Seaborne. The Banks automatically draw these fees. The Debtors seek permission to pay these Bank Fees and continue paying the Bank Fees in the ordinary course in accordance with past practices on a post-petition basis. The Debtors also have certain obligations under the documents governing the Accounts (collectively, the "Bank Account Agreements"), including to reimburse any Bank for any checks deposited with such Bank that have been dishonored or returned for insufficient funds, and any reimbursement or other obligations, such as overdrafts arising under the Bank Account Agreements (collectively, the "Bank Account Claims"). The Debtors believe that as of the Petition Date they have no outstanding Bank Account Claims. Nonetheless, the Debtors seek authority for the Banks to charge the Debtors and deduct from the appropriate Accounts any Bank Account Claims that are incurred in the ordinary course of business, whether such items are dated prior to, on, or after the Petition Date.

### Business Forms

49.     The Debtors, in the ordinary course of their businesses, use a multitude of checks and other business forms including purchase orders and invoices (collectively, the "Business Forms"). By virtue of the nature and scope of the business in which the Debtors are engaged, and the numerous parties with whom the Debtors deal, it is imperative that the Debtors be permitted to continue to use the Business Forms without alteration or change.

### Intercompany Claims

50.     The Debtors direct funds to each Debtor in accordance with existing needs (the "Intercompany Transactions"). From time-to-time, this may have the effect of rendering one Debtor a net lender and the other a net borrower, creating intercompany claims (the "Intercompany

26

Claims").

51.     To ensure each Debtor will not fund, at the expense of its creditors, obligations of another Debtor, the Debtors propose that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims arising on or after the Petition Date as a result of Intercompany Transactions through the Cash Management System be accorded administrative expense status. As a result, each entity utilizing funds in the system will continue to bear its own obligations with respect to the underlying transactions.

52.     The Intercompany Transactions are an essential component of the Debtors' operations.  Any interruption of the Intercompany Transactions would severely disrupt these operations and result in harm to the Debtors' estates and their stakeholders.  The Intercompany Transactions are comparable to those of other companies with similarly complex corporate structures and operate in a fashion typical of such other companies.  Accordingly, the Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business on a post-petition basis, in a manner substantially consistent with past practice.

## **Employee Obligations**

53.     As of the Petition Date, the Employees were owed, or had accrued in their favor within one hundred eighty (180) days of the Petition Date, various sums due from the Debtors for wages, salaries, expenses, bonuses, deductions, insurance premiums, HSA contributions, union dues, employee-expense reimbursements, payroll taxes, and 401(k) contributions by reason of, among other things, the following:

        a.     The chapter 11 petition was filed in the middle of three of the Debtors' four separate payroll cycles for hourly and salaried Employees and during the Debtors' normal reimbursement cycle for Employees' expenses;

SGR/72268638.1

and

      b.     Certain other forms of compensation, including, among other things, sick pay, vacation pay, and bonuses related to prepetition services have not yet been paid to, or for the benefit of, the Employees because such benefits, while accrued either in whole or in part prior to the Petition Date, were not payable at such time but will become payable in the ordinary course of business in the immediate future.

(these obligations are collectively referred to as the "Employee Prepetition Compensation").

54.     The Debtors pay the Employee Prepetition Compensation to: (i) non-union employees in arrears every other Friday, with Silver and Seaborne pay-dates on alternating weeks, resulting in a non-union payroll every week; and (ii) union employees a half-month in arrears semi-monthly, on the 15th and 30th. As of the Petition Date, the Silver non-union Employees are owed 11 days of prepetition wages; Seaborne Employees are owed 2 days of prepetition wages; and union Employees (Silver pilots and flight attendants) are owed 15 days of prepetition wages. A summary of Employee Prepetition Compensation is attached **Exhibit B** to the *Motion for Order Authorizing Debtors to (i) Pay Certain Prepetition Wages, Salaries, Union Dues, Payroll Taxes, Reimbursable Expenses, and Workers Compensation Insurance Premiums and (ii) Continue Employee Benefits Programs* [Doc. No. 17]. No non-union Employee is owed more than $15,150.00 in prepetition wages. Except for those Silver Employees identified on **Exhibit C** to the Motion (the "Pilots"), no union Employee is owed in excess of $15,150.00 in prepetition wages.

55.     The Debtors offer Employees health insurance products through Cigna, United Health Care, Medical Card System, and Atlantic Medical; dental insurance through Cigna, United Health Care, Atlantic Medical, and Delta Dental; and vision insurance through Cigna, United

SGR/72268638.1

Health Care, Atlantic Medical, and Medical Card System (the "<u>Benefit Providers</u>"). These benefits are administered by the Benefit Provider.   The Debtors deduct certain amounts through payroll deductions (the "<u>Voluntary Benefit Contributions</u>") from electing Employees for health savings account and 401(k) plan contributions; health, vision, and dental insurance premiums; supplemental life insurance premiums; accidental death and dismemberment insurance premiums; short- and long-term disability insurance premiums; critical-illness insurance premiums; accident insurance premiums; emergency-air ambulance insurance premiums; hospital indemnity insurance premiums; and cancer insurance premiums. The Debtors are required to pay the gross amount of the monthly insurance premiums regardless of the amount contributed by the Employees (the "<u>Health Insurance Obligations</u>").

56.    Additionally, the Debtors are legally required to provide workers' compensation insurance for its Employees and pay premiums on the same (together with the Health Insurance Obligations, the "<u>Insurance Obligations</u>"). Silver's Employees in the state of Florida are covered under a policy issued by Starr Specialty Insurance Company. The annual premium for this policy is $374,252.78 for a term running from December 15, 2024 through December 15, 2025. An initial installment of $93,556.60 is currently due and scheduled to be paid on January 6, 2025. A second installment of $31,187.42 is scheduled to be paid January 15, 2025. Installments of $31,187.42 follow monthly beginning in February 2025 and continuing through September 2025. Debtors' Employees in Puerto Rico are covered under a policy issued by territory's Corporacion Del Fondo Del Seguro Estado. The annual premium for Silver covering calendar year 2025 is $106,756.82 and is due January 22, 2025. The annual premium for Seaborne covering the same period is $2,325.00 and is likewise due January 22, 2025. Employees in the U.S. Virgin Islands are covered under a policy issued by the territory's Department of Finance Government Insurance Funds. The

annual premium for Silver covering calendar year 2025 is $8,858.38 and is not due until March 31, 2025. The annual premium for Seaborne covering the same period is $17,321.03 and is likewise due on March 31, 2025.

57.    The Debtors are requesting authority to continue withholding the Voluntary Benefit Contributions and to remit said amounts, along with the Insurance Obligations, and any necessary costs to the appropriate carrier in the ordinary course of business.

58.    If the relief requested herein is not granted, the Employees will suffer great hardship and, in many instances, financial difficulties, because those monies are needed to enable them to meet their own personal obligations. If the payments are not made, the Debtors believe a number of the Employees will seek other employment and the Debtors will suffer immediate and irreparable harm.  Unless the relief requested is granted, the Debtors may be deprived of the opportunity to reorganize. It is in the best interests of the Debtors and their creditors that the Court authorize the payments described herein to avoid hardship to the Employees and also to maintain and preserve the viability of the Debtors' ongoing business.

## Interline and Code Share Agreements

59.    In the ordinary course of business, the Debtors are party to and operate under bilateral interline agreements (collectively, the "Interline Agreements") with the airlines identified as such on Exhibit A to the *Motion for Entry of an Order (i) Authorizing Debtors to Honor Interline Agreements, Clearinghouse Agreements, and Code Share Agreements and Prepetition Obligations Related Thereto, (ii) Modifying the Automatic Stay Solely to the Extent Necessary to Effectuate the Intended Relief, and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Doc. No. 27] (collectively, the "Interline Airlines") and bilateral code share agreements (collectively, the "Code Share Agreements")  with the airlines identified as such on

Exhibit A to the motion  (the "Code Share Airlines").  Although similar, the Interline Agreements and Code Share Agreements  provide the Debtors' customers  (and customers  of the other participating airlines) with different services.  Most major airlines participate in interline and code share agreements  with other  airlines because of the tremendous  operating  efficiencies and consumer benefits obtained through their use.  Approximately 30% of the Debtor's total revenues is derived from the relationships with the Interline Airlines and Code Share Airlines.

### A. **Interline Agreements**.

60.     As a general matter, under bilateral interline agreements, two airlines contract for a reciprocal interline relationship.  The Debtors' Interline Agreements are consistent with this general approach.  Specifically, the Debtors' relationship with the Interline Airlines under the Interline Agreements relates to ticketing, baggage-handling, and other services.

61.     With regard to ticketing, the Interline Agreements authorize the Interline Airlines and the Debtors to issue tickets for transportation on each other's respective airline. This enables the Debtors, the Interline Airlines, and travel agents to issue single tickets that can be used for travel on more than one airline.  If the Interline Agreements were not in place, a traveler buying a ticket directly from an Interline Airline would be issued a ticket only for those segments of the itinerary that involve that airline, even though the desired itinerary might necessitate the use of a second  airline, in this instance the Debtors'  airlines.  Similarly, if the traveler sought to buy a ticket from a travel agent and no Interline Agreement were in place, the travel agent would be required to  write  separate  tickets for  each  segment that  involves  distinct airlines, making it significantly less convenient for the travel agent to sell flights on the Debtors'  airlines.[3]

62.     As for baggage and handling, the Interline Agreements allow passengers' luggage

---

[3] The Interline  Agreements  also allow Interline Airline passengers whose flights are late or canceled to use their tickets with another airline for a substitute flight.

SGR/72268638.1

to be seamlessly transferred from the Debtors' airlines to an Interline Airline. For example, absent an interline agreement, a passenger of the Debtors connecting to a flight on an Interline Airline at Broward County Airport in Ft. Lauderdale, Florida would first have to retrieve his or her checked luggage from the Debtors, then take it to the Interline Airline terminal, and re-check it there. The Interline Airlines also agree to provide the Debtors (and vice versa) with ground handling and special maintenance services through the Interline Agreements. These arrangements pursuant to the Interline Agreements obviate the need to have separate personnel and facilities devoted to these services at each airport to which the Debtors fly.

63.    The Debtors **request** to be authorized, but not directed, to honor the Prepetition Obligations arising under the Interline Agreements and to continue to perform and exercise their rights and obligations under the Interline Agreements in the ordinary course of business. The Debtors also request approval under Bankruptcy Code section 363(b) to renew and continue Interline Agreements, and to cure defaults thereunder, including permitting interline creditors to complete mutual pre- and postpetition recoupments and offsets.

**B. Code Share Agreements**

64.    Bilateral code share agreements allow the participating airlines to designate certain flight routes serviced by one airline as its own flight for marketing and publishing purposes. For example, under the Debtors' Code Share Agreements, the participating Code Share Airline can market and publish the Debtors' flight route from Puerto Rico to St. Thomas as such airline's own flight.[4] To facilitate this code sharing, the Debtors agreed to provide the Code Share Airlines with automated computerized access to the Debtors' seat inventory system. Under the Code Share Agreements, both the Debtors and Code Share Airlines are authorized to issue tickets for

---

[4] The Debtors' unique flight code is used for actual flight operation purposes *(e.g.,* air traffic control).

designated code sharing flight routes.

65.    Each Code Share Agreement calculates differently the financial benefit that flows to the Debtors in exchange for the right to code share.  The Debtors have unique and established special pro-rate agreements ("SPAs") with all partner Code Share Airlines that determine the pro-ration of revenue between the carriers on a code share itinerary.  Values under the SPAs are determined based on both the route in which the passenger is carried and the class of service that the ticket is sold, less the code share commission as defined by each Code Share Agreement. Regardless of how the Code Share Agreements calculate the Debtors' financial benefit, however, financial settlement for the code share relationship takes place through the ACH or ICH (defined below).

66.    The Debtors request to be authorized, but not directed, to honor the Prepetition Obligations arising under the Code Share Agreements and to continue to perform and exercise their rights and obligations under the Code Share Agreements in the ordinary course of business. The Debtors also request approval under Bankruptcy Code section 363(b) to renew and continue Code Share Agreements, and to cure defaults thereunder, permitting counterparties to complete mutual prepetition and postpetition offsets with respect to the Code Share Agreements.

### Clearinghouse Agreements[5]

67.    The Debtors, other participating airline carriers (including the Interline and Code Share Airlines), as well as Global Distribution System providers, airports, international government agencies, and airline support vendors, settle their mutual payment obligations through two clearinghouses: the IATA Clearinghouse (the "ICH") and/or the Airlines Clearing House, Inc.

---

[5] Global Distribution Systems ("GDS") are computerized networks that enable transactions between the Debtors' airlines and travel agencies (both traditional and online) by having a real-time link to the Debtors' inventory database. The largest Global Distribution System providers are Sabre, Inc., Amadeus CRS, and Travelport.  The Debtors have service agreements with all three.

SGR/72268638.1

(the "ACH").  In addition, the Debtors settle payment obligations to travel agencies through the Airline Reporting Corporation ("ARC," and together with the ICH and ACH, the "Clearinghouses").  The Clearinghouses are critical to the Debtors' business as they facilitate payments to vendors and other airlines relating to the purchase and sale of tickets on the Debtors' airlines, the lifeblood of the Debtors' business.

### A. ACH and ICH

68.     The ACH conducts settlements primarily for participating airlines, airports, vendors essential to the operation of the airlines (i.e. ground handling), passenger-facility charges, software licenses, and parties related to the airline industry based in the United States and other countries in the Western Hemisphere.  The ICH conducts settlements similar to ACH primarily for airlines, airports, government agencies, and vendors that are based elsewhere.  As participants in the ACH and ICH, the Debtors settle interline and code share obligations with other ACH participants through the ACH and settle interline and code share obligations with ICH participants through the ACH and ICH as part of an interclearance process.  The Debtors also settle their obligations with their GDS, vendor service providers, and airports through the ACH.   The Debtors' participation in the ACH and ICH are governed by separate contractual agreements (together, the "ACH and ICH Agreements").

69.     **Approximately** every week, with published carriers, the ACH, and ICH each aggregate billings from their respective participants to the Debtors and from the Debtors to the other participants and calculate a net balance.  For any given week, based upon the net balance of the billings, the Debtors may be required to make net payments to other participants in the ACH or ICH, or the Debtors may be entitled to receive net payments from other participants. Settlement among ACH and ICH participants for billings attributable to transactions in any given week occurs

34

the following week.  ACH and ICH settlements are based on un-audited (and in some cases estimated) billings. As a result, billings that have been settled through the ACH or ICH remain subject to audit and adjustments under rejection/chargeback, rebilling, and dispute resolution procedures set forth in the applicable rules.

70.    The Debtors **request** to be authorized, but not directed, to honor the Prepetition Obligations arising under the ACH and ICH Agreements and to continue to perform and exercise their rights and obligations under the ACH and ICH Agreements in the ordinary course of business. The Debtors also request approval under Bankruptcy Code section 363(b) to renew and continue the ACH and ICH Agreements, and to cure defaults thereunder, permitting counterparties to complete mutual prepetition and postpetition offsets with respect to the Clearinghouse Agreements.  Prior to the Petition Date, the Debtors estimate a net receivable balance of approximately $334,239.89 to the ACH and ICH, in the aggregate.

## B. <u>ARC</u>

71.    In addition to **the** ACH and ICH, the Debtors also participate in the ARC, which is specific to settling obligations owed to travel agencies (both traditional and online).  For example, if a travel agency sells a ticket for a flight on the Debtors' airlines to a customer, that travel agency is entitled to a commission based on the value of the ticket sold.  Rather than settling directly with the Debtors, the travel agency receives its commission through the ARC before the ARC remits any payment to the Debtors for the value of the ticket sold.  Similar to the ACH and ICH, the Debtors' participation in the ARC is governed by agreement between the Debtors and ARC (the "ARC Agreement" and together with the ACH Agreement and ICH Agreement, the "Clearinghouse Agreements").

72.    The **Debtors** request to be authorized, but not directed, to honor the Prepetition

SGR/72268638.1

Obligations arising under the Clearinghouse Agreements and to continue to perform and exercise their rights and obligations under the Clearinghouse Agreements in the ordinary course of business. The Debtors also request approval under Bankruptcy Code section 363(b) to renew and continue the Clearinghouse Agreements and to cure defaults thereunder, permitting counterparties to complete mutual prepetition and postpetition offsets with respect to the Clearinghouse Agreements.

## <u>CONCLUSION</u>

73.     The foregoing account describes the Debtors' businesses and capital structure, the factors that precipitated the commencement of these Chapter 11 Cases, and the critical need for the Debtors to restructure their financial affairs and operations in chapter 11 which the Debtors will provide the best outcome for all stakeholders.

74.     I declare under penalty of perjury that the foregoing is true and correct.


Executed at Orlando, Florida on January 3, 2025.


*/s/ Steven A. Rossum*
Steven A. Rossum

SGR/72268638.1

**ATTACHMENT A**

| Airline | Interline | Codeshare | Loyalty |
|---|---|---|---|
| B6 - jetBlue Airways | Y | Y | Y |
| UA - United Airlines | Y | Y | Y |
| AC - Air Canada | Y | | Nearly finalized |
| 2K - AeroGal (Avianca Ecuador) | Y | Y | |
| AD – Azul | Y | Y | |
| AV - Avianca Airlines | Y | Y | |
| CM - Copa Airlines | Y | Y | |
| LR - LACSA (Avianca Costa Rica) | Y | Y | |
| TA - TACA (Avianca El Salvador) | Y | Y | |
| 9K - Cape Air | Y | | |
| AA - American Airlines | Y | | |
| AS - Alaska Airlines | Y | | |
| BB - Seaborne Airlines | Y | | |
| DL - Delta Airlines | Y | | |
| EK – Emirates | Y | | |
| NH - All Nippon Airways | Y | | |

SGR/72268638.1

**ATTACHMENT B**



SGR/72268638.1

**ATTACHMENT C**

↑ Year over year performance increase in all key indicators

↑ Redesigned network in March and operational consistency has driven results despite challenges
  - 3rd party damage to N705SV (4 months out of service)
  - 2 hurricanes in October
  - Parts shortage and hot airplanes



Controllable Completion Factor



On Time Performance - Arrivals Within 14 Minutes

Uncontrollable Cancels 20204



2024 YTD* Highlights

**24,236**
Schedule Departures
(+3% vs 2023)

**95.5%**
Completion Factor
(+480 bp vs 2023)

**97.2%**
Controllable CF
(+480 bp vs 2023)

**69.2%**
OTP A-14
(+510 bp vs 2023)

* Through Dec 17, 2024

39

**ATTACHMENT D**

**Increase in jetBlue Locals Driving Estimated $4.8m in Incremental Annual Revenue**



SGR/72268638.1

**ATTACHMENT E**



2024 (Nov YTD) Cost Per Departure % Change

SGR/72268638.1