

ORDERED in the Southern District of Florida on May 19, 2025.



**Peter D. Russin, Judge
United States Bankruptcy Court**
_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                              Chapter 11 Cases

SILVER AIRWAYS LLC, *et al.*,[1]                    Case No. 24-23623-PDR

                                                    (Jointly Administered)

Debtors.
_____/

**ORDER GRANTING MOTION TO APPROVE DEBTOR IN POSSESSION
FINANCING AND MOTION TO APPROVE BIDDING PROCEDURES**

The Bankruptcy Code balances benefits with corresponding burdens. It

permits secured creditors to enforce their liens, but it does not excuse those who

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are SILVER AIRWAYS LLC (6766), and SEABORNE VIRGIN ISLANDS, INC. (1130). The mailing address and principal place of business of Silver is 2850 Greene Street, Hollywood, FL 33020. The mailing address and principal place of business of Seaborne is 2850 Greene Street, Hollywood, FL 33020.

Page **1** of **20**

invoke the Chapter 11 process to dispose of their collateral from bearing the costs necessary to preserve and administer the estate. Administrative expenses—postpetition goods and services, wages, rent, professional fees, and other necessary costs—are not optional. The Bankruptcy Code affords them priority treatment because no reorganization, and no orderly sale, is possible without them.

The motions before the Court seek approval of postpetition financing and sale procedures of the Debtor airlines that risk leaving some administrative expenses unpaid. In most cases, such a proposal would require denial. As the Supreme Court confirmed in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), a bankruptcy court may not authorize distributions that bypass the Code's priority scheme absent the consent of those affected. That rule reflects a foundational principle: administrative creditors are entitled to priority payment, and their claims may not be subordinated or otherwise compromised absent statutory authority or consent. But where such consent is given—openly, on the record, and in the absence of a better alternative—the law permits the process to proceed.

Here, the consequences of denial are not hypothetical. If the motions are not granted, the DIP Lender will not advance additional funds, and the Debtors will be grounded. The result would be an immediate collapse of any effort to sell the enterprises as going concerns. Such an outcome would not just risk loss to administrative creditors—it would guarantee it.

The alternative, though imperfect, offers a different prospect. Proceeding with financing and sale approval creates a reasonable, if uncertain, pathway toward

recovery. That pathway is supported by the estate's largest administrative creditors, who have actively participated in these proceedings, acknowledged the risks, and voiced their informed agreement to proceed. They have chosen potential recovery over certain loss.

The Court does not ignore the Code's structure. It upholds it—by recognizing that the consent of priority creditors transforms what might otherwise be impermissible into a lawful course of action. The Bankruptcy Code does not require that administrative creditors be insulated from all risk. But it does require that any risk to their priority or prospects of payment be imposed only with statutory authority or their informed consent.

On this record, the Court finds that the proposed process respects both the legal rights and the considered judgment of those most affected. The motions will therefore be granted.

## I. <u>Background</u>

This matter is before the Court after the May 7 and 13, 2025 preliminary hearings and May 15, 2025 evidentiary hearing on the *Debtors' Emergency Motion to Approve (I) Authority for Debtors to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, (IV) Modifying 1110(a) Agreements with Certain Aircraft Lessors and (V) Granting Related Relief* (the "DIP Financing Motion"),[2] and the *Debtor Silver Airways, LLC's Emergency Motion for Entry of an Order (I)*

---

[2] Doc. No. 358.

*Approving Bidding Procedures in Connection With Transaction by Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof; (IV) Approving Contract Procedures; and (V) Granting Related Relief* (the "Bidding Procedures Motion").[3] After careful consideration of the procedural history, the factual record, and the applicable legal standards, the Court grants the motions for the reasons that follow.

Here, the Court must weigh the Debtors' urgent need to maintain operations and pursue a going-concern sale against the consequences—both legal and practical—of denying the motions. The outcome will shape not only the immediate administration of these jointly administered cases, but their ultimate resolution. In doing so, the Court must not only assess the present record but also anticipate the legal challenges to come and must apply the law prospectively to ensure that the outcome remains faithful to the dictates of the Bankruptcy Code.

A. <u>Factual and Procedural History</u>

On December 30, 2024 (the "Petition Date"), Silver Airways LLC ("Silver Airways") and its affiliate, Seaborne Virgin Islands, Inc. ("Seaborne") (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases are being jointly administered.[4] Silver Airways, headquartered in Hollywood, Florida, operates a regional airline providing passenger and cargo service across Florida, the Bahamas, and the Caribbean. Seaborne, based in St. Croix,

---

[3] Doc No. 446.
[4] Doc. No. 32.

provides inter-island air service from St. Croix to St. Thomas. As of the Petition Date, Silver Airways had approximately 646 employees, and Seaborne had 53 employees.[5]

According to available financial disclosures, the Debtors' assets include aircraft and related equipment, ground support infrastructure, airport gate leases, maintenance and operations facilities, receivables, and intellectual property. The Debtors' liabilities consist of secured obligations to KIA II, LLC (the "DIP Lender") for interim superpriority debtor-in-possession financing ("DIP Financing"), prepetition secured debt held by Brigade Agency Services LLC ("Brigade") and by Argent Funding LLC and Volant SVI Funding LLC (together "Argent" and collectively with Brigade, the "Prepetition Secured Lenders"), aircraft lease obligations, outstanding vendor payables, accrued employee wages and benefits, and postpetition administrative expense claims, including, but not limited to operational obligations, claims arising under 11 U.S.C. §§ 503(b)(9) and 1110, and outstanding airport fees.

The Debtors' financial distress was precipitated by several factors, including challenges associated with the transition to ATR aircraft, operational setbacks, and liquidity constraints. Notably, the Debtors' fleet has been reduced from 16 aircraft at the time of filing to just eight currently under lease.

---

[5] *Declaration of Steven A. Rossum in Support of Debtors' First Day Motions* (Doc. No. 35).

Upon filing, the Debtors sought and obtained interim approval to use cash collateral to fund operations. However, the cash collateral proved insufficient to sustain the Debtors' operations, leading to the need for DIP Financing.

On April 14, 2025, the Debtors filed their DIP Financing Motion, seeking approval of an agreement with KIA II, which offered up to $5.5 million in postpetition funding to support ongoing operations and facilitate a sale process. Following an expedited hearing, the Court entered its *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, (IV) Modifying 1110(A) Agreements with Certain Aircraft Lessors, and (V) Granting Related Relief* (the "Interim DIP Order") on April 22, 2025, authorizing an initial advance of $3 million and scheduling a final hearing for May 7, 2025.[6] However, at the expedited hearing, the Court made clear that it may not approve the DIP Financing Motion on a final basis if the ultimate agreement did not provide a carve out for the payment of administrative expense claims.

The obligations arising under the DIP Financing are secured by first-priority, priming liens on substantially all the Debtors' assets—including those previously encumbered by the Prepetition Secured Lenders—and are entitled to superpriority administrative expense status under 11 U.S.C. § 364(c)(1). The Interim DIP Order approved various protections for the DIP Lender, including a waiver of the Debtors'

---

[6] Doc. No. 410.

rights under § 506(c) to surcharge collateral and provisions limiting the use of proceeds to those authorized under an approved budget.

The DIP Lender is also the proposed stalking horse bidder for substantially all the Silver Airways assets, offering to credit bid its DIP Financing claim. The DIP milestones and sale timeline are tightly integrated, with the DIP Financing structured as a bridge to a going concern transaction.

The Debtors now seek approval of bidding procedures in connection with the proposed § 363 sale of Silver Airways. The stalking horse bid from KIA II, presumes the balance of the DIP Financing will be approved and funded, proposes a credit bid of the DIP Lender's resulting claim and is valued at approximately $5.775 million.

Notably, the proposed sale includes only Silver Airways' assets and excludes Seaborne's assets and Silver Airway's equity interest in Seaborne. The Debtors anticipate finalizing negotiations with a purchaser for the Seaborne assets in the very near future. After finalizing definitive documentation for a sale of the Seaborne assets, the Debtors will file a separate motion to approve bid procedures and a sale process for Seaborne.

B. <u>Secured Creditors and DIP Structure</u>

As of the petition date, the Debtors owed a total of approximately $399,283,401 to the Prepetition Secured Lenders. Of this, $187,438,757.35 was owed to Brigade, and $211,844,643.79 was owed to Argent. Brigade's lien is in first position and these obligations were secured by valid, perfected, first-priority liens on substantially all the Debtors' assets (the "Prepetition Collateral").

The Prepetition Secured Lenders have consented to the relief requested by the Debtors in the Motions, and other than the payment of $125,000 to Brigade should Seaborne be sold, they have agreed to a "carve out" in full for any and all unpaid administrative expense claims.

C. <u>Administrative Expense Claims</u>

The Debtors' lack of financial transparency has been a persistent concern. Although delays in monthly operating reports are not uncommon, the budgets submitted in connection with the Debtors' cash collateral motions have lacked sufficient detail, particularly in light of unpaid administrative obligations. On several occasions, the Court ordered the Debtors to provide updated, detailed budgets, including variance reports comparing actual to projected disbursements. The Court specifically directed disclosure of "every dime in, every dime out." While that level of detail has not been fully achieved, the Debtors' CFO did provide a comprehensive spreadsheet at the final evidentiary hearing, which the Court credits as a fair approximation of the Debtors' administrative liabilities as of May 9, 2025.[7]

The spreadsheet and testimony from CEO Steven Rossum and CFO Pedro Motta established that the Debtors projected approximately $11.89 million in total administrative expenses through the expected closing date. These fall into three principal categories:

> **1. Operating Expenses** – Comprising past-due and projected obligations for payroll and benefits, facilities, insurance, fuel, communications, pilot training, IT services, aircraft parts exchanges, and other operational vendors. Total estimated: **$6.17 million**, of which **$1.78 million** was already past due as of May 9.

---

[7] Doc. No. 499.

**2. Section 1110 Cure Obligations** – Lease cure payments required under 11 U.S.C. § 365(b) for assumption of aircraft leases:
- *Assumed Leases* (to be paid by the buyer outside the purchase price):
  - Azorra Eagle 1 DAC: $2,151,017
  - Jetstream Aviation Holdings, LLC: $725,325
  - StandardAero Atlantic Inc.: $92,086

- *Rejected Leases* (treated as administrative expense claims):
  - Nordic Aviation: $821,100
  - TrueNoord: $884,529
  Total estimated: **$4.67 million**

**3. Deferred and Other Claims** – Including a $639,600 § 503(b)(9) claim by World Fuel Services and an estimated $400,000 for professional fee carve-outs.

Mr. Rossum testified that the Debtors projected approximately $9 million in monthly revenue, which they intended to use to satisfy accruing administrative claims in the ordinary course. Mr. Motta testified that operating expenses were expected to be paid from ongoing revenue but acknowledged the volatility of airline earnings.

Despite those efforts, the Debtors projected a $3 million shortfall in closing-date administrative liabilities—primarily trade payables, taxes, and payroll—that would remain unpaid unless assumed by a buyer. Additionally, $4 to $5 million in other administrative claims, including professional fees, § 503(b)(9) claims, and the § 1110 cure amounts, were expected to be satisfied only if there were an overbid for Silver Airways or a successful sale of Seaborne. If neither occurred, the total unpaid administrative exposure would be several million dollars.

In addition to the possibility of overbids and a Seaborne sale, a third and independent source of administrative repayment is the buyer's agreement to assume certain aircraft leases under 11 U.S.C. § 365(b), which requires full cure of outstanding defaults as a condition of assumption. At the evidentiary hearing, the Debtors and DIP Lender confirmed that these cure obligations—totaling over $2.2 million—will be paid directly by the buyer and are not included in the purchase price. Accordingly, these payments will flow to specific administrative creditors (e.g., Azorra, Jetstream, StandardAero) without drawing on the estate's assets, the DIP facility, or the sale proceeds. This provides additional assurance of recovery for a portion of the estate's administrative liabilities but can only occur if the Motions are granted.

Notwithstanding the potential shortfall, administrative creditors appeared at the final hearing and expressed their support for the proposed process. These included:

- **Azorra**, with claims exceeding $2 million, supported the motions and acknowledged the process offered the only realistic path to recovery.

- **Jetstream**, owed approximately $1 million, echoed Azorra's support.

- **NAC and TrueNoord**, with combined § 1110 cure and lease claims of approximately $1.7 million, accepted the likelihood of less than full payment but stated that proceeding with the sale was the only viable option for any recovery.

- **Airport authorities and other trade creditors**, including Monroe County, Hillsborough, Orlando, and Pensacola, either affirmatively supported or did not oppose the process, subject to negotiated reservations of rights and cure protections.

The Court acknowledges that not all administrative claimants appeared or voiced a position. Several employees, including pilots and flight attendants, attended the hearing and were there seemingly to support the Debtors, but did not speak. Other administrative creditors—potentially including vendors and service providers—may have received notice but remained silent. Their silence does not constitute consent. But it also does not alter the reality that no party has filed an objection or proposed an alternative to the process now before the Court. Every creditor with an active role in the case and meaningful administrative exposure was afforded the opportunity to be heard. Those who did appear—Azorra, Jetstream, NAC, World Fuel, multiple airport authorities—expressly supported the process, knowing the risks. The Court does not interpret silence as approval, but neither can it infer opposition where none was expressed, particularly in the absence of any alternative relief sought.

Based on the spreadsheet, the sworn testimony, and the recorded positions of administrative claimants at the evidentiary hearing, the Court finds that the estate's primary administrative expense claimants reviewed the structure, understood the risks, and consented to proceed in the hope of recovery. That consent forms the legal basis for approval under *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 697 (2017), and aligns with the principles set forth in § 1129(a)(9)(A) of the Bankruptcy Code.

D. <u>Proffered Sources of Payment; Expectations of Competitive Bidding and Asset Value</u>

The Debtors argued that payment of administrative claims would come from three potential sources: (1) ordinary course revenues prior to closing; (2) a third-party

overbid for the Silver Airways assets; and (3) a successful sale of Seaborne. Mr. Rossum also suggested that there are claims against American Express for $1 million, the manufacturer of their ATR aircraft for "millions" and potentially others, but for purposes of adjudicating the Motions the Court has discounted the viability of these claims.

Mr. Rossum testified that the Debtors have conducted an extensive sale and marketing process for both Silver Airways and Seaborne, including outreach to over 75 parties and establishing data room access for 15–20 potential buyers. He confirmed continued interest from multiple regional airlines, including a creditworthy 135 operator that submitted a written expression of interest for Seaborne assets on the morning of the evidentiary hearing. At least one Seaborne bidder had previously offered $3.75 million in cash, though that deal ultimately fell through for lack of a deposit.

The Debtors called as a witness, Angelo Scolari, a prospective bidder, who testified that he had been for months actively performing due diligence and considering a bid for Silver Airways that would include assumption of the $3 million in closing-date liabilities. He confirmed that an affiliate of his company, Rengen Energy Solutions, was considering a $6 million cash bid with an additional $250,000 topping fee. He also testified that he had previously submitted a nonbinding letter of interest in the $10 million range. Although not committing to bid, he expressed serious interest and confirmed his intent to negotiate with administrative creditors. The Court found his testimony candid, albeit necessarily cautious.

It is not lost on the Court that the Debtors borrowed collectively several hundred million dollars, yet the contemplated asset sale values total at present less than $10 million. But the Debtors assert the PIK interest charged by the Prepetition Lenders has much to do with the disparity. In any event, as with many bankruptcy cases, the facts are stubborn and are what they are.

E. Revisions to Bid and DIP Financing Terms

At the conclusion of the evidentiary hearing, the DIP Lender agreed on the record to several material revisions to its proposed stalking horse bid:

- Reduction of the breakup fee from 5% to 3%, with no separate expense reimbursement;
- Waiver of any preexisting defaults under the DIP facility upon final approval;
- Carve-out and subordination of its recovery from Seaborne proceeds, but only in the event of a third-party Seaborne sale, and an extension of time for the Debtors to obtain a qualified bid for the Seaborne assets;
- Exclusion of intercompany claims and avoidance actions from the purchased assets;
- Shortened post-closing contract rejection period from 30 days to 10 business days;
- Waiver of APA § 11.1(14), which otherwise permitted termination of the transaction based on asset sufficiency.

II. **Jurisdiction**

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Florida. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), (M), (N), and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

III. **Analysis**

The issues raised by the proposed DIP Financing are inextricably intertwined with the structure and terms of the proposed sale. KIA II—the DIP Lender—is also the proposed stalking horse bidder. The milestones under the DIP Financing are tied directly to consummation of the sale, and the proceeds of the sale are expected to repay the DIP loan in full either through a credit bid or overbid.

The Interim DIP Order reflects that the DIP Financing provides up to $5.5 million in new money financing (of which $3 million has been advanced), secured by priming liens on all the Debtors' assets and entitled to superpriority administrative expense status under § 364(c)(1). The order further provides that the DIP Lender's liens and claims are subordinate only to a narrowly defined Carve-Out, which includes only capped professional fees and limited U.S. Trustee expenses. Crucially, the DIP Lender also secured a waiver of surcharge rights under § 506(c), thereby shielding its collateral from postpetition cost allocations.

This Court has carefully reviewed the proposed sale of substantially all of Silver Airways' assets and the consequences, as best can be determined, that may follow if the transaction is approved. The record reflects a significant administrative expense burden—one that sale proceeds alone may not fully satisfy. Yet the record also reflects something more: the informed and express support of nearly every major administrative claimant and the prospect, though far from guaranteed, that competitive bidding on Silver Airways assets and the sale of Seaborne's assets may yield meaningful payment.

The Court does not retreat from the principle that the Bankruptcy Code prohibits sales that circumvent the statutory priority scheme. As the Supreme Court made clear in *Czyzewski v. Jevic Holding Corp.*,[8] a court may not approve a structured dismissal or other transaction that deprives priority creditors of their rights without consent. But the operative word is *consent*. Where the very creditors protected by § 503(b) choose to accept risk in order to preserve the possibility of recovery, the Code does not forbid that choice—it respects it. Nothing in *Jevic* or the Code prevents administrative creditors from agreeing to a process that may leave them underpaid, so long as they do so voluntarily, with eyes open and in the absence of better alternatives.

To understand why this Court grants the motions—notwithstanding a potential administrative shortfall—it is essential first to be clear about what the Bankruptcy Code requires.

Section 503(b) provides that administrative expenses, including postpetition goods and services necessary to preserve the estate, and professional fees incurred in administering it, "shall be allowed" and are entitled to second-priority status under § 507(a)(2).[9] Section 1129(a)(9)(A) then states plainly that no plan can be confirmed unless those administrative claims are paid in full on the effective date, "unless the holders of a particular claim have agreed to a different treatment."[10]

---

[8] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).
[9] 11 U.S.C. § 503(b).
[10] *See In re Blehm Land & Cattle Co.*, 859 F.2d 137, 139 (10th Cir. 1988) ("[Administrative expenses] must be paid in full under §1129(a)(9)(A) unless the holder agrees otherwise.")

In most cases, that framework functions as designed. A debtor proposes a plan, administrative claims are paid, and the estate winds down in orderly fashion. But in sale-driven Chapter 11 cases like this one—where proceeds are potentially insufficient, alternatives are exhausted, and no plan has been filed—the statutory machinery may stall. A sale may close, but a confirmable plan may not follow and if it does not, what remains is conversion or dismissal. And if a sale closes without administrative solvency, what results is the functional equivalent of a structured dismissal—precisely the scenario the Supreme Court warned against in *Czyzewski v. Jevic Holding Corp.*[11]

*Jevic* instructs that the Code does not permit bankruptcy courts to authorize distributions that sidestep the priority structure "without the consent of the affected parties."[12] That instruction governs here. The critical difference—the one that renders this decision lawful—is that the affected parties, i.e. the administrative claimants, have given their consent. Informed, qualified, and on the record.

The Court does not overlook that the estate may accrue additional administrative liabilities before closing. Nor does it minimize the risks posed by the possibility that the sale of Silver Airways will not yield an overbid or that Seaborne may go unsold and be handed to the DIP Lender without additional consideration, pursuant to the DIP Financing agreement. But those risks have been disclosed, debated, and embraced by those who would bear their burden. Nearly every administrative claimant of consequence—Azorra, Jetstream, UMB, TrueNoord, NAC,

---

[11] *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017).
[12] *Id.*

World Fuel, the airports—stood before the Court, weighed their options, and urged the Court to approve the path now adopted.

This is not a case of capitulation; it is one of calculation. The administrative creditors chose a negotiated risk over a guaranteed loss. And while § 1129(a)(9)(A) typically applies at confirmation, its consent language resonates here. The Code does not demand that courts foreclose all risk. It simply demands that risk not be imposed without consent.

The administrative expenses at issue were not incurred gratuitously. They were essential to preserving, operating, and marketing the Debtors' assets—assets now proposed to be sold. To authorize a sale over the objection of unpaid administrative creditors would be to sanction a transaction that harvests the fruits of their labor while disclaiming its costs. Courts have long and consistently rejected that proposition.

In *In re Townsends, Inc.*, the Delaware Bankruptcy Court refused to approve DIP financing that favored some administrative creditors while leaving others behind, stating flatly: "[it] can't be done on the back of the . . . admin claims. Congress has made that determination."[13] Similarly, in *In re NEC Holdings Corp.*, the court refused to bless a § 363 sale that left administrative claims unpaid, holding that the secured creditor had to "pay the freight" if it wanted the benefits of bankruptcy.[14]

---

[13] Hr'g Tr. at 24:1-5, *In re Townsends, Inc.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011).
[14] *See In re NEC Holdings Corp.,* Case No. 10-11890 (PJW) (Bankr. D. Del. July 11, 2011)

Other courts have reached the same conclusion, not based on abstract fairness, but on the text and structure of §§ 503(b), 507(a)(2), and 1129(a)(9).[15]

These principles remain true here. But they do not dictate the outcome. What distinguishes this case from *Townsend*, *NEC*, and others is not a novel reading of the Code. It is the one element those cases lacked: consent. Nearly every administrative creditor of significance—Azorra, Jetstream, NAC, UMB, World Fuel, the airports—appeared and affirmed that, though the risk is real, the alternative is worse. They chose the possibility of at least partial recovery through continued operations over the certainty of loss through collapse.

The Bankruptcy Code permits that choice. Section 1129(a)(9)(A) requires full payment of allowed administrative claims on the plan's effective date "unless the holders of a particular claim have agreed to a different treatment." That consent requirement echoes here. While this is not a confirmation context, the logic is parallel. The Court does not relieve the estate of its obligations. It respects the decision of those entitled to payment to accept uncertainty in the hope of a better outcome.

The DIP Lender may argue, regardless of administrative creditor consent, the Court should grant the Motions because it is simply recovering what it is owed under its superpriority secured claim. The fact that no funds remain for others is not its fault. The bid is subject to overbids, and the assets were marketed. That argument, while facially consistent with priority, fails to address a deeper concern. Chapter 11 is not designed to permit a single secured creditor to extract all value through a § 363

---

[15] *See In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009); *In re Encore Healthcare Associates*, 312 B.R. 52 (Bankr. E.D. Pa. 2004).

sale while leaving those who kept the estate aloft—vendors, lessors, professionals, and employees—unpaid. That is not honoring priority; it is circumventing it.

A secured creditor that chooses to avail itself of the protections and powers of Chapter 11—including the ability to sell its collateral free and clear under § 363(f), to provide DIP financing under § 364, or to benefit from a structured wind-down—must also accept the obligations that come with that choice. Chief among them is the requirement that the estate's administrative expenses be paid. If those expenses cannot be paid, then a plan dependent on the sale is not feasible or confirmable under the Code. The Court is not free to disregard that reality simply because secured creditor parties prefer the sale to other alternatives. Neither convenience nor expediency justify the erosion of the Code's structural protections.

However, where, as here, those at risk entitled to administrative priority have assessed the circumstances, considered the alternatives, and opted to support a process that may maximize going concern value, that decision deserves respect. The law allows creditors to weigh the risks and bet on recovery through continued operations—particularly when the alternatives are neither a confirmable plan nor a competitive reorganization, but certain collapse.

Maximizing the going concern value of the Debtors may well prove to be their salvation—or at least a partial one. The Bankruptcy Code permits such a path when taken transparently, with creditor consent, and not at the expense of unknowing or unwilling stakeholders. In that respect, this case is not about circumventing statutory

protections. It is about applying them as the Code allows: with clarity, integrity, and the informed agreement of those with the most to lose.

The Court is persuaded that the proposed sale and DIP Financing process, though certainly not free from hazard, does not transgress the structural limits of the Code. It respects the Code's design by honoring administrative priority, and by proceeding only with the support of those most entitled to protection.

For these reasons, the Court grants the DIP Financing Motion and the Bidding Procedures Motion and has entered orders consistent with this ruling.

## IV.  Conclusion

Therefore, the Court **ORDERS**:

1. The DIP Financing Motion is **GRANTED.**

2. The Bidding Procedures Motion is **GRANTED**.

# # #

Copies To:

All parties in interest.