**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **SILVER AIRWAYS LLC, et al.** | § | **Case No. 24-23623-PDR** |
| | § | **(Jointly Administered)** |
| Debtors-in-Possession. | § | |

**PURCHASER'S NOTICE OF FILING**
**ASSET PURCHASE AGREEMENT WITH EXHIBITS**

PLEASE TAKE NOTICE that pursuant to the hearing held on June 4, 2025, and continued to June 10, 2025 and June 11, 2025 on Debtor Silver Airways LLC's Emergency Motion for Entry of an Order (i) Approving Bidding Procedures in Connection with Transaction by Auction; (ii) Scheduling a Hearing to Consider the Transaction; (iii) Approving the Form and Manner of Notice Thereof; (iv) Approving Contract Procedures; and (v) Granting Related Relief [ECF No. 446], which has been approved by the Court [ECF Nos. 501, 502, 570], Purchaser Argentum Acquisition Co., LLC files the Asset Purchase Agreement (originally filed at ECF No. 505) with exhibits, attached as Exhibit "A" hereto.

Dated: June 12, 2025

Respectfully submitted,

Markowitz Ringel Trusty & Hartog, P.A.
*Local Counsel*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, Florida 33301
Tel: (954) 767-0030

By: *s/ Ross R. Hartog*
Ross R. Hartog, Esq.
Florida Bar No. 564559
Email: rhartog@mrthlaw.com

- and -

Tucker, Arensberg, P.C.
*Lead Counsel*
One PPG Place, Suite 1500
Pittsburgh, PA 15222
Main Tel. No. (412) 594-5586
Direct Dial Tel. No. (412) 378-3064
Michael A. Shiner, Esq
Email: mshiner@tuckerlaw.com

**Exhibit "A"**

**(APA with Exhibits)**

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**SILVER AIRWAYS LLC**

**AS SELLER**

**- and –**

**ARGENTUM ACQUISITION CO. LLC**

**AS PURCHASER**

**Dated as of May 20, 2025**

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

**This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of May 20, 2025 (the "**Signing Date**"), by and among Silver Airways LLC, a Delaware limited liability company (the "**Seller**") and Argentum Acquisition Co. LLC, a Delaware limited liability company (the "**Purchaser**").

<u>RECITALS</u>:

A.      The Seller is a U.S. air carrier operating under a Part 121 certificate issued by the Federal Aviation Administration ("FAA") and interstate and foreign certificate, exemption and other authorities issued by the Department of Transportation ("DOT") and various authorities issued by foreign governmental authorities,  and is based in Hollywood, Florida   Seller owns a second U.S. air carrier operating to destinations in the Caribbean under a Part 121 certificate issued by the Federal Aviation Administration ("FAA") and interstate and foreign certificate, exemption and other authorities issued by the Department of Transportation ("DOT") and various foreign governmental  authorities and approvals, Seaborne Virgin Islands, Inc., a United States Virgin Islands corporation ("**Seaborne**") with operations principally in the United States Virgin Islands (collectively, the "**Business**").

B.      On December 30, 2024, the Seller filed a voluntary petition for reorganization relief (the "**Bankruptcy Case**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"), Case No. 24-23623-PDR, and intends to seek the entry of an order by the approving this Agreement and authorizing Seller to consummate the transactions contemplated hereby and by other transaction documents;

C.      The Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as more specifically provided herein;

D.      On April 22, 2025, the Bankruptcy Court entered its *INTERIM ORDER (I) I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING,  (IV) MODIFYING 1110(A) AGREEMENTS WITH CERTAIN AIRCRAFT LESSORS AND (V) GRANTING RELATED RELIEF,* pursuant to which KIA II LLC, an affiliate of Purchaser, agreed to provide financing to Seller in the aggregate principal amount of $5,500,000;

E.      Seller has designated Purchaser as a Stalking Horse Bidder and entered into that certain Asset Purchase Agreement with Purchaser dated May 6, 2025 ("Original APA");

F.      Pursuant to Section 12.8 of the Original APA, the parties may amend the Original APA by a writing signed by both parties;

G.      Following the hearing on May 15, 2025, on Seller's Motions to approve the Final DIP Order, Bid Procedures Order and other related items, and consistent with such matters agreed to by the parties and the Court at such hearing, the parties desire to amend and restate the Original APA as set forth herein;

H.    The board of managers of Seller has determined that it is advisable and in the best interests of the respective estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement.

I.    The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Case.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Terms Defined. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms on **Schedule 1** attached hereto and as set forth elsewhere herein.

1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's permitted successors and assigns.

(e)    Any reference to any specific contract, guaranty, lease, agreement or item shall not operate to exclude such contract, guaranty, lease, agreement or item from any broader defined term herein contained which would otherwise encompass such contract, guaranty, lease, agreement or item generally;

(f)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative

2

provision substituted therefore, and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     Any reference in this Agreement to $ shall mean U.S. dollars.

(h)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1     Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's direct or indirect, right, title and interest in, to and under substantially all of Seller's tangible and intangible assets, properties and rights as of the Closing Date of whatever kind or nature and wherever situated or located, other than the Excluded Assets, free and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Exceptions and Permitted Liens). All of such assets, properties and rights (other than the Excluded Assets) are collectively referred to in this Agreement as the "**Acquired Assets**." Without limitation of the foregoing, the Acquired Assets shall include all Seller's right, title and interest in and to the following assets as of the Closing Date, except to the extent that any of the following are also enumerated in Section 2.2 as being Excluded Assets:

(a)     all Accounts Receivable;

(b)     all owned Inventories, including all rotable and consumable spare parts;

(c)     those airport Facility Leases, agreements and licenses or arrangements at Stations (collectively, the "**Station Leases**"),  which Purchaser elects by written notice to Seller given not less than three (3) days prior to the date on which the Auction occurs to assume at Closing, together with all Station Property, in each case relating to such assumed Station Leases (collectively, the "**Acquired Station Assets**");

(d)     all of Seller's DOT certificate, exemption and other approvals and authorities and all of Seller's FAA Part 121 certificate, Operation Specifications and other approvals and authorities, and all of Seller's foreign governmental approvals and authorities;

(e)     all Route Authority to destinations served by Seller;

(f)     all Code Share Agreements;

(g)     50% of the net recovery on all causes of action (specifically excluding avoidance actions) of Seller, whether known or unknown, fixed or contingent, arising out of or relating to the accruing or arising on or prior to the petition date  ("Litigation") or of the acquisition of the Litigation by a third-party in the Bankruptcy Case;

3

(h)      all deposits (including, without limitation, security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, reserves, rights in respect of promotional allowances, vendor rebates and other refunds, claims, causes of action, rights of recovery, rights under guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, Accounts Receivable payments and other communications of Seller and the right to ticket revenue in respect to transportation or other services performed but unbilled or uncollected as of the Closing, provided, however, all deposits provided to any utility provider under Bankruptcy Code Section 366 shall be payable to Purchaser upon termination of the utility service;

(i)      to the extent that such lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a lease (and any agreement related thereto) for a Leased Property, in each case together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(j)      all owned aircraft engines and propellers;

(k)      all owned maintenance tools and tooling;

(l)      all owned real property fixtures;

(m)      all information technology systems;

(n)      all owned office furniture and furnishings;

(o)      all pre-Closing ticket sales proceeds for flights agreed by Purchaser to be flown post-Closing;

(p)      all owned Ground Support Equipment and other FF&E;

(q)      all Intellectual Property;

(r)      all Assigned Contracts;

(s)      all Documents;

(t)      all Permits;

(u)      all Manuals;

(v)      all recoverable overpayments of air transportation related governmental fees and charges;

(w)      except to the extent that such insurance policy is an Excluded Asset under Section 2.2(i) below and to the extent assignable, all rights under or arising out of all insurance proceeds and insurance policies relating to the Business or any of the Acquired Assets (including, without limitation, returns and refunds of any premiums paid, or other

4

amounts due back to Seller, with respect to cancelled policies), unless non-assignable as a matter of Law;

(x)    all motor vehicles owned by Seller;

(y)    the right to enforce or enjoin all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction); provided that any monetary recovery from such rights or choses-in-action are deemed to be Litigation ;

(z)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by or provided, to Seller or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets; provided that any monetary recovery from such rights or choses-in-action are deemed to be Litigation

(aa)    all books and records of Seller (excluding Seller's limited liability company books and records and limited liability company proceedings, financial and Tax and records, work papers and other records that Seller is required by Law to retain, copies of which, however, shall be provided to Purchaser upon request);

(bb)    all sales and promotional materials, catalogues and advertising literature;

(cc)    all bank accounts, checkbooks and cancelled checks of Seller;[1]

(dd)    all Data and Documents;

(ee)    all (or the benefit of all, to the extent not assignable) Tax refunds, rebates, credits and similar items of Seller, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return;

(ff)    all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names;

(gg)    the assets, if any, listed on **Schedule 2.1(gg)** (regardless of whether such assets are covered by any of the foregoing);

(hh)    all goodwill of the Business; and

(ii)    other assets related to, associated with or used in the conduct of the Business and/or the Acquired Assets, excepting therefrom only the Excluded Assets.

If Purchaser desires to assume the rights or other benefits relating to Assigned Contracts, manufacturer warranties, guaranties or Permits which in any such case are non-assignable, Seller will use their best reasonable efforts to seek the necessary consents to such assignment, and failing

---

[1] NTD - Counsel to discuss accounts related to airline clearinghouse and general post-close cash flow.

to obtain such consent, will, at Purchaser's option, sublease or otherwise arrange or make available the benefits and use thereunder to Purchaser after Closing in such manner and by such means as Purchaser may reasonably request.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Purchaser; Purchaser hereby disclaims all liability or responsibility with respect to any of the Excluded Assets; and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.6, the term "**Excluded Assets**" shall consist of the following items and assets:

(a)     Subject to Section 2.7, all Seaborne assets;

(b)     any asset of Seller that would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the Ordinary Course of Business prior to the Closing Date not in violation of this Agreement;

(c)     all Cash of Seller, including Cash funded under the DIP Credit Agreement for the payment of professional fees and disbursement, whether held in escrow or held as retainers or deposits by such professionals;

(d)     all amounts owed to Seller by Seaborne as repayment for intercompany transfers, loans or other obligations;

(e)     the limited liability company books and records of the Seller and corporate proceedings, financial and Tax records, work papers and other records that Seller is required by Law to retain; provided, however, copies of the foregoing items shall be provided by Seller to Purchaser upon request;

(f)     the rights of Seller under this Agreement and all cash and non-cash consideration payable or deliverable to Seller under this Agreement;

(g)     all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(h)     all shares of capital stock or other equity interests in Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in Seller;

(i)     the assets, if any, listed on **Schedule 2.2(h)**;

(j)     all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets;

(k)     50% of proceeds from Litigation;

(l)     all of Seller's rights and interest in the avoidance actions;

(m)     all Tax attributes of Seller;

(n)    all Rejected Contracts and all Additional Rejected Contracts;  and

(o)    Permits that are not transferable, as set forth on Schedule 2.2(o).

2.3    <u>Assumption of Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement, Purchaser shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the liabilities and obligations of Seller (and only those liabilities and obligations of Seller) to the extent enumerated in this Section 2.3 (the "**Assumed Liabilities**"):

(a)    all of Seller' liabilities and obligations under the Assigned Contracts arising after Closing; and

(b)    those specific liabilities and obligations of Seller (if any) identified on **Schedule 2.3(b).**

2.4    <u>Excluded Liabilities</u>. All claims against Seller, and all liabilities and obligations of Seller (in each case of any nature whatsoever, whether direct or indirect, matured or unmatured, known or unknown, absolute, accrued, contingent or otherwise, whether now existing or hereafter arising) which are (x) enumerated below in this Section 2.4 or (y) not specifically assumed by Purchaser pursuant to Section 2.3 are collectively referred to herein as the "**Excluded Liabilities**." Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities.  Excluded Liabilities include, but shall not be limited to:

(a)    any and all liabilities arising under any Aircraft Lease and under any aircraft engine, propeller or spare parts lease not assumed by Purchaser pursuant to Section 2.1(d);

(b)    any and all liabilities arising under any Station Lease not assumed by Purchaser pursuant to Section 2.1(d);

(c)    any and all liabilities and obligations for Taxes arising from or with respect to the Acquired Assets or the Business to the extent attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by this Agreement;

(d)    any and all liabilities for indebtedness of Seller with respect to borrowed money (other than obligations with respect to capitalized leases, if any, that are Assigned Contracts);

(e)    any and all liabilities and obligations arising under any Environmental Law or any other Law (including as a result of any action or inaction of Seller or of any third party) relating to the storage, use or operation of the Acquired Assets other than those disclosed on **Schedule 2.4(e)** and attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by this Agreement;

(f)    any and all liabilities and obligations for any violation of any Law other than those disclosed on **Schedule 2.4(f)** and attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by this Agreement;

(g)    any and all liabilities and obligations for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Case (including,

without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller, and the official creditors' committee, the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(h)    any and all liabilities and obligations of Seller to the extent that its existence or magnitude constitutes or results in a material breach of a representation, warranty or covenant made by Seller to Purchaser under this Agreement, or makes the information contained in the any Schedule incorrect or incomplete in any material respect at the relevant time;

(i)    any liabilities of Seller under those Contracts and Permits which constitute Excluded Assets or which are not assigned to Purchaser pursuant to the provisions of this Agreement;

(j)    any and all liabilities and obligations (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (iii) relating to any bodily injury, or damage to property, incurred by any Person or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing;

(k)    any liabilities or obligations which Purchaser may or could become liable for as a result of or in connection with any "de facto merger" or "successor-in-interest" theories of liability;

(l)    those specific liabilities and obligations of Seller identified on **Schedule 2.4(l)** attached hereto;

(m)    all liabilities or obligations arising under any Employee Benefit Plan;

(n)    any liability or obligation of Seller to their respective stockholders, members or other equity holders or affiliates;

(o)    any costs and expenses that may be recovered from the Acquired Assets on account of the operation of Bankruptcy Code section 506(c);

(p)    any liabilities arising out of any representation, warranties, actions or failure to act by Seller in connection with any Assigned Contract, including any claims by any person or entity other than the counterparty to such Assigned Contract; and

(q)    without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Seller or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by Purchaser pursuant to the provisions of Section 2.3.

(r)    except as otherwise agreed to by Purchaser, all wages, salaries, commissions, bonuses, accrued vacation, paid time off, or other compensation or benefits

8

payable to any current or former employee of Seller, whether arising prior to, on, or after the Closing Date.

2.5     Assignment and Assumption of Contracts.

(a)     Assignment and Assumption at Closing.

(i)     No later than two (2) days following the entry of the Bidding Procedures Order, Seller shall provide to Purchaser a schedule setting forth (x) each Contract to which Seller is a party or by which Seller is bound and that is used in or related to the Business or any of the Acquired Assets, (y) all Cure Amounts (if any) for each such Contract and (z) a detailed description of each such Contract (such schedule is referred to herein as the "**Contracts Schedule**").

(ii)     No later than one (1) day prior to the date on which the Auction occurs, Purchaser shall, by delivering written notice to Seller, designate each Contract on the Contracts Schedule as "Assumed," "Rejected" or "Held." Each Contract so designated as "Assumed" is referred to herein as an "**Assumed Contract**;" each Contract so designated as "Rejected" is referred to herein as a "**Rejected Contract**;" and each Contract designated as "Held" is referred to herein as a "**Held Contract**." Notwithstanding the foregoing, Purchaser shall have the right (in its sole and absolute discretion) to change any such designation and to notify Seller in writing of any such change until Closing in which case such Contract shall become an Assumed Contract, a Rejected Contract or a Held Contract as indicated by such changed designation.

(iii)     Seller shall provide timely and proper written notice of the procedures for the assumption and assignment of Contracts to parties to all Contracts and take all other actions necessary to cause all Assumed Contracts to be assumed by Seller and assigned to Purchaser, and all Rejected Contracts to be rejected by Seller, pursuant to Bankruptcy Code section 365, provided that (x) the only Contracts to be actually assumed and assigned to Purchaser at Closing will be the Assumed Contracts and (y) the only Contracts to be actually assumed and assigned to Purchaser after Closing will be the Additional Assumed Contracts. Purchaser shall, at or prior to Closing, comply with all requirements under Bankruptcy Code section 365 necessary to assign to Purchaser the Assumed Contracts.

(iv)     At Closing, (x) Seller shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Purchaser, assume and assign to Purchaser (the consideration for which is included in the Purchase Price) each of the Assumed Contracts and (y) Purchaser shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to among Purchaser and Seller or as determined by the Bankruptcy Court) and assume and agree to perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreement(s).

(b)     Assignment and Assumption During the Designation Period.

9

(i) During the 10 (ten) business day period following the Closing Date with respect to all Held Contracts, or such later date as may be agreed to by the Seller and Purchaser (the "**Designation Period**"), Purchaser may from time to time, by delivering one or more written notices to Seller (each such written notice is referred to herein as an "**Additional Designation Notice**"), designate, in its sole and absolute discretion, any Held Contract as either "Assumed" or "Rejected." Each such Held Contract so designated as "Assumed" during the Designation Period is referred to herein as an "**Additional Assumed Contract**;" and each Held Contract so designated as "Rejected" is referred to herein as an "**Additional Rejected Contract**."

(ii) No later than the third (3ʳᵈ) Business Day following the receipt by Seller of each Additional Designation Notice, Seller shall file (such date of a filing of an Additional Designation Notice, an **"Additional Designation Date"**) with the Bankruptcy Court, on notice, and with an opportunity to object, to all non-Seller parties to Contracts designated as Additional Assumed Contracts and Additional Rejected Contracts (as applicable) in such Additional Designation Notice, a notice (an **"Additional Cure Notice"**) providing that such Additional Assumed Contact and Additional Rejected Contract (as applicable) has been designated by Purchaser as "Assumed" or "Rejected" (as applicable) and establishing any additional Cure Amount due for an applicable Additional Assumed Contract for the period between Closing and the filing of such Additional Cure Notice.

(iii) Upon approval by the Bankruptcy Court of the assumption and assignment of such Additional Assumed Contract, (x) Seller shall assume and assign to Purchaser (the consideration for which is included in the Purchase Price) the applicable Additional Assumed Contracts and (y) Purchaser shall pay all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to among Purchaser and Seller or as determined by the Bankruptcy Court) and assume and agree to perform and discharge the Assumed Liabilities (if any) under the applicable Additional Assumed Contracts, pursuant to the applicable Assignment and Assumption Agreement.

(iv) Each Additional Rejected Contract shall be deemed, for all purposes of this Agreement, rejected as of the applicable Additional Designation Date. Each Additional Assumed Contract shall be deemed, for all purposes of this Agreement, as assigned and assumed as of the applicable Additional Designation Date.

(c) <u>Previously Omitted Contracts</u>.

(i) In the event that it is discovered that a Contract should have been listed on the Contracts Schedule but was not listed on the Contracts Schedule (any such Contract, a "**Previously Omitted Contract**"), Seller shall, immediately following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), (x) notify Purchaser of such Previously Omitted Contract and all Cure Amounts (if any) for such Previously Omitted Contract, and (y) file a motion with the Bankruptcy Court on notice to the counterparties to such

Previously Omitted Contract seeking entry of an order (the "**Omitted Contract Order**") fixing the Cure Amounts and approving the assumption and assignment of such Previously Omitted Contract in accordance with this Section 2.5 (provided that no Previously Omitted Contract shall be assumed and assigned unless such Previously Omitted Contract is designated by Purchaser as "Assumed" in accordance with Section 2.5(b) and Section 2.5(c)(ii)).

(ii)     Within fifteen (15) Business Days following the filing of the Omitted Contract Order, Purchaser shall deliver written notice to Seller (such written notice shall be an "Additional Designation Notice") to Seller, designating such Previously Omitted Contract set forth in such Omitted Contract Order as "Assumed," "Rejected" or "Held." For purposes of the application of this Section 2.5, each Previously Omitted Contract so designated as "Assumed" shall be an Additional Assumed Contract, each Previously Omitted Contract so designated as "Rejected" shall be an Additional Rejected Contract; and each Previously Omitted Contract so designated as "Held" shall be a Held Contract for purposes of this Section 2.5. Each Previously Omitted Contract shall then be treated in accordance with the provisions of this Section 2.5 with respect to Additional Assumed Contracts, Additional Rejected Contracts and Held Contracts.

(d)     <u>Held Contracts, Assumed Contracts and Additional Assumed Contracts</u>.

(i)     Subject to Purchaser's obligations under Section 2.5(f) below, during the Designation Period, (x) each Held Contract shall be held by Seller, (y) Seller shall not reject or seek to reject (pursuant to Section 365 of the Bankruptcy Code or otherwise) any Held Contract and (z) Seller shall not terminate, amend, supplement or modify, or waive any rights under, any Held Contract or take any affirmative action not required by the terms thereof by Seller, without the prior written consent of Purchaser. Following the end of the Designation Period, Seller shall promptly cause all Held Contracts not designated as either "Assumed" or "Rejected" by Purchaser during the Designation Period to be rejected pursuant to Bankruptcy Code section 365.

(ii)     On each date that each Assumed Contract (including in all such cases the Code Share Agreements) or Additional Assumed Contract (as applicable) is assumed and assigned to Purchaser pursuant to this Section 2.5 (including, without limitation, the approval of the assumption and assignment thereof by the Bankruptcy Court), such Assumed Contract or Additional Assumed Contract (as applicable) shall constitute an "**Assigned Contract**" and shall be an Assigned Contract for all purposes under this Agreement, provided that no Assumed Contract or Additional Assumed Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Purchaser.

(e)     <u>Non-Assignment of Contracts and Permits</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or

transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Purchaser (unless the restrictions on assignment or transfer thereunder would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the efforts of Seller in accordance with the covenant set forth in Section 6.1(c)(xiii), such consent or approval is required but not obtained with respect to an Assumed Contract or an Additional Assumed Contract (as applicable) or a Permit, neither Seller nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Purchaser's termination right set forth in Section 11.1(c)(ix)) shall the Closing be delayed in respect of the Assumed Contracts or the Permits. From and after the date hereof, including through and after the Closing, Seller shall use their best reasonable efforts to obtain all consents or approvals that are required with respect to Assumed Contracts, Permits and Additional Assumed Contracts, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Purchaser such Contracts and Permits. For the avoidance of doubt, nothing in this Section 2.5(e) shall be deemed to (x) limit the liability, if any, of Seller pursuant to this Agreement for failing to have obtained any required consent or approval or (y) alter or limit any rights of Purchaser under Section 11.1(c)(ix) of this Agreement.

(f)        Held Contracts. Following the Closing Date and through the date that such Held Contract becomes an Assigned Contract or an Additional Rejected Contract, with respect to the Held Contracts, Purchaser shall pay any and shall be solely responsible for, all actual and direct costs incurred by Seller associated with each Held Contract, including the direct and reasonable out-of-pocket costs actually incurred by Seller in connection with the filings and hearings which are required for Held Contracts to become Assigned Contracts or Rejected Additional Contracts. Purchaser shall be obligated to satisfy any Cure Amounts with respect to each Held Contract that becomes an Assumed Contract. Notwithstanding the foregoing, Purchaser shall not be responsible for any liabilities or obligations relating to or arising out of such Held Contracts as a result of (A) any breach by Seller of such Contracts (provided that such breach is not caused by the breach of Purchaser of its obligations under this Section 2.5(f), (B) any violation of Law, breach of warranty, tort or infringement, in each case by Seller (provided that such violation is not caused by any act or omission of Purchaser after the Closing), (C) any charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand against Seller prior to the Closing (provided that such matters do not arise out of the act or omission of the Purchaser after the Closing), or (D) any other obligation or liability which is enumerated herein as an Excluded Liability. In addition, Purchaser shall perform, or shall cause to be performed, any and all obligations of Seller under each such Held Contract relating to the period from and after the Closing until such each such Held Contract has been, in accordance with this Section 2.5, (i) assumed and assigned to Purchaser or (ii) designated as an Additional Rejected Contract. From and after the Closing, Seller shall cooperate, at Purchaser's expense, with Purchaser in any reasonable arrangement Purchaser may request to provide Purchaser with all of the benefits of, or under, the applicable Held Contracts, including enforcement for the benefit of Purchaser of any and all rights of Seller against any Person party to the applicable Held Contract arising out of the breach or cancellation thereof by such Person.

2.6    Right to Change Designations.    Notwithstanding anything contained in this Agreement to the contrary, Purchaser reserves the right, and shall have the right, to designate in one or more written notices delivered to Seller (i) at any time prior to the Closing Date, any Acquired Asset as an Excluded Asset and (ii) at any time prior to two days prior to the commencement of the Auction, any Excluded Asset as an Acquired Asset (it being understood and agreed that such written notices will be deemed to have automatically updated and revised **Schedule 2.1(gg)** and **Schedule 2.2(h)** (in each case as applicable) for all purposes under this Agreement.

2.7    Seaborne. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that this Agreement contemplates the acquisition of the Acquired Assets solely of Silver as of the Signing Date. However, in the event that no Qualified Bid (as defined in the Bidding Procedures) is submitted or received as of the Closing Date, the Parties agree that this Agreement shall be deemed automatically amended, without further action by any Party, to include as part of the Acquired Assets all of the assets of Seaborne, and all references herein to the "Acquired Assets" shall be interpreted to include the assets of both Silver and Seaborne. The Parties shall take such actions and execute such documents as may be reasonably necessary to reflect such inclusion and to consummate the purchase and sale of the assets of both Silver and Seaborne in accordance with the terms of this Agreement, as so amended.

## ARTICLE 3
## CONSIDERATION

3.1    Purchase Price. In consideration of the sale of the Business and the Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions set forth herein, the purchase price (the "**Purchase Price**") for the Business and the Acquired Assets:

(a)    shall be equal to the sum of $5,775,000.00 *plus* those additional Obligations of the DIP Facility in excess of the principal obligations and Exit Fee, payable in Purchaser's sole and absolute discretion, on a dollar for dollar basis, by offset (i) to the DIP Facility Obligations evidenced by Purchaser delivering to Seller releases and waivers, fully executed, from the applicable lenders (in each of their respective sole and absolute discretion) under the DIP Credit Agreement with respect to all of a part of Seller's obligations thereunder and/or with the written consent of the lender under the DIP Credit Agreement (in each of their respective sole and absolute discretion), by Purchaser assuming all or a part of Seller's obligations thereunder on terms reasonably acceptable to Purchaser in its sole and absolute discretion; and, plus

(b)    assumption of the Assumed Liabilities.

3.2    Allocation of Purchase Price. Within the earlier of (i) 180 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Seller a statement (the "**Allocation Statement**") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)    The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement (other than if Seller reasonably disagrees with the Allocation

13

Statement, then the parties will work in good faith to resolve such disagreement), (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser:

4.1     Organization.  Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted. Except as a result of the commencement of the Bankruptcy Case, Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

4.2     Authorization of Agreement.  Subject to entry of the Bankruptcy Sale Order and authorization as is required by the Bankruptcy Court:

(a)     Seller has, or at the time of execution will have, all necessary corporate or limited liability company (as the case may be) power and authority to execute and deliver this Agreement and each Ancillary Agreement to which Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)     the execution and delivery of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary limited liability company (as the case may be) action on the part of Seller and no other limited liability company (as the case may be) proceedings (shareholder, member or otherwise) on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c)     this Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.3        Conflicts; Consents of Third Parties.

(a)        Except as set forth on **Schedule 4.3(a)**, the execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement to which Seller is or will become a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof and thereof do not, or will not, result in the creation of any Lien upon the Acquired Assets and do not, or will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)        Seller's certificates of formation, limited liability company agreements or comparable organizational documents of Seller;

(ii)        subject to entry of the Bankruptcy Sale Order, any Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound;

(iii)        subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the date hereof; or

(iv)        subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b)        Subject to entry of the Bankruptcy Sale Order, except as set forth on **Schedule 4.3(b)**[2] and such consents, waivers, approvals, orders, Permits or authorizations would not unreasonably be expected to have a Material Adverse Effect, no consent, waiver, approval, order, Permit or authorization of, or declaration, filing or registration with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets or the assumption of the Assumed Liabilities.

4.4        Title to Acquired Assets.  Seller has good and valid title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than any exceptions expressly set forth on **Schedule 4.4** hereto (the "**Permitted Exceptions**") and Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Bankruptcy Code sections 363 and 365, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions and Permitted Liens.

4.5        Contracts.  **Schedule 4.5** sets forth a complete list, as of the date hereof, of all Contracts to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets.  Purchaser has received true and complete copies of such

---

[2] NTD - Schedule to include appropriate notices to appropriate Government Authorities re change of ownership pursuant to 14 CFR Section 204 and if the FCC (if any radio licenses held by Seller), provided that such approvals are not a condition of Closing.

Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

       4.6        Property.  Seller does not own any real property.  Except as described on **Schedule 4.6**, neither the Seller nor the Business leases, subleases, licenses or otherwise occupies any real property.  Purchaser has received true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.  Purchaser has received true and complete copies of all default notices and any other correspondence of a material nature to or from any party to any lease, ground lease, sublease or license relating to the Leased Property.

       4.7        Intellectual Property.  Except as set forth on **Schedule 4.7(i)**, (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest to all such Intellectual Property, without any conflict known to Seller with the rights of others, (ii) no Person other than Seller has the right to use the Intellectual Property owned by Seller and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Seller's Business that is owned by a party other than Seller. **Schedule 4.7(ii)** sets forth a complete list, as of the date hereof, of all registered and applied for Intellectual Property owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

       4.8        Permits.  **Schedule 4.8(i)** sets forth a complete list, as of the date hereof, of all Permits issued to Seller for the operation of the Business.  **Schedule 4.8(ii)** sets forth a complete list, as of the date hereof, of all Permits applied for by Seller or the issuance of which to Seller is pending. Seller represents and warrants that such approvals are in full force and effect and have not been limited, revoked or modified in any manner and will continue in full force and effect immediately following the Closing.  **Schedule 4.8(iii)** sets forth a complete list, as of the date hereof, of all Permits required for the operation of the Business which have not been issued to Seller or applied for by Seller or the issuance of which to Seller is not pending.

       4.9     Employee Benefit Plans; Employees.  **Schedule 4.9(i)** sets forth a list of each Employee Benefit Plan.  Neither Seller nor any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan.  All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder.  Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which Seller may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.  **Schedule 4.9(ii)** sets forth a true, correct and complete list of the names, positions, work locations, hire dates, total compensation (listing separately applicable salaries and hourly rates) and eligibility and elections with respect to Employee Benefit Plans of all Employees, consultants and independent contractors engaged by Seller, and indicates which of such individuals are on disability leave or any other type of leave of absence, authorized or otherwise.

       4.10     Labor Relations.  Except as set forth on **Schedule 4.10**, Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization.  Seller has not

received written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any labor board, and, to the knowledge of Seller, no such petition has been threatened, and, to the knowledge of Seller, no labor dispute, strike, picketing, work slowdown, work stoppage or hand billing has been threatened in writing. Seller is not subject to any material unfair labor-practice charge.

    4.11    Environmental Matters. The Acquired Assets are in material compliance with all applicable Laws, regulations, or other legal requirements ("**Environmental Laws**") relating to the protection of the environment, pollution or human health and safety. At all times, Seller have conducted the Business and the respective operations in accordance with all Environmental Laws applicable to Seller and the Business. Seller have not received written notice of any investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to the knowledge of Seller, are any of the same being threatened in writing against Seller or any real property owned, operated, or leased by Seller. Seller have not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws. To the knowledge of Seller, there has been no release of any Hazardous Material into the environment at, onto, or from any property owned or leased by Seller which would reasonably be expected to result in material liability, costs or Claims relating to any Environmental Law. This Section 4.11 constitutes the sole and exclusive representation and warranty of Seller regarding environmental and human health and safety matters and liabilities and obligations and compliance with Laws relating thereto.

    4.12    Insurance. Seller maintains the insurance policies set forth on **Schedule 4.12(i)**, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and, except as set forth on **Schedule 4.12(ii)**, will continue in full force and effect immediately following the Closing. Seller has paid all premiums on such policies due and payable prior to the Signing Date. Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

    4.13    No Brokers or Finders. Except as set forth on **Schedule 4.13**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

    4.14    Litigation; Proceedings. Except as set forth in **Schedule 4.14**, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to knowledge of Seller, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to knowledge of Seller, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any arbitration award or settlement agreement with any Person.

    4.15    Board Approval and Recommendations. Each board of directors or managers (or similar governing body) of Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in

this Agreement regarding the solicitation of Alternate Transactions, if necessary, a sale, assignment and assumption of the Acquired Assets and the Assumed Liabilities pursuant to this Agreement under Bankruptcy Code sections 105, 363 and 365 is and are each in the best interests of Seller.

4.16    Compliance with Laws.  Except as set forth on **Schedule 4.16(i),** Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits (exclusive of Tax law compliance to the extent disclosed in **Schedule 4.18**) in all material respects, and (ii) hold all material Permits. Except as set forth on **Schedule 4.16(ii)**, Seller has not received any written notice or other written communication from any Governmental Entity or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (y) notifying Seller of the non-renewal, revocation or withdrawal of any Permit.  Seller is in material compliance with the terms of the Permits.

4.17    Aircraft

(a)    The airframe, each engine, and all parts and components of each Aircraft are in good operating condition, free from material defect (latent or patent), and have been maintained in accordance with (i) all applicable laws and regulations of the state of registration and any applicable aviation authority, including but not limited to the FAA or other  authority with jurisdiction over the Seller, and (ii) Seller's FAA- approved maintenance programs;

(b)    The Aircraft are, as of the Closing Date, airworthy and duly certified as such under an effective and valid certificate of airworthiness issued by the applicable aviation authority;

(c)    All inspections, checks, repairs, overhauls, and other maintenance required to be performed with respect to the Aircraft, engines, and parts by applicable law or regulation, or in accordance with Seller's FAA-approved  maintenance program, have been duly and properly performed and documented;

(d)    There are no known defects or conditions that would render the Aircraft, any engine, or any part unfit for normal commercial operations; and

(e)    All Aircraft records, including maintenance records and Manuals, are accurate and up to date, and all Aircraft have been maintained in accordance with Seller's FAA-approved maintenance programs.

4.18    Taxes.  Except as set forth on **Schedule 4.18**, (A) none of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the Code; (B) all material Taxes shown on such Tax Returns and all Trust Fund Taxes owing by Seller has been or will be paid in a timely fashion or have been accrued for on the Seller's financial statements; (C) there are no liens for any Tax on the Acquired Assets, except for Taxes not yet due and payable; and (D) Seller is not a foreign person as defined in Treasury Regulation section 1.445-2(b)(2)(i).

4.19    Financial Statements.

(a)    Seller has made available to Purchaser (i) the unaudited balance sheet of the Seller and the related unaudited statements of income, stockholders' equity and cash flow for

the fiscal year ended December 31, 2024, all certified by a financial officer of the Seller. The Financial Statements have been prepared from the books and records of Seller, have been prepared in accordance with GAAP (except as may be stated in the notes thereto) and fairly present the financial position and the results of operations and cash flows of Seller as of the times and for the periods referred to therein.

(b)    **Schedule 4.19** contains an aged list of the Accounts Receivable of the Seller as of December 31, 2024.  All such Accounts Receivable arose from, and all Accounts Receivables of the Seller existing as of the Closing Date will have arisen from, the delivery of products or services in its ordinary course of business.

4.20    Citizenship.    The Seller is a "citizen of the United States" as defined in 49 U.S.C. §40102 (a)(15) of the Federal Aviation Act, and an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. §§ 41101-41112).

4.21    Station Leases and Equipment.

(a)    **Schedule 4.21(a)** sets forth the aggregate amount of airline fees and charges paid and payable (if different) by Seller to the lessor or Governmental Authority under the Station Leases with respect to calendar year 2024.

(b)    **Schedule 4.21(b)** sets forth a true, correct and complete list of all leases, subleases, use agreements, licenses, permits, certificates or other documents or agreements under which Seller leases or occupies any location subject to a Station Lease, in each case, including identification of the Seller and the lease expiration date.  Any of the aforesaid agreements that are leases which are terminable by Seller or their assigns upon thirty days' notice or without penalty do not need to be listed on **Schedule 4.21(b)**.

(c)    **Schedule 4.21(c)** sets forth a true, correct and complete list of all the leases, subleases, use agreements, licenses, permits, certificates or other documents or agreements under which Seller leases, occupies or otherwise has the right to use any Ground Support Equipment included in the Transferred Assets, and all amendments thereto (the "**Ground Equipment Leases**"), in each case, including identification of the applicable Seller and the lease expiration date.

(d)    **Schedule 4.21(d)** sets forth a true, correct and complete list of all the Station Property owned by Seller (together with the Ground Support Equipment owned by Seller, the "**Owned Station Items**").

(e)    Except as set forth in **Schedule 4.21(e)** identifying the specific equipment and specific condition or non-compliance, the Owned Station Items are all in good operating condition and repair, subject to normal wear, are usable in the regular and ordinary course of business and, to Seller's knowledge, conform in all material respects to applicable Laws.

(f)    The Station Leases are in full force and effect, and except by reason of the filing of the Chapter 11 Cases or the insolvency of Seller, Seller has no knowledge of any material default under the Station Leases or of any condition or event which has occurred which with notice or the passage of time or both would constitute a material default, by Seller under the Station Leases which has not been disclosed to Purchaser.

(g)    Seller has not received any notice that any portion of the Owned Station Items is or will be subject to, or affected by, any condemnation, eminent domain or similar proceeding and there are no material violations of record or otherwise known to Seller against any portion of the Owned Station Items.

(h)    With respect to the Owned Station Items which Purchaser elects to purchase pursuant to Section 2.1(c) hereof, the Seller has, and at the Closing, Seller shall convey to Purchaser, good, valid and indefeasible title thereto free and clear of all Liens other than Permitted Liens, and with respect to Station Leases Purchaser elects to acquire, the Seller has and at the Closing, Seller shall assign to Purchaser valid rights to the lessee's interest thereunder.

(i)    Set forth on **Schedule 4.21(i)** is a list of all service, supply and other agreements to which Seller is a party or by which it is bound and which are known to Seller to be in effect on the Signing Date relating to services provided by a Person who is not an Affiliate of Seller to support Seller's operations or operations under or in connection with each Station Lease (collectively, the "**Service Agreements**").

4.22    Warranties Are Exclusive .  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1    Corporate Organization. Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate or limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

5.2    Authorization and Validity.  Purchaser has, or at the time of Purchaser's execution of such Ancillary Agreement will have, all necessary corporate or limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary action by the board of managers (or similar governing body) of Purchaser, and no other corporate or limited liability company proceedings on the part of Purchaser is necessary to authorize such

execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which Purchaser is or will become a party constitutes, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against Purchaser in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    No Conflict or Violation.  The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject, in each case, other than any violation, conflict, breach, event of default or default that would not reasonably be expected to adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

5.4    Consents and Approvals.  Except with respect to the issuance of the Bankruptcy Sale Order or as otherwise as set forth on **Schedule 5.4**[3], no consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is or will become a party or the performance by Purchaser of its obligations hereunder or thereunder.

5.5    Financing. Purchaser currently has, and on the Closing Date will have, readily available funds in such amount as is required to consummate the transactions contemplated hereunder on the terms set forth herein and otherwise to perform all of Purchaser's obligations under this Agreement.

5.6    Litigation.  There is no action, suit, proceeding or claim that is pending or, to Purchaser's knowledge, threatened in any court or by or before any Governmental Authority that would adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

5.7    No Other Representations and Warranties.  Except for the representations and warranties contained in this ARTICLE 5, neither Purchaser nor any other Person authorized by Purchaser makes any other express or implied representation or warranty on behalf of Purchaser.

---

[3] NTD - Schedule to include necessary DOT/FCC filings and approvals, provided that such approvals are not a condition of Closing.

5.8    Citizenship.    The Purchaser is a "citizen of the United States" as defined in the Federal Aviation Act, and an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. §§ 41101-41112).

# ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1    Pre-Closing Covenants of Seller.    Seller covenants to Purchaser that, during the period from and including the Signing Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11:

(a)    Cooperation.    Seller shall, without payment of funds to counterparties, use their commercially  reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)    Access to Records and Properties. Seller shall (i) provide Purchaser and its Related Persons reasonable access upon reasonable notice to the facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law, including access to perform field examinations and inspections of the Business' or the Acquired Assets' inventories, facilities and equipment; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties, prospects or operations of Seller as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any Employee of Seller.

(c)    Conduct of Business Prior to Closing. Except as expressly contemplated by this Agreement or disclosed on **Schedule 6.1(c)**, and except to the extent expressly required under the DIP Credit Agreement, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court and except to the extent waived by Purchaser's prior written consent (which consent may be delivered via electronic mail by any senior officer of Purchaser and may be withheld in Purchaser's sole and absolute discretion), Seller shall ensure that:

(i)    Seller shall not, directly or indirectly, take any action which, if taken, take any act which, if omitted to be taken, would constitute or result in an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement or the DIP Orders;

(ii)     Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than the sale of Inventory in the Ordinary Course of Business or the use of cash collateral in accordance with the DIP Credit Agreement or the DIP Orders;

(iii)     Seller shall not, directly or indirectly, permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens and Liens granted in connection with the DIP Credit Agreement;

(iv)     Seller shall not, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in a Material Adverse Effect on the Business or constitute a breach of any representation or warranty (as if then made) or covenant made by Seller in this Agreement;

(v)     Seller shall notify Purchaser promptly in writing of the occurrence of any Material Adverse Effect;

(vi)     Seller shall not, directly or indirectly, make any promise or representation, oral or written, or otherwise, to (x) increase the annual level of compensation payable or to become payable by Seller to any of its directors, managers, members, officers or Employees, (y) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, manager, member, officer or Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) enter into any employment, deferred compensation, severance, consulting, non-competition, non-solicitation or similar agreement (or amend any such current agreement) to which Seller is a party or involving a director, manager, member, officer or Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Signing Date and disclosed on **Schedule 4.9(i)**;

(vii)     Seller shall comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset;

(viii)     Except as set forth on **Schedule 6.1(c)(viii),** Seller shall not, directly or indirectly, (x) enter into any Contract that is material to Seller, (y) enter into any Contract if entering into such Contract, when taken together with all other Contracts entered into by Seller, would be material in the aggregate to Seller (taken as a whole) or (z) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets (including any Assigned Contract) or take any affirmative action not required by the terms of any such Contract;

(ix)    Seller shall not, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(x)    Seller shall not, directly or indirectly, enter into any commitment for any capital expenditure, except pursuant to any budget approved by the lenders under the DIP Credit Agreement;

(xi)    Seller shall not, directly or indirectly, terminate, amend or modify in any manner any Contract for Leased Property except for the rejection or other cancellation of facilities no longer used by Seller ;

(xii)    Seller shall use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the Ordinary Course of Business, (ii) preserve the existing business organization and management of the Business intact, (iii) keep available the services of the current Employees, to the extent reasonably feasible, (iv) maintain the existing relations with customers, carriers, centers, distributors, suppliers, creditors, business partners, Employees and others having business dealings with the Business, to the extent reasonably feasible, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (*e.g.*, discount policies) for any of its products or services; provided that the foregoing shall not preclude the performance management, furloughing, or termination of the employment of current Employees in the ordinary course of managing Seller's Business;

(xiii)    Seller shall use best reasonable efforts to obtain all consents or approvals prior to the Closing that are required, including making filings with the Governmental Authorities, notwithstanding the provisions of Bankruptcy Code sections 363 and 365, for Seller to assume and assign to Purchaser any Assumed Contract or Permit, *provided that* Purchaser hereby agrees to waives FAA and DOT approval as a condition to Close;

(xiv)    Seller shall use best reasonable efforts to assist Purchaser in obtaining all Permits required to own or operate the Acquired Assets under applicable Laws, including making filings with the Governmental Authorities and issuing powers of attorneys to Purchaser, as necessary;

(xv)    Seller shall not, directly or indirectly, take, or agree, commit or offer (in writing or otherwise) to take or omit to take, any action or actions in violation of the foregoing or which would otherwise adversely affect the consummation of the transactions contemplated hereby;

(xvi)    Seller shall maintain in full force and effect each Permit held by Seller as of the Signing Date or otherwise obtained by Seller prior to the Closing, Seller shall comply with the terms of each such Permit and Seller shall not permit any such Permit to terminate, be suspended, be dormant, expire or lapse;

(xvii)    Seller shall maintain in full force and effect without modification any insurance policy with respect to Acquired Assets, Seller shall

comply with the terms of such insurance policy and Seller shall not permit any such policy to terminate, expire or lapse; and

(xviii) Upon the request of Purchaser, Seller shall use their best reasonable efforts to obtain such consents and agreements from all lessors or secured parties of equipment (as defined in Section 1110(a)(3) of the Bankruptcy Code) necessary to extend the 60 day period provided for in Section 1110 of the Bankruptcy Code to the Closing Date and such consents and approvals shall be approved by the Bankruptcy Court as set forth in Section 1110(b) of the Bankruptcy Code.

(xix)    Maintenance of Acquired Assets. Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of the Acquired Assets and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

(xx)    Regulatory Matters; Citizenship; Utilization; Collateral Requirements. The Seller shall:

(A)    be a United States Citizen;

(B)    maintain at all times its status as an "air carrier" within the meaning of Section 40102(a)(2) of Title 49, and hold a certificate under Section 41102(a)(1) of Title 49;

(C)    maintain at all times its status at the FAA as an "air carrier" and hold an air carrier operating certificate under Section 44705 of Title 49 and operations specifications issued by the FAA pursuant to Parts 119 and 121 of Title 14 as currently in effect or as may be amended or recodified from time to time;

(D)    possess and maintain all necessary certificates, exemptions, franchises, licenses, permits, designations, rights, concessions, authorizations, frequencies and consents that are material to the conduct of its business and operations as currently conducted, except to the extent that any failure to possess or maintain would not reasonably be expected to result in a Material Adverse Effect;

(d)    [Reserved].

(e)    Notice of Certain Events.  Seller shall promptly notify Purchaser of, and furnish Purchaser any information it may reasonably request with respect to, (i) the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to Purchaser's obligations to consummate the transaction(s) contemplated by this Agreement

25

or by any Ancillary Agreement not to be fulfilled, (B) any material breach or inaccuracy of any representation or warranty of Seller contained in this Agreement, or (C) directly or indirectly, any Material Adverse Effect on Seller, or (ii) the receipt of any proposal for an Alternate Transaction and shall deliver all written proposals for an Alternate Transaction to Purchaser.  Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 6.1(e) shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(f)    Employees.  Seller shall promptly (but in any event within three (3) days or the occurrence of any such change) deliver to Purchaser a revised **Schedule 4.9(ii)** if any of the information set forth thereon, or required to be set forth thereon (such as with respect to terminated Employees and new Employees) changes after the date hereof with respect to any Employee, consultant or independent contractor.  On the Business Day immediately prior to Closing, Seller shall deliver to Purchaser a final **Schedule 4.9(ii)** which will be accurate and complete as of the Closing Date with respect to all information required to be set forth thereon.

6.2    Pre-Closing Covenants of Purchaser. Purchaser covenants to Seller that, during the period from the Signing Date through and including the Closing or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11:

(a)    Cooperation. Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things commercially reasonably necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby, provided that the foregoing shall not require Purchaser to participate in the Auction or to make any expenditure of funds or to incur any other obligation or liability.

(b)    Adequate Assurance Regarding Assigned Contracts and Required Orders. Purchaser agrees that it will provide information and cooperate as reasonably requested by Seller to assist in establishing adequate assurance of future performance within the meaning of Bankruptcy Code section 365 with regard to the Assigned Contracts, provided that the foregoing shall not require Purchaser to make any expenditure of funds or to incur any other obligation or liability except as expressly set forth herein.

(c)    Permits. Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws, provided that the foregoing shall not require Purchaser to make any expenditure of funds or to incur any other obligation or liability without its prior consent in Purchaser's sole and absolute discretion.

6.3    Other Covenants of Seller and Purchaser.

(a)    Disclosure Schedules and Supplements. From time to time prior to the Closing Date, Seller, on the one hand, with respect to disclosure schedules relating to Seller, shall notify Purchaser of, and Purchaser on the other hand, with respect to disclosure schedules relating to Purchaser, shall notify Seller of, and shall supplement or amend the

disclosure schedules (the "**Schedules**") to this Agreement with respect to, any matter that arises after the Signing Date and that, (i) if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation or warranty of Seller or Purchaser, as applicable, that has been rendered inaccurate thereby. Each such notification and supplement, to the extent known, shall be made by Seller to the Schedules prepared by Seller or Purchaser to the Schedules prepared by Purchaser, as applicable, no later than two (2) Business Days after discovery thereof by Seller or Purchaser, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties hereto, then promptly after discovery thereof by Seller or Purchaser, as applicable, and in any event prior to the Closing. Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Purchaser under Section 9.2(a) or Section 11.1(c)(iv) as if the Schedules were not supplemented or amended pursuant to this Section 6.3(a) and (ii) no such supplement or amendment to the Schedules shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(b)    <u>Personally Identifiable Information</u>.  Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Bankruptcy Code section 363(b)(1)(A).

(c)    <u>Access to Records after Closing</u>.  From and after the Closing Date, each party hereto shall provide the other parties hereto (and their respective representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes, including, but not limited to claims objections and resolutions.    If any party desires to dispose of any such records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove such records to be disposed of at the removing party's expense.

(d)    <u>Schedules and Exhibits</u>.  On or prior to the date hereof, Seller shall deliver to Purchaser a preliminary set of all schedules and exhibits hereto which are true and correct to the Seller' knowledge.  Within ten (10) Business Days hereafter, the Seller shall deliver to the Purchaser a true, correct and complete set of all schedules and exhibits hereto, which shall be true, correct and complete as the delivery thereof to Purchaser.

6.4    <u>Employment Covenants and Other Undertakings</u>.

(a)    <u>Employees</u>. Subject to an interview and other appropriate measures to determine that an Employee is reasonably qualified to perform his or her functions to Purchaser's standards, the Purchaser may, in its sole discretion, offer to employ, effective as of the Closing Date, some of Seller's Employees who are actively employed in the Business on the Closing Date.  Such offers of employment shall be on terms and conditions which are consistent with the Purchaser's policies and procedures  and shall be determined

by Purchaser in its sole and absolute discretion. Any Employees actually employed by Purchaser are referred to herein as "**Transferred Employees**." Purchaser shall endeavor to deliver a list of the Employees it intends to offer employment no later than two (2) days prior to the Closing Date. Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as Seller certify in writing are exempt from such requirement). Seller shall terminate all Transferred Employees as of the Closing Date.

(b)    Seller's Employee Benefit Plans. Seller shall retain (i) all liabilities and obligations in respect of its past, present and future employees under applicable Laws and (ii) all liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(c)    Other Obligations. Except as otherwise required by Law or otherwise agreed to in writing by Purchaser, neither Purchaser nor any of its Affiliates shall be obligated to provide any severance, separation pay or other payments or benefits to any Employee on account of any termination of such Employee's employment, and all such severance, separation pay and other payments and benefits (if any) shall remain obligations of Seller. For the avoidance of doubt, notwithstanding anything contained herein, Seller shall be responsible for (and Purchaser shall not be liable for) any wages or other remuneration, including, without limitation, with respect to paid time off, due to any Employee, whether with respect to their services as an Employee through the Closing Date or otherwise. In addition, Seller shall be responsible for, and Purchaser shall not be liable for, failure by Purchaser or Seller to provide any required notice under the WARN Act or, the Puerto Rico Unjust Dismissal Act (P.R. Stat. Tit. 29 Section 185(f.)) or other similar Law.

(d)    Forms W-2 and W-4. Seller and Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under this procedure, Seller shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable Law concerning record retention and Purchaser will obtain new IRS Forms W-4 with respect to each Transferred Employee.

(e)    No Right to Employment. Nothing herein shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with Purchaser or any of its Affiliates. Nothing in this Section 6.4 or any other provision of this Agreement: (i) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (ii) shall limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (iii) shall be construed to create any third-party beneficiary right in any employee or other Person other than the parties to this Agreement.

6.5    Casualty.  If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Purchaser shall have the option to:  (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have a Material Adverse Effect, the Purchaser may terminate this Agreement and the transactions contemplated hereby.

6.6    Confidentiality.  The Seller and the Purchaser agree and acknowledge that the Acquired Assets include confidential information of the Business which will be transferred to Purchaser at Closing.  From and after Closing; (a) Seller shall, and shall cause each of their respective Affiliates to, hold in confidence all confidential information included in the Acquired Assets and transferred to Purchaser; (b) in the event that Seller or any of its respective Affiliates shall be legally compelled to disclose any such information, Seller shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Seller or its respective Affiliates shall furnish only such information that is legally required to provide.

6.7    Collection on Acquired Assets.  If, after the Closing Date, Seller shall receive payment with respect to any Acquired Assets, Seller shall immediately deliver such funds or assets to Purchaser and take all steps necessary to vest title to such funds or assets in Purchaser.  Seller hereby designates Purchaser and its respective officers as Seller's true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Purchaser all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Acquired Assets.  Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Purchaser is coupled with an interest, and further agrees to execute and deliver to Purchaser from time to time any documents or other instruments requested by Purchaser to evidence such power of attorney.

6.8    Waiver of Bulk Sales Law  To the greatest extent permitted by applicable Law, Purchaser and Seller hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect to the transactions contemplated by this Agreement.  The Bankruptcy Sale Order shall contain a finding by the Bankruptcy Court or shall decree that the Seller and Purchaser are not required to comply with any such Laws.

# ARTICLE 7
# TAXES

7.1    Taxes Related to Purchase of Acquired Assets.

(a)    All transfer, conveyance, recording and similar Taxes, including all such state and local Taxes, incurred in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "**Transaction Taxes**"), that are imposed solely as a result of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne by Purchaser.  Purchaser and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b)     On or prior to the Closing Date, Seller shall pay all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets and the Business and/or attributable to Tax periods or portions thereof commencing on or after the Petition Date and ending on the Closing Date; provided, however, Seller shall not be obligated to pay any such Tax that is disputed in good faith by Seller, as long as appropriate reserves have been established in accordance with generally accepted accounting principles.  All sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date shall be paid by Seller.  Subject to Section 7.1(a), all sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that both accrue and are due after the Closing Date shall be paid by Purchaser.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1     Motions. Seller shall file with the Bankruptcy Court, per the Interim DIP Order, a motion or motions seeking the Bankruptcy Court's approval of the Bidding Procedures Motion and the Bankruptcy Sale Order. Seller shall affix a true and complete copy of this Agreement to such motion or motions filed with the Bankruptcy Court. Such motion or motions shall request, among other things, (i) the scheduling of the date for the Auction, and the Sale Hearing in accordance with the milestones set forth in the Interim DIP Order, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in **Exhibit B** and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in **Exhibit A**.

8.2     Contracts. Seller shall serve on all non-Debtor counterparties to all of the Contracts on the Contracts Schedule a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than seven (7) days prior to the Sale Hearing. In cases in which Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The motions contemplated by Section 8.1 and Section 2.5(c) shall reflect Purchaser's promise to perform from and after the Closing under all Assumed Contracts and the Additional Assumed Contracts (as applicable).

8.3     Procedure. Seller shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall make all changes reasonably requested by Purchaser.  Seller agrees to diligently prosecute the entry of the Bankruptcy Sale Order.  In the event the entry of the Bankruptcy Sale Order shall be appealed, Seller and Purchaser shall use their respective commercially reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting changes to this Agreement or the Ancillary Agreements or any resulting material changes to the Orders shall be subject to Purchaser's approval in its sole and absolute discretion.

8.4     Purchaser Protections.  Seller shall pay to Purchaser the Expense Reimbursement pursuant to the terms and conditions set forth in Section 11.3 hereof.

# ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1    <u>Conditions Precedent to Performance by Seller</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(d)) may be waived by Seller, in its sole and absolute discretion:

(a)    <u>Representations and Warranties of Purchaser</u>. Each and every representation and warranty of Purchaser made in this Agreement that is qualified by a materiality standard, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Purchaser made in this Agreement that is not qualified by a materiality standard, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date.

(b)    <u>Performance of the Obligations of Purchaser</u>. Purchaser shall have performed in all material respects (i) all obligations required under this Agreement that are to be performed by Purchaser on or before the Closing Date (except with respect to (1) obligations which Purchaser is to perform as of the Closing under this Agreement (including, without limitation, the obligation to pay the Purchase Price), Purchaser shall be ready, willing and able to perform such obligations against performance by Seller hereunder and simultaneously with the Closing Purchaser shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement) and (ii) all obligations required under each Ancillary Agreement to which Purchaser is a party that are to be performed thereunder by Purchaser on or before the Closing Date (except with respect to (I) obligations which Purchaser is to perform as of the Closing under the applicable Ancillary Agreement, Purchaser shall be ready, willing and able to perform such obligations against performance by Seller thereunder and simultaneously with the Closing Purchaser shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the applicable Ancillary Agreement).

(c)    <u>Bankruptcy Court Approval</u>. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    <u>Bidding Procedures Order</u>. The Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(f)    <u>Assumption, Sale and Assignment of Contracts</u>. The Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assumed Contracts.

For avoidance of doubt, there shall be no conditions precedent to Seller' obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

    9.2       Conditions Precedent to the Performance by Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c), Section 9.2(e) and Section 9.2(h) (if applicable), except as expressly provided therein) may be waived by Purchaser, in its sole and absolute discretion:

    (a)       Representations and Warranties of Seller. Each and every representation and warranty of Seller made in this Agreement that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Seller made in this Agreement that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date (disregarding for all purposes of this Section 9.2(a) any supplement or amendment to any of the Schedules pursuant to Section 6.3(a)).

    (b)       Performance of the Obligations of Seller. Seller shall have performed in all material respects (i) all obligations required by Seller under this Agreement that are to be performed by Seller on or before the Closing Date (except with respect to (1) obligations which Seller is to perform as of the Closing under this Agreement, Seller shall be ready, willing and able to perform such obligations against performance by Purchaser hereunder and simultaneously with the Closing, Seller shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement) and (ii) all obligations required under each Ancillary Agreement to which Seller is a party that are to be performed thereunder by Seller on or before the Closing Date (except with respect to (I) obligations which Seller are to perform as of the Closing under the applicable Ancillary Agreement, Seller shall be ready, willing and able to perform such obligations against performance by Purchaser thereunder and simultaneously with the Closing Seller shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the applicable Ancillary Agreement).

    (c)       Bankruptcy Court Approval. (i) The Bankruptcy Sale Order, in a form acceptable to Purchaser, shall have been entered by the Bankruptcy Court and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement, and (ii) the Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition in this clause (ii) has been waived in writing by Purchaser in its sole and absolute discretion.

    (d)       Stipulations and Releases. The Stipulations and the Releases (each as defined in the DIP Orders) shall have become finally entered and binding on all Persons,

in each case in form and substance acceptable to Purchaser in its sole and absolute discretion.

(e)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(f)    <u>Credit Bid Approval</u>.  The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Case unconditionally allowing, authorizing and approving the credit bid by Purchaser contemplated by this Agreement.

(g)    <u>Bidding Procedures Order</u>.  The Bidding Procedures Order, in a form acceptable to Purchaser, shall have been entered by the Bankruptcy Court.

(h)    <u>No Claims</u>. No Claim shall have been brought by any Person against any of Purchaser, Lenders (as defined in the DIP Credit Agreement) or any of their affiliated or related Persons, and, to the extent applicable, all periods in which any Claim could be brought against any of the foregoing by any Person shall have expired.

(i)    <u>Permits</u>. Purchaser shall have obtained Permits in replacement of any Permits that are not transferable by Seller to Purchaser and that are necessary for Purchaser to take title to all of the Acquired Assets at Closing and thereafter to operate all aspects of the Business including specifically the approval by the United States Department of Transportation of the substantial change of ownership and management of Seller and a determination that post-closing Seller shall be fit, willing and able and remain a citizen of the United States enabling Seller to continue to operate under its DOT Permits (the "DOT Approval Letter"),   and approval by the United States Federal Communications Commission of the change of ownership of Seller, and to any necessary approval of the right to provide regularly scheduled passenger and freight air transportation services on the Seller's international routes under Route Authority to be acquired from Seller.

(j)    <u>Certificate</u>.  The Air Carrier Certification Process under Title 14 of the Code of Federal Regulations (14 CFR) for Part 121 air carriers shall have been accomplished with the FAA such that Seller shall continue to have authority to provide interstate and foreign air transportation of passengers, freight and mail.

(k)    <u>Certain Agreements</u>. Any consents required to the assignment or transfer of the Assigned Contracts, including without limitation, the Acquired Station Assets, Code Share Agreements, and the interstate and foreign Permit authorities  shall have been obtained to the reasonable satisfaction of Purchaser.  In addition, Purchaser shall have, with respect to any asset of Seller that may be secured by a purchase money security interest, security interest or lien that is senior to any security interest or lien of Purchaser, entered into a lease with Seller, in the Purchaser's sole and absolute discretion, whereby Purchaser leases certain assets rather than purchasing such assets as an Acquired Asset hereunder.

(l)    <u>Contract Defaults</u>. Other than pre-petition defaults, there shall be no defaults, violations or breaches of, or under, any Contracts to which Seller is a party.

(m)    <u>Violations of Law</u>. There shall be no violations of Law that, in the opinion of Purchaser in its sole and absolute discretion, could adversely affect in any manner Purchaser's operation of the Business.

(n)    <u>Schedules and Exhibits</u>. All of the Schedules and Exhibits shall have been delivered prior to execution of this agreement and shall all be acceptable to Purchaser in its reasonable discretion.

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.2. Upon the non-fulfillment of any condition set forth in this Section 9.2, this Agreement may, at Purchaser's option, be terminated pursuant to, in accordance with and with the effect set forth in ARTICLE 11.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1    <u>Closing</u>. The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "**Closing**") shall be held on the first Business Day on which all conditions (except for only those conditions that by their terms can only be satisfied on the Closing Date) to the obligations of the parties hereto set forth in ARTICLE 9 to consummate the transactions contemplated hereby are first satisfied and/or waived, or at such other time, date and place as the parties shall mutually agree (the "**Closing Date**"). The Closing shall on the Closing Date occur at 10:00 a.m., Eastern Time, in the offices of Smith, Gambrell & Russell, LLP, 1105 W. Peachtree Street, N.E. Suite 1000, Atlanta, Georgia 30309. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (Eastern Time) on the Closing Date.

10.2    <u>Seller's Deliveries</u>. At the Closing:

(a)    the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser shall direct, shall be effected by the execution and delivery by Seller of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Trademark Assignment Agreements, (iv) the Transition Services Agreement and (v) such additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Purchaser;

(b)    Seller shall deliver all keys to Leased Real Property that are included in the Acquired Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein;

(c)    Seller shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in Section 9.2(a), Section 9.2(b) and Section 9.2(e), in form and substance satisfactory to Purchaser;

(d)       Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(e)       Seller shall deliver possession of the Acquired Assets;

(f)       Seller shall deliver duly and properly authorized and executed documents (in form and substance satisfactory to Purchaser) as to the amendment of Seller's organizational documents (the "**Organizational Amendments**") changing Seller's name to another name which does not include any of the following words "Silver Airways," or other iteration thereof; and

10.3       Purchaser's Deliveries.  At the Closing:

(a)       Purchaser shall pay the Purchase Price; and

(b)       Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement, the Transition Services Agreement and any other Ancillary Agreement which Purchaser is required to execute under the terms of this Agreement.

## ARTICLE 11
## TERMINATION

11.1       Termination. This Agreement may be terminated only in accordance with this Section 11.1. This Agreement may be, or, as applicable, shall be, terminated at any time before the Closing as follows:

(a)       by mutual written consent of Seller and Purchaser;

(b)       automatically and without any action or notice by Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i)       the issuance of a final and non-appealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)       approval by the Bankruptcy Court of an Alternate Transaction;

(iii)       acceptance by Seller of an Alternate Transaction; or

(iv)       Purchaser is not declared the winning bidder upon completion of the Auction.

(c)       by Purchaser:

(i)       if the Bidding Procedures Order shall not have been entered within ten days (10) of filing;

(ii)       if the Auction has not concluded on or prior to May 29, 2025;

(iii)    if the Bankruptcy Court has not entered the Bankruptcy Sale Order on or prior to five (5) days from the date of the Auction;

(iv)    if there has been a material violation or breach by Seller of any representation, warranty, agreement or covenant contained in this Agreement (disregarding any supplement or amendment to any of the Schedules pursuant to Section 6.3(a) and the disclosure of Previously Omitted Contracts) which (x) has rendered the satisfaction of any condition to the obligations of Purchaser set forth in Section 9.2 impossible or is not curable or, if curable, has not been cured within seven (7) days following receipt by Seller of written notice of such violation or breach from Purchaser, and (y) has not been waived by Purchaser;

(v)    if, prior to the Closing, the Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vi)    if the DIP Credit Agreement has been terminated or any of the lenders' obligations under the DIP Credit Agreement are terminated;

(vii)    if either of the interim or final order authorizing and approving the DIP Credit Agreement has not been entered within the time periods set forth therein;

(viii)    if any of the Milestones (as defined in the DIP Credit Agreement) are not met;

(ix)    if there shall be excluded from the Acquired Assets any Assumed Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and the exclusion of such Assumed Contract shall, in the opinion of Purchaser in its sole and reasonable discretion, prevent Purchaser from effectively operating the Business;

(x)    if Purchaser so elects in writing pursuant to Section 6.5 hereof;

(xi)    if any Claim is brought by any Person against any of Purchaser, Lender (as defined in DIP Credit Agreement) or any of their affiliated or related Persons prior to the expiration of the applicable period in which such Claim could be brought;

(xii)    if any Material Adverse Effect has occurred and be continuing;

(xiii)    if there exists any default, violation or breach of or under any Contract to which Seller is a party which has not been disclosed to Purchaser;

(xiv)    there exist any violations of Law (when either taken individually or in the aggregate) that either (x) were not disclosed by Seller to Purchaser by the Signing Date or (y) occurred after the Signing Date, and in the opinion of Purchaser in its reasonable discretion, could adversely affect in any manner Purchaser's operation of the Business;

36

(xv)    either the Schedules Delivery or the Exhibits Delivery has not occurred on or prior to the Delivery Date;

(xvi)    the Schedules delivered by Seller to Purchaser under this Agreement are not all acceptable to Purchaser in its reasonable discretion; or

(xvii)    the Exhibits delivered by Seller to Purchaser under this Agreement are not all acceptable to Purchaser in its reasonable discretion.

(d)    by Seller, if there has been a material violation or breach by Purchaser of any representation, warranty, agreement or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Seller set forth in Section 9.1 impossible or is not curable or, if curable, has not been cured within seven (7) days following receipt by Purchaser of written notice of such violation or breach from Seller, and (y) has not been waived by Seller.

Each condition set forth in this Section 11.1 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in Section 11.1 are applicable, Purchaser shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2    Effect of Termination.  In the event of termination pursuant to Section 11.1 or Section 6.5, this Agreement shall become null and void and have no effect and no party hereto shall have any liability to the other parties hereto, except (i) if the circumstances giving rise to such termination were caused either by the other party's breach of this Agreement or by any of the representations and warranties contained in this Agreement by such other party being incorrect when made (disregarding any supplement or amendment to any of the Schedules pursuant to Section 6.3(a) and the disclosure of Previously Omitted Contracts and (ii) with respect to the provisions of ARTICLE 11 and ARTICLE 12 which shall expressly survive termination hereof.

11.3    Stalking Horse Protections.

(a)    If this Agreement is terminated pursuant to Sections 11.1(a)-(c) then the Breakup Fee shall immediately become earned and due from Seller to Purchaser. Purchaser shall have no right to the Break-Up Fee if this Agreement is terminated pursuant to Section 11.1(d).

(b)    The Break-Up Fee shall be paid to Purchaser by wire transfer of immediately available funds contemporaneous with the closing of an Alternate Transaction. The Break-Up Fee shall be a super-priority administrative priority expense obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority claims of Seller's post-petition lenders.

(c)    Seller hereby acknowledges that the obligation to pay the Break-Up Fee shall survive the termination of this Agreement, and shall have administrative priority status against Seller and its estate.

# ARTICLE 12
## MISCELLANEOUS

12.1     Survival and Holdback.

(a)     Survival Period. The Representations and Warranties of Seller and Purchaser made in this Agreement shall survive the Closing Date for a period of six (6) months (the "Survival Period"). All covenants and agreements of Seller and Purchaser contained herein shall survive the Closing in accordance with their terms.

(b)     Holdback Amount. As security for any liability of, or amounts owed by, Seller after Closing due to a breach of any representation or warranty of Seller, Seller agrees that, until the later of (i) the expiration of the Survival Period, or (ii) if a post-Closing claim is made by Purchaser prior to the expiration of the Survival Period, until the resolution of such post-Closing claim (which, in the event litigation is commenced, shall be a final non-appealable order of a court of competent jurisdiction), Seller's shall retain and pay to Seller's counsel at Closing in escrow $57,750.00 from either: (i) the cash proceeds received from the sale of the Seaborne assets, or (ii) other available funds, and shall not make any disbursements, distributions, or payments to creditors, claimants, or any other parties.

12.2     Further Assurances.  At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3     Successors and Assigns. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns, including any trustee appointed in the Bankruptcy Case or subsequent chapter 7 case and Seller if the Bankruptcy Case is dismissed. Except as set forth in clauses (a) or (b) below, neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the parties hereto without the prior written consent of the other party or parties hereto (which consent may be granted, withheld, conditioned or delayed in such other party's sole and absolute discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect. Notwithstanding the foregoing:

(a)     Without the consent of Seller or any other Person, Purchaser may (i) assign this Agreement or any of Purchaser's rights, interests and/or obligations, in whole or in part (including the right or obligation to acquire any of the Acquired Assets or the right or obligation to assume any Assumed Liabilities), under this Agreement to one or more Persons who are Affiliates of Purchaser and (ii) designate any Person who is an Affiliate of Purchaser to perform any of Purchaser's obligations, in whole or in part (including the obligation to acquire any of the Acquired Assets or the obligation to assume any Assumed Liabilities), under this Agreement. In the event of any assignment or designation pursuant to this Section 12.3(a), Purchaser shall not be relieved of any liability or obligation to Seller hereunder; and

(b)      Without the consent of Seller or any other Person, Purchaser may assign this Agreement or any of Purchaser's rights, interests and/or benefits, in whole or in part, under this Agreement as collateral to any lender of Purchaser; provided, however, no such assignment shall relieve Purchaser of any liability or obligation to Seller hereunder.

12.4      Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.  For so long as Seller are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of any state or federal court having competent jurisdiction in Southern District of Florida.

12.5      Expenses.  Except as otherwise provided in this Agreement, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6      Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Signing Date and (b) the date (if any) this Agreement was last amended.

12.7      Notices.

(a)      All notices, requests, demands, consents, waivers and other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, if delivered personally; (ii) when sent, if sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); (iii) on the day of transmission, if sent via electronic transmission to the email address below (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); and (iv) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to Seller:

Silver Airways LLC
2850 Greene Street
Hollywood, Florida 33020
Attention: Chief Executive Officer
E-mail: steve.rossum@silverairways.com


With a copy (which shall not constitute notice) to:

Smith Gambrell & Russell LLP
1105 West Peachtree Street, N.E., Suite 1000
Atlanta, Georgia 30309
Attention Brian Hall
E-mail:  bhall@sgrlaw.com


If to Purchaser:

Argentum Acquisition Co. LLC
Attn: Wayne Heller, CEO
777 West Putnam Avenue
Greenwich, CT 06830

With a copy (which shall not constitute notice) to:

Tucker Arensberg, P.C.
Attn: Michael A. Shiner
One PPG Place, Suite 1500
Pittsburgh, PA 15222


(b)    Any party hereto may change its address or facsimile number for the purpose of this Section 12.7 by giving the other parties written notice of its new address in the manner set forth above. Written confirmation of receipt (A) given by the recipient of such notice, request, demand, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

12.8    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party hereto waiving compliance.  Any waiver by any party hereto of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or

warranty of this Agreement.  Notwithstanding the foregoing, it is understood and agreed that any changes affected pursuant to Section 2.2(l) or Section 2.6 shall not require compliance with this Section 12.8.

12.9    Entire Agreement. This Agreement, the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), supersede all other prior oral or written agreements among the parties hereto solely with respect to the matters contained herein and therein, and this Agreement, the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, contain the entire understanding of the parties hereto solely with respect to the matters contained herein and therein. For clarification purposes, the Recitals are part of this Agreement. It is understood and agreed by the parties hereto that all rights, obligations and provisions set forth herein, as well as the exercise of any such rights, the performance of any such obligations and any action taken (or inaction) related to this Agreement by any party hereto, shall be completely separate from, and independent of, all of the foregoing related to, or arising under, the DIP Credit Agreement.

12.10    Seller Disclosures.  After notice to and consultation with Purchaser, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in Seller' chapter 11 Bankruptcy Case and other Persons bidding on assets of Seller.  Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Purchaser, which shall not unreasonably be withheld or delayed, provided, however, Seller, without the prior consent of Purchaser, may issue such press release or make such public statement as may, upon the advice of counsel, be required by Law or any Governmental Authority with competent jurisdiction.

12.11    Headings.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

12.13    Name Change.  Immediately following the Closing, Seller shall discontinue the use of its current name (and any other trade names currently utilized by Seller) and shall not subsequently change its name or use or otherwise use or employ any name which includes the words "Silver," "Silver Airways" or any iteration thereof, and Seller shall cause its name in the caption of the Bankruptcy Case to be changed to the new names as provided in Section 10.2(g) and the last sentence of this Section 12.13. From and after the Closing, Seller covenant and agree not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or similar Intellectual Property rights utilized by Seller in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder. Seller hereby irrevocably authorizes

Purchaser to file, immediately following the Closing, the Organizational Amendments with the applicable Secretary of State Seller' jurisdiction of formation and in each State in which Seller is qualified to do business.

12.14    Payments and Revenues. If after the Closing, Seller shall receive any payment, revenue or other amount that belongs to Purchaser pursuant to this Agreement, Seller shall promptly remit or cause to be remitted the same to Purchaser.

12.15    Waiver of Jury Trial. **EACH PARTY HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS AGREEMENT.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.**

12.16    No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than Purchaser's Related Persons referred to in Section 12.16.

[Signature page to follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

Argentum Acquisition Co. LLC

By: _____
     Wayne Heller, CEO


[*signature pages continue*]

**SELLER :**

SILVER AIRWAYS LLC

By: _____

Name: Steven A. Rossum

Title: Chief Executive Officer


As to Section 2.7 only :


SEABORNE VIRGIN ISLANDS, INC.

By: _____

Name: Steven A. Rossum

Title: Chief Executive Officer

**EXHIBIT A**
**SALE ORDER**

[To be filed]

**EXHIBIT B**
**<u>BIDDING PROCEDURES ORDER</u>**

See [Doc. 501].

**EXHIBIT C**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**

See attached. Seller was provided a copy of this document on June 6, 2025. No comment was ever received.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "**Agreement**") dated June __, 2025, is executed by and between SILVER AIRWAYS, LLC, a Delaware limited liability company ("**Assignor**"), and ARGENTUM ACQUISITION CO. LLC, a Delaware limited liability company ("**Assignee**").

## RECITALS

Assignor has entered into that certain Amended and Restated Asset Purchase Agreement (the "**Purchase Agreement**"), dated May 20, 2025, with Assignee.  Pursuant to the Purchase Agreement and subject to the terms and conditions herein, and the Sale Order, Assignor has agreed to contribute, convey, and assign, and Assignee has agreed to assume and receive the Assumed Contracts (as defined in the Purchase Agreement). Capitalized terms used herein but not defined shall have the meanings assigned to such terms in the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Assignment and Assumption.** Assignor hereby irrevocably contributes, grants, delegates, conveys, transfers, and assigns to Assignee all of Assignor's rights, duties and obligations associated with the Assumed Contracts, pursuant to and in accordance with the terms and conditions of the Purchase Agreement as of the date hereof.  Each such assignment is without representation or warranty by the Assignor. Assignee hereby agrees to pay, discharge, perform, or otherwise satisfy, and assumes and agrees to be bound by only those obligations associated with the Assumed Contracts which arise on or after the Closing Date (but not including liabilities stemming from pre-closing breaches of Assignor), pursuant to and in accordance with the terms and conditions of the Purchase Agreement as of the date hereof.

2.   **Further Action.** Each of the Assignor and the Assignee, as applicable, shall use commercially reasonable efforts to take or cause to be taken all appropriate action, do or cause to be done all things necessary, proper or advisable, and execute and deliver such documentation and instruments as may be required to carry out the provisions of this Agreement.

3.   **Conflict of Terms.** Nothing in this Agreement shall alter any liability or obligation of Assignor or Assignee arising under the Purchas Agreement.  For the avoidance of doubt, in the event of any inconsistency between the provisions of this Agreement and any provision of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control.

4.   **Entire Agreement.** This is the final and exclusive expression of the agreement of Assignor and Assignee as to the subject matter hereof, and no course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any term expressed in this Agreement.

5. **Governing Law.** The provisions of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York as such laws are applied to contracts entered into and performed in such state and without regard to the conflict of law rules of any state.

6. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Execution and delivery of this Agreement by email or exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Agreement by such party.

7. **Successors and Assigns.** All of the covenants, terms and conditions set forth herein shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

*[Signature page follows]*

2

The terms set forth in this Agreement are hereby agreed to:

ASSIGNOR:

**SILVER AIRWAYS, LLC**

By: _____
    Steven Rossum, CEO

ASSIGNEE:

**ARGENTUM ACQUISITION CO. LLC**

By: _____
    Wayne Heller, CEO

TADMS:20805123-2:042679-205174

*[Signature page to Assignment and Assumption Agreement]*

3

**EXHIBIT D**
**<u>BILL OF SALE</u>**

See attached. Seller was provided a copy of this document on June 6, 2025. No comment was ever received.

## BILL OF SALE

THIS BILL OF SALE is entered into June ___, 2025, by Silver Airways, LLC, a Delaware limited liability company (the "Seller"), in consideration of the covenants, agreements, terms and provisions contained in that certain Amended and Restated Asset Purchase Agreement dated May 20, 2025 (the "Purchase Agreement"), by and among the Seller and Argentum Acquisition Co. LLC, a Delaware limited liability company (the "Purchaser") and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby grant, assign, convey, transfer and deliver to Purchaser the Acquired Assets (as such term is defined under the Purchase Agreement) unto Purchaser, free and clear of all Encumbrances, other than Permitted Liens, if any.

TO HAVE AND TO HOLD all and singular said Acquired Assets unto Purchaser, its successors and assigns, to its own use and benefit forever.

This Bill of Sale is subject in all respects to the terms of the Sale Order (as defined in the Purchase Agreement), the Purchase Agreement, and all of the representations, warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided for in the Purchase Agreement. All capitalized words and terms used in this Bill of Sale and not defined herein shall have the respective meanings ascribed to them in the Purchase Agreement.

This Bill of Sale and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Florida, without giving effect to the conflict of law principles thereof. This Bill of Sale may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. The electronic transmission of any signed original counterpart of this Bill of Sale shall be deemed to be the delivery of an original counterpart of this Bill of Sale.

[Signature page follows]

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above written.


**SELLER:**

Silver Airways, LLC

By: _____
    Steven Rossum, CEO

*Signature Page to Bill of Sale*

**EXHIBIT E**
**TRADEMARK ASSIGNMENT AGREEMENT**

See attached. Seller was provided a copy of this document on June 6, 2025. No comment was ever received.

## TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT, dated as of June [__], 2025 (this "**Assignment**"), is made and entered into by and between SILVER AIRWAYS, LLC, a Delaware limited liability company ("**Assignor**"), and ARGENTUM ACQUISITION CO. LLC, a Delaware limited liability company (the "**Assignee**"). Assignor and Assignee are sometimes herein referred to collectively as the "**Parties**" and individually as a "**Party**." Capitalized terms used but not defined herein shall have the meanings given to such terms in the Amended and Restated Asset Purchase Agreement, dated May 20, 2025, by and among the Parties (the "**Purchase Agreement**").

WHEREAS, Assignor owns certain intellectual property and has all rights, title, and interest in the service mark set forth in <u>Exhibit A</u> hereto (the "**Mark**"); and

WHEREAS, on December 30, 2024, the Assignor filed a voluntary petition for reorganization relief (the "**Bankruptcy Case**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"), Case No. 24-23623-PDR;

WHEREAS, Assignor desires to assign all right, title and interest in and to the Mark, together with all goodwill arising from or relating thereto, to Assignee, and Assignee desires to acquire same.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1. <u>Assignment</u>. Assignor hereby irrevocably conveys, transfers, assigns, and delivers unto Assignee, absolutely and forever, its entire right, title, and interest in the United States and throughout the world, in and to the Mark, whether statutory or at common law, together with all goodwill arising from or related to the business symbolized by the Mark, the same to be held and enjoyed by Assignee for its own use and enjoyment, and for the use and enjoyment of its licensees, successors, assigns, and/or other legal representatives, including the right to sue for and receive all damages accruing from past, present and future infringement of the Mark, to be used as fully and entirely as such rights would have been held and enjoyed by each Assignor had this Assignment not been made. Assignor hereby represents and warrants to Assignee that it has the full right to convey the Mark herein assigned and that it has not executed, and covenants that it will not execute, any agreement in conflict with this Assignment.

2. <u>Further Assurances</u>. Assignor hereby agrees to take such actions and execute such documentation as may be required by any domestic or foreign intellectual property registrar or regulatory agency to transfer ownership of the Mark from Assignor to Assignee. Assignor hereby also agrees to execute such further assignments and related documents with respect to the Mark as Assignee shall reasonably request.

3. <u>Rights and Royalties</u>. All rights and any income, royalties or payments otherwise due or payable to Assignor with respect to the Mark as of the date hereof or thereafter, will be held and enjoyed by Assignee, its successors, executors and permitted assigns.

4.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor, Assignee and their respective successors and permitted assigns.

5.    <u>Headings</u>.  The article and section headings of this Assignment are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

6.    <u>Governing Law</u>.  The law of the State of New York shall govern all questions concerning the construction, validity, interpretation and enforceability of this Assignment and the exhibits and schedules attached hereto, the determination of any contractual or non-contractual rights, duties or remedies of the Parties arising out of or relating to this Assignment and the exhibits and schedules attached hereto, and the performance of the obligations imposed by this Assignment, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York. The Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Assignment, and consent to the jurisdiction of any state or federal court having competent jurisdiction in Southern District of Florida.

7.    <u>Severability</u>. Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment or the application of any such provision to any Person or circumstance shall be held to be prohibited by or invalid, illegal or unenforceable under applicable Law in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Assignment.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Assignment a legal, valid and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

8.    <u>Entire Agreement</u>.   This Assignment, the other transaction documents contemplated by the Purchase Agreement and the agreements and documents referred to herein and therein contain the entire agreement and understanding between the Parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings.

9.    <u>Amendments; No Waiver</u>.  Any provision of this Assignment may be waived or amended if, and only if, such amendment or waiver is in writing and signed by all of the Parties. No failure by any Party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Assignment, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

10.    <u>No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of the Parties hereto, their permitted assigns and nothing herein expressed or implied shall give or be

construed to give any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder.

11.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts (including by means of facsimile pdf or other electronic signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

*[Signature pages follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Assignment to be executed by its duly authorized representatives effective on the date first written above.

ASSIGNOR:                                    SILVER AIRWAYS, LLC


By: _____
Name:
Title:



ASSIGNEE:                                    ARGENTUM ACQUISITION CO. LLC


By: _____
Name:
Title:




[Signature Page to Trademark Assignment Agreement]

## EXHIBIT A

## SERVICE MARK

| Mark | U.S. Serial No. | Reg. No. | U.S. Classes | Goods/Services |
|---|---|---|---|---|
| SILVER AIRWAYS | 85980426 | 4452646 | 100, 105 | Airline transportation services; air transportation services; arranging and coordinating travel arrangements for individuals and groups, namely vacation and business travel |

**EXHIBIT F**
**<u>TRANSITION SERVICES AGREEMENT</u>**

Not applicable.

## Schedule 1

## DEFINED TERMS

"**Accounts Receivable**" means accounts receivable, negotiable instruments, chattel paper (including, without limitation, completed work that has not yet been billed), credit card and other receivables (including, without limitation, in respect of services rendered including air transportation or other services performed by Seller but unbilled or uncollected as of Closing) goods shipped, products sold, licenses granted or otherwise associated with the Business and all amounts that may be returned or returnable with respect to any letters of credit drawn down prior to Closing.

"**Acquired Assets**" has the meaning ascribed to in it in Section 2.1 of this Agreement.

"**Acquired Station Assets**" shall have the meaning ascribed to such term in Section 2.1(d)(i) of this Agreement.

"**Additional Assumed Contract**" has the meaning ascribed to it in Section 2.5(b)(i) of this Agreement.

"**Additional Cure Notice**" has the meaning ascribed to it in Section 2.5(b)(ii) of this Agreement.

"**Additional Designation Date**" has the meaning ascribed to it in Section 2.5(b)(ii) of this Agreement.

"**Additional Designation Notice**" has the meaning ascribed to it in Section 2.5(b)(i) of this Agreement.

"**Additional Rejected Contract**" has the meaning ascribed to it in Section 2.5(b)(i) of this Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning ascribed to it in the preamble of this Agreement.

"**Aircraft**" means any contrivance invented, used, or designed to navigate, or fly in, the air leased by Seller, now or in the future, including but not limited to those which are the subject of the Aircraft Leases.

"**Aircraft Leases**" means those aircraft leases identified on Schedule 1- AL.

"**Allocation Statement**" has the meaning ascribed to it in Section 3.2 of this Agreement.

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Seller (a) accept a Qualified Bid, other than that of Purchaser, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser.

"**Ancillary Agreement**" means any other agreement, document or instrument that Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"**Assigned Contract**" has the meaning ascribed to it in Section 2.5(d)(ii) of this Agreement.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in substantially the form annexed hereto as **Exhibit C** evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts, which **Exhibit C** shall be acceptable to Purchaser in its sole and absolute discretion.

"**Assumed Contract**" has the meaning ascribed to it in Section 2.5(a)(ii) of this Agreement and shall include in all cases the Code Share.

"**Assumed Liabilities"** has the meaning ascribed to it in Section 2.3 of this Agreement.

"**Auction**" means the auction for the sale of Seller' assets conducted by Seller if any Qualified Bid is received pursuant to the Bidding Procedures Order.

"**Bankruptcy Cases**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Sale Order**" means an order, in all material respects in the form of **Exhibit A**, issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole and absolute discretion.

"**Bidding Procedures Motion**" means a motion, in form and substance satisfactory to Purchaser in its sole and absolute discretion, to approve the Bidding Procedures Order.

"**Bidding Procedures Order**" means an order, in all material respects in the form of **Exhibit B**, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids, which Bidding Procedures Order shall be acceptable to Purchaser in its sole and absolute discretion.

"**Bill of Sale**" means each Bill of Sale in all material respects in the form of **Exhibit D** conveying to Purchaser title to all of the Acquired Assets, which **Exhibit D** shall be acceptable to Purchaser in its sole and absolute discretion.

"**Break-Up Fee**" means 3% of the Purchase Price.

"**Business**" has the meaning ascribed to in the recitals to this Agreement.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York are authorized by Law or other governmental action to close.

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, instruments for the payment of money, certificates of deposit and other time deposits and letters of credit.

"**Casualty**" has the meaning ascribed to it in Section 6.5 of this Agreement.

"**Causes of Action**" means all Claims and causes of action held by Seller immediately prior to the Closing Date, including, but not limited to, any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether arising under any contract or under the Bankruptcy Code or other federal, state or other non-bankruptcy law.

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" has the meaning ascribed to it in Section 10.1 of this Agreement.

"**Closing Date**" has the meaning ascribed to it in Section 10.1 of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Code Share Agreements**" means those certain Contracts consisting of code share agreements, however entitled, listed on Schedule 1- CS, as amended, and all pro-rate agreements and interline partner agreements, in any such case, to which Seller, or either of them, are a party.

"**Collective Bargaining Agreements**" means those certain Contracts enumerated on Schedule 4.10.

"**Contract**" means any agreement, contract, lease (including, without limitation, Code Share Agreements, Service Agreements, leases for the Leased Property), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto that is an executory contract pursuant to Bankruptcy Code Section 365.

"**Contracts Schedule**" has the meaning ascribed to it in Section 2.5(a)(i) of this Agreement.

"**Cure Amounts**" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Contracts so that they may be sold and assigned to Purchaser pursuant to Bankruptcy Code Sections 363 and 365.

"**Data**" means all Documents and data related to the Business, including, but not limited to all clinical, analytical, bench and manufacturing data.

"**Delivery Date**" means the Petition Date or such later date as determined by Purchaser in its sole and absolute discretion.

"**Designation Period**" has the meaning ascribed to it in Section 2.5(b)(i) of this Agreement.

"**DIP Credit Agreement**" means the April 22, 2025, Debtors-in-Possession Credit and Security Agreement by and between  Seller and KIA II LLC as the same may be amended, restated, supplemented or otherwise modified and in effect from time to time.

"**DIP Facility Obligations**" means the "Obligations" as defined in the DIP Orders.

"**DIP Orders**" means the Interim DIP Order  the Final DIP Order  of the Bankruptcy Court approving Seller' entry into the DIP Credit Agreement.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), personnel files and employment records relating to employees (including, without limitation, applicable completed I-9 forms), supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Leased Property, but excluding any materials exclusively related to any Excluded Assets.

"**DOT**" shall mean the U.S. Department of Transportation or any successor thereto.

"**Employee Benefit Plans**" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or any ERISA Affiliate and that covers any current or former employee, director, manager, member, officer or consultant of Seller (or their dependents, spouses or beneficiaries).

"**Employees**" means all individuals employed by Seller in connection with the Business as of the Closing Date.

"**Encumbrances**" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to Seller personally, other agreement term tending to limit any right or privilege of Seller under any Contract, conditional sale Contract, title retention Contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, Contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"**Environmental Laws**" has the meaning ascribed to it in Section 4.11 of this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Excluded Assets**" has the meaning ascribed to it in Section 2.2 of this Agreement.

"**Excluded Liabilities**" has the meaning ascribed to it in Section 2.4 of this Agreement.

"**Expense Reimbursement**" means an amount equal to the lesser of (a) the aggregate documented, actual, reasonable out-of-pocket fees and expenses (including, without limitation, fees and expenses of legal counsel, accounting fees and expenses, escrow and other fees and expenses) incurred by Purchaser in connection with this Agreement (including, without limitation, the drafting, negotiation and implementation of this Agreement), the transactions contemplated hereby and matters related hereto and thereto (including, without limitation, relating to business, legal and accounting due diligence and all matters in connection with the Bankruptcy Case), in each case whether incurred before or after the Petition Date, and (b) $150,000.

"*FAA*" shall mean the Federal Aviation Administration or any successor thereto.

"**Facilities Leases**" means all airport facility leases to which Seller, or either of them, are a party, including without limitation all of Seller's right and interest thereunder in and to Seller's maintenance bases and hangar leases in Orlando, Florida and San Juan, Puerto Rico, ramp space, and associated service facilities.

"**FCC**" shall mean the Federal Communications Commission or any successor thereto.

"**Federal Aviation Act**" shall mean the Federal Aviation Act of 1958, as amended, together with the aviation regulations of the FAA, as the same may be in effect from time to time.

"Final DIP Order"means _____.

"**Federal Rules of Bankruptcy Procedure**" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to title 11 of the United States Code.

"**FF&E**" means all equipment (including, without limitation, laser equipment), machinery, fixtures, furniture and other tangible property (unless sold to any third party in the Ordinary Course of Business and not in violation of this Agreement) (including all such property that is damaged), including all attachments, appliances, fittings, gas and oil burners, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"**Governmental Authority**" means any federal, state, Puerto Rican, U.S. Virgin Islands, foreign governmental authority, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"**Ground Equipment Leases**" has the meaning ascribed it in Section 4.21(d).

"**Ground Support Equipment**" means each vehicle, tool, piece of equipment, or other tangible asset owned or leased by Seller in connection with aircraft operations or maintenance at facilities included in or covered by the Station Leases.

"**Held Contract**" has the meaning ascribed to it in Section 2.5(a)(ii) of this Agreement.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"**Intellectual Property**" means all intellectual property, including, without limitation, (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming,

service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, Websites and Web pages, (h) any and all other intellectual property and proprietary rights, (i) company-wide telephone numbers (including facsimile numbers) and (j) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"**Interest**" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"**Interim DIP Order**" means _____ dated April 24, 2025

"**Inventories**" or "**Inventory**" means all inventory of any kind or nature (other than FF&E) whether or not prepaid, and wherever located, held or owned, including, without limitation, office and medical supplies, service parts and accessories.

"**Law**" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order (including, without limitation, the Orders), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"**Leased Property**" means all real or personal property leased, subleased or licensed by Seller which is used or useful in connection with the operation of the Business including Station Leases and Ground Equipment Leases.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Manuals**" means all documents, whether in physical or electronic format, that are required by and approved by the Federal Aviation Authority or customarily provided by manufacturers in connection with the operation, maintenance, repair, or support of the Aircraft, including, without limitation, the Aircraft fight manual, training manuals, dispatch manuals, flight attendant manuals, customer service manuals, maintenance manuals, M.E.L. manuals, M.T.L. manuals, training flight manuals, structural repair manual, component maintenance manuals, pilot operating handbooks, checklists, and any other technical, training, or operational documents related to the Aircraft, as amended, supplemented, or revised from time to time.

"**Material Adverse Effect**" means a state of facts, event, change or effect with respect to the Business, the Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results in a material adverse effect on the value of the Acquired Assets or the Business, taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (a) changes in economic, regulatory or political conditions generally; or (b) the fact that Seller filed as a debtor pursuant to the Bankruptcy Code.

"**Obligations**" means, collectively, the Pre-Petition Obligations (as defined in the DIP Orders) and the DIP Obligations.

"**Omitted Contract Order**" has the meaning ascribed to it in Section 2.5(c)(i) of this Agreement.

"**Orders**" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"**Ordinary Course of Business**" means the conduct by Seller of the Business in substantially the same manner as conducted as of the Signing Date and in compliance with

applicable Law in all material respects, after taking into consideration changes that are a result of, relating to, in connection with or resulting from the Bankruptcy Case.

"**Organizational Amendments**" has the meaning ascribed to it in Section 10.2(f) of this Agreement.

"**Owned Station Items**" has the meaning ascribed to it in Section 4.21(e) of this Agreement.

"**Permitted Exceptions**" has the meaning ascribed to it in Section 4.4 of this Agreement.

"**Permitted Liens**" means: (a) statutory liens arising in the Ordinary Course of Business that are not overdue and that do not affect in any material respect the value or use of the affected asset, all of which are listed on <u>**Permitted Liens Schedule**</u> attached hereto; (b) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security legislation; and (c) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case detract in any material respect from the value or use of the property subject thereto or interfere in any material respect with the ordinary conduct of the business of Seller at the property subject thereto.

"**Permits**" means all Route Authority, licenses, certificates, permits, concessions, deviations, grants, easements, variances, exemptions, consents, orders, franchise, filings, approvals, authorizations and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**Petition Date**" means the date on which the Bankruptcy Case is filed with the Bankruptcy Court.

"**Previously Omitted Contract**" has the meaning ascribed to it in Section 2.5(c)(i) of this Agreement.

"**Purchase Price**" has the meaning ascribed to it in Section 3.1(a) of this Agreement.

"**Purchaser**" has the meaning ascribed to it in the preamble of this Agreement.

"**Purchaser Plans**" has the meaning ascribed to it in Section 6.4(b) of this Agreement.

"**Qualified Bid**" means competing bids qualified for the Auction in accordance with the Bidding Procedures Order.

"**Rejected Contract**" has the meaning ascribed to it in section 2.5(a)(ii) of this Agreement.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, stockholders, employees, controlling

persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"**Released Claims**" has the meaning ascribed to it in Section 12.16 of this Agreement.

"**Route Authority**" means the authority granted by the U.S. Department of Transportation to provide passenger and/or freight air services to international destinations.

"**Sale Hearing**" means the hearing to consider the entry of the Bankruptcy Sale Order.

"**Schedules**" has the meaning ascribed to it in Section 6.3 of this Agreement.

"**Seller Indemnified Parties**" shall mean the following Persons:  the members of the board of managers of Seller from and as of December  30, 2024, the designated corporate officers of Seller from and as of December 30, 2024 including those serving as the chief executive officer, president, treasurer, secretary, general counsel, or any level of vice president.

"**Seller**" has the meaning ascribed to it in the preamble of this Agreement.

"**Service Agreements**" has the meaning ascribed to it in Section 4.21(k) of this Agreement.

"**Signing Date**" has the meaning ascribed to it in the preamble of this Agreement.

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"**Station**" shall mean any airport at which Seller has a Station Lease.

"**Station Lease**" shall have the meaning ascribed to such term in Section 2.1(d) of this Agreement.

"**Station Property**" shall mean all facilities, equipment, furnishings, fixtures (including permanent improvements to any property comprising Station Property), leasehold improvements, appurtenances and personalty (including, without limitation, ticket counters, ticket kiosks and other ticketing dispensers or devices) owned by Seller and used in connection with any Station Lease, but does not include Ground Support Equipment.

"**Tax**" or "**Taxes**" means all taxes, fees and other governmental charges, however denominated, including any interest, penalties or additions to such taxes, fees or charges that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by

reason of Contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code), passenger ticket and airport taxes, departure, arrival and flight segment taxes, jet fuel taxes, cargo taxes, passenger facility charges, customs user fees, immigration user fees, aircraft and passenger fees, agricultural inspection fees, transportation security fees, and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Trademark Assignment Agreement**" means each Trademark Assignment Agreement in substantially the form annexed hereto as **Exhibit E** evidencing the assignment to Purchaser of all trademarks which are Acquired Assets, which **Exhibit E** shall be acceptable to Purchaser in its sole and absolute discretion.

"**Transaction Taxes**" has the meaning ascribed to it in Section 7.1(a) of this Agreement.

"**Transferred Employees**" has the meaning ascribed to it in Section 6.4(a) of this Agreement.

"**Transition Services Agreement**" means the Transition Services Agreement in substantially the form annexed hereto as **Exhibit F** evidencing the terms and conditions of Purchaser's post-closing operations of the Acquired Assets while certain Governmental Authority approvals are pending, which **Exhibit F** shall be acceptable to Purchaser in its sole and absolute discretion.

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

"**Trust Fund Tax**" means any Tax for which Seller are liable to any Governmental Authority by reason of collecting it from passengers or another Person and holding the Tax until paid to the particular Governmental Entity to which it is owed, including fuel taxes, sales taxes, passenger ticket, departure and arrival taxes, excise taxes, and certain payroll taxes.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, *et seq*, as amended.

**Schedule 2.1(gg)**

**<u>Acquired Assets</u>**

None.

**Schedule 2.2(h)**

**<u>Excluded Assets</u>**


Seller has failed to provide as of the Closing Date; Seller's response is presumed "None."

**Schedule 2.2(o)**

**<u>Nontransferable Permits</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 2.3(b)**

**<u>Assumed Liabilities</u>**

None.

**Schedule 2.4(e)**

**<u>Environmental Liabilities</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule

**Schedule 2.4(f)**

**Violations of Law**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule

**Schedule 2.4(l)**

**<u>Excluded Liabilities</u>**

All liabilities or obligations of Seller arising under or related to:

1. The WARN Act;
2. Any collective bargaining agreement to which Seller is a party.

**Schedule 4.3(a)**

**<u>Conflicts</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule

**Schedule 4.3(b)**

**<u>Consents</u>**

1. US Department of Transportation

2. Federal Aviation Administration

3. Puerto Rico Industrial Development Company (PRIDCO)

4. US Customs and Borders Protection

5. Transportation Security Administration

6. Department of Homeland Security

**Schedule 4.4**

**Permitted Exceptions**

None.

**Schedule 4.5**

**<u>Contracts</u>**

See attached as delivered by Seller.  Purchaser rejects this schedule as it is in a format that makes confirming the corresponding contract difficult, and in some instances impossible.  Seller failed to respond to such objection. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

| Other Party | Address | Description | Nature of Interest | Remaining Term (months) |
|---|---|---|---|---|
| WILMINGTON TRUST CO TRUSTEE | 1103 N MARKET ST, WILMINGTON, DE | ATR 42-600- MSN-1403 | Silver is Leasing AC MSN1403-N405 | 81 |
| WILMINGTON TRUST CO TRUSTEE | 1104 N MARKET ST, WILMINGTON, DE | ATR 42-600- MSN-1405 | Silver is Leasing AC MSN1405-N406 | 82 |
| WILMINGTON TRUST CO TRUSTEE | 1105 N MARKET ST, WILMINGTON, DE | ATR 42-600- MSN-1411 | Silver is Leasing AC MSN1411-N407 | 83 |
| WILMINGTON TRUST CO TRUSTEE | 1106 N MARKET ST, WILMINGTON, DE | ATR 72 MSN1553-N702SV | Silver is Leasing AC MSN1553-N702 | 83 |
| WILMINGTON TRUST CO TRUSTEE | 1107 N MARKET ST, WILMINGTON, DE | ATR 72 MSN1553-N703SV | Silver is Leasing AC MSN1553-N703 | 85 |
| WILMINGTON TRUST CO TRUSTEE | 1108 N MARKET ST, WILMINGTON, DE | ATR 72 MSN1548-N700SV | Silver is Leasing AC MSN1548-N700 | 113 |
| JAH2022A ATR72 MSN 1185, LLC | 3000 Turtle Creek Blvd. Dallas, TX 75219 | ATR 72 MSN1085-N706SV | Silver is Leasing AC MSN1085-N706 | 55 |
| JAH2022A ATR72 MSN 1092, LLC | 3000 Turtle Creek Blvd. Dallas, TX 75219 | ATR 72 MSN1085-N706SV | Silver is Leasing AC MSN1085-N706 | 58 |
| JetStream Aviation Holdings 2022A, LLC | 3000 Turtle Creek Blvd. Dallas, TX 75219 | PW127M - ESN-EB0210 | Silver is Leasing MTM ESN-EB0210 | 1 |
| KD Properties Group LLC | 3301 N 29th Ave, Hollywood , FL, 33020 | Building:2850 Greene Street,Holly | Silver is Leasing Office Space | 26 |
| GREATER ORLANDO AVIATION AUTH. | P.O. BOX 946634, ATLANTA, GA, 30394-6634 | Orlando International Airport Hang | Silver is Leasing Hangar Space | 1 |
| CARIBBEAN AIRPORT FACILITIES, INC. | Caribbean Airport Facilities, Inc 150 Sector Central, Suite ; | PR Hangar | Silver is Leasing Hangar Space | 25 |
| CARIBBEAN AIRPORT FACILITIES, INC. | Caribbean Airport Facilities, Inc 150 Sector Central, Suite ; | PR 2nd floor Office | Silver is Leasing Office Space | 25 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number : T81142GPU-4 | Silver is leasing GPU | 20 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | Air Conditioning Unit Serial Numbe | Silver is leasing Air Conditioning Uni | 20 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | Air Conditioning Unit Serial Numbe | Silver is leasing Air Conditioning Uni | 20 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | Air Conditioning Unit Serial Numbe | Silver is leasing Air Conditioning Uni | 21 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | Air Conditioning Unit Serial Numbe | Silver is leasing Air Conditioning Uni | 21 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T93183 0 | GPU Silver is leasing GPU | 18 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T93184 0 | GPU Silver is leasing GPU | 18 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T93185 0 | GPU Silver is leasing GPU | 18 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T92482 0 | GPL Silver is leasing GPU | 18 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T92483 0 | GPU Silver is leasing GPU | 18 |
| AES - ALVEST EQUIPMENT SERVICES USA LLC | 3230 MAGNUM DRIVE, ELKHART, IN 45616 | GPU Serial Number :T92538 0 | GPU Silver is leasing GPU | 18 |
| Charter America Holdings, Inc. | 9100 SOUTH DADELAND BOULEVARD, SUITE 408, Miami, I | Water Cart Serial Number: 5778 / F | Silver is leasing Water Cart | 13 |
| Charter America Holdings, Inc. | 9100 SOUTH DADELAND BOULEVARD, SUITE 408, Miami, I | Baggage tractor tug Serial Number | Silver is leasing Baggage tractor tug | 11 |
| Charter America Holdings, Inc. | 9100 SOUTH DADELAND BOULEVARD, SUITE 408, Miami, I | Baggage tractor tug Serial Number | Silver is leasing Baggage tractor tug | 11 |
| Charter America Holdings, Inc. | 9100 SOUTH DADELAND BOULEVARD, SUITE 408, Miami, I | Water Cart Serial Number 6157 Wa | Silver is leasing Water Cart | 13 |
| Charter America Holdings, Inc. | 9100 SOUTH DADELAND BOULEVARD, SUITE 408, Miami, I | Baggage tractor tug Serial Number: | Silver is leasing Baggage tractor tug | 11 |
| Air Canada | 7373 Blvd. Cote-Vertu Ouest Saint-Laurent, QC H4S 1Z3 C | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| Alaska | 19300 International Blvd. SeaTac, WA 98188 | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| All Nippon | Shiodome-City Center, 1-5-2, Higashi-Shimbashi Minato C | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| American | 1 Skyview Dr. Fort Worth, TX 76155 | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| Avianca | Avianca Administrative Center, Ac. 26 ##59-15, Bogotá, Cc | Code Share Agreement | Silver is party to a Codeshare Agree | Perpetual |
| Azul | Avenida Marcos Penteado de Ulhôa Rodrigues, 939, Edifici | Code Share Agreement | Silver is party to a Codeshare Agree | Perpetual |
| Cape Air | 660 Barnstable Road, Hyannis, MA 02601 | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| Copa | Avenida Principal y Avenida de la Rotonda, Urbanización C | Code Share Agreement | Silver is party to an Interline Agreem | Perpetual |
| Delta | 1030 Delta Blvd, Atlanta, GA 30354 | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| Emirates | PO Box 686, Dubai, United Arab Emirates | Interline Agreement | Silver is party to an Interline Agreem | Perpetual |
| JetBlue | 2701 Queens Plz N, Fl 6, Long Island City, NY 11101 | Code Share Agreement | Silver is party to an Interline Agreem | Perpetual |
| United | 233 South Wacker Drive, Chicago, Illinois | Code Share Agreement | Silver is party to an Interline Agreem | Perpetual |

| Name | Address | Description | Description 2 | Type | No. |
|---|---|---|---|---|---|
| ZOHO CORPORATION | 4141 Hacienda Drive Pleasanton, CA 94588 | IT Software Hlepdesk | Endpoint central (PC remote / MDM | | 11 |
| RINGCENTRAL, INC | 20 Davis Drive, Belmont, CA 94002 | Phone system | Cloud-Based Phone System and Co | Recurring subscription | |
| VCOM SOLUTIONS, INC. | P.O. Box 849491 Los Angeles, CA 90084 | Mobile Plan (AT&T) | Mobile Plan (AT&T) | Recurring subscription | |
| Security 101 Holdings, LLC | 1450 Centrepark Blvd., #210, West Palm Beach, FL 33401 | Door system,MX for 3yrs as of 1/24 | Silver is party to a service agreemen | | 24 |
| CDW DIRECT | P.O. Box 75723, Chicago, Illinois 60675 | Microsoft, Adove provider | Microsoft, Adove provider | Recurring subscription | |
| AUTOMATED SYSTEMS IN AIRCRAFT | P.O. BOX 2457, Cranberry, TWP, PA 16066 | Software for Takeoff/landing perfor | 118 W&B PASSENGER / 110 RW AN, | Recurring subscription | |
| Avenger Flight Group LLC | 1450 LEE WAGNER BLVD., BUILDING 300, Ft. Lauderdale, I | Training center | PILOT TRAINING | | 28 |
| ENTERPRISE | P O Box 402383, Atlanta, GA 30384 | Car Rental | Car Rental | Unknown | |
| JEPPESEN Boeing Digital Solutions, Inc. | 55 Inverness Drive East Englewood, CO 80112 | Provides navigational information, | Provides navigational information, I | Recurring subscription | |
| SITA INC | P.O. BOX 26212, NETWORK PLACE, CHICAGO, IL 60673 | Provides Digital Day of Operations, | AIRCOM COCKPIT SERVICES /MESS | Recurring subscription | |
| TEAMSTERS LOCAL 1224 | 2754 OLD STATE ROUTE 73, WILMINGTON, OH 45177 | Pilot union | Pilot union | | 8 |
| VIEMO SCALED ANALYTICS INC. | 555 LEGGET DRIVE, suite 304 tower A, Kanata, ON, Canad | Flight Data monitoring services | Flight Data monitoring services | Recurring subscription | |
| AIRLINES FOR AMERICA - ACH | 1275 Pennsylvania Ave, NW, Suite 1300, WASHINGTON, D | KCM Services | KCM Services | Unknown | |
| COMMUNICATIONS WORKERS OF AMERICA | 501 THIRD ST N.W., WASHINGTON, DC 20001 | Union labor for Flight Attendant | Union labor for Flight Attendant | | 23 |
| AVIATION SPECTRUM RESOURCES, INC. | M&T BANK ,P.O. BOX 62113, BALTIMORE, MD 21264 | ASRI GROUND STATION ADMINISTI | Aviation Spectrum Resources, Inc. ( | Recurring subscription | |
| The Weather Company Aviation, LLC | 1001 Summit Blvd NE Suite 2000, BROOKHAVEN, GA 3031 | Aviation Forecast Services | PilotBrief Authorized User - monthl | Recurring subscription | |
| NAVBLUE INC | 295 HAGEY BLVD, SUITE 200, WATERLOO, ON, N2L 6R5 | N'Crew Planning Bidding and Awan | N'Crew Planning Bidding and Awarc | Recurring subscription | |
| WORLD FUEL SERVICES, INC. | 9800 NW 41ST STREET, SUITE #400, MIAMI, FL, 33178 | Fuel Management Fee | Fuel Management Fee | Recurring subscription | |
| AEROSTAR AIRPORT HOLDINGS, LLC. | P.O. BOX 38085, San Juan,, PR, 00937-1085 | Puerto Rico Airport | Fees incurred includes : landing, ter | Unknown | |
| Bimini Airport Development Partners Ltd. | 101 E Kennedy Blvd, Suite 1470, Tampa,, FL, 33602 | Bimini Aiport | Fees incurred includes : landing, ter | Unknown | |
| BROWARD COUNTY AVIATION DEPT. | ATTN: FINANCE DIVISION, 320 TERMINAL DRIVE, SUITE 20 | Fort Lauderdale Airport | Fees incurred includes : landing, ter | | 20 |
| BROWARD COUNTY AVIATION DEPT. (Parking) | 400 Terminal Drive, Box 50, Fort Lauderdale, FL, 33315 | Fort Lauderdale Airport | Fees incurred includes : landing, ter | | 20 |
| CITY OF TALLAHASSEE | APS-Accounting Services Division - A/R, C/O BOX A-4, City | Tallahassee Airport | Fees incurred includes : landing, ter | Unknown | |
| CITY OF TAMPA | 2105 N. NEBRASKA AVE., GROUND FLOOR, PO BOX 31047 | City of Tampa | Renew business tax | Unknown | |
| Civil Aviation Authority of The Bahamas | #1 Bay Street, Unit 202, 2nd Floor, British Colonial Centre | Civil Aviation Authority of The Baha | Bahamas passenger levy fees | Unknown | |
| COUNTY OF MONROE - KEY WEST INTERNATION/ | KEY WEST INTERNATIONAL AIRPORT, 3491 S. ROOSEVELT | Key West Aiprot | Fees incurred includes : landing, ter | | 14 |
| CPAT GLOBAL LLC | 24624 Interstate 45 N, Ste 270, SPRING, TX, 77386 | Provide software-as-a-service appl | General Subjects Library, IC, Exam ( | Recurring subscription | |
| FEDERAL EXPRESS | PO BOX 660481, DALLAS, TX, 75266-0481 | Shipping and freight fees | Shipping and freight fees | Unknown | |
| FREEPORT AIRPORT DEVELOPMENT | FREEPORT AIRPORT DEVELOPMENT, GB P.O. BOX F4091( | Freeport Ground Handling services | Freeport Ground Handling services | | 4 |
| Freeport Airport Development- Company | Airport Road, Freeport, Grand Bahama, Freeport, BAHAMA | Freeport Ground Handling services | Freeport Ground Handling services | | 4 |
| FUSION UNIFORMS & LINENS, INC. | 1993 NE 10th place Way, Miami, FL, 33179 | Employee uniform | Employee uniform | Unknown | |
| G2 SECURE STAFF, LLC | P.O. BOX 674159, DALLAS, TX, 75267-4159 | Provide passenger assistance | Wheelchair services in Tampa and ( | Unknown | |
| HILLSBOROUGH COUNTY AVIATION AUTHORITY | P.O. BOX 919730, ORLANDO, FL, 32891-9730 | Tampa Aiport | Fees incurred includes : landing, ter | Unknown | |
| IATA EF SERVICES | P.O Box N3017, Nassau , BAHAMAS | Bahamas Airport Departure Taxes | Bahamas Airport Departure Taxes | ACH/ICH Periodically Billing | |
| ISDS BENTORIK N.V DBA ECRU SECURITY | ST ROSE LANE #3, COLE BAY, SX | Security Services/PIE Concession F | Security Services/PIE Concession Fi | Unknown | |
| JETSCAPE SERVICES, LLC | 240 SW 34TH STREET, FT. LAUDERDALE, FL 33315 | Diesel Red Dye | Diesel Red Dye | | 11 |
| MANAGEMENT AVIATION SERVICES | 20582 SW 2ND ST, PEMBROKE PINES, FL 33029 | Wheelchair Services/HQ Cleaning/ | Wheelchair Services/HQ Cleaning/E | Unknown | |
| NASSAU FLIGHT SERVICES LIMITED | P.O. BOX AP-59203, NASSAU, Bahamas | Ground Handling/Security Services | Ground Handling/Security Services | Unknown | |
| PENSACOLA INTERNATIONAL AIRPORT | 2430 AIRPORT BLVD., SUITE 225, PENSACOLA, FL, 32504-I | Fixed Rent/Joint Use Space Rent/Lu | Fixed Rent/Joint Use Space Rent/La | Unknown | |
| PRINCESS JULIANA INTERNATIONAL AIRPORT | Netherlands Antilles Airport Authority, PO Box 2027, St. Mi | Departure Fees/ Landing Fees/Sect | Departure Fees/ Landing Fees/Secu | ACH/ICH Periodically Billing | |
| PURE WATER PARTNERS, LLC | P.O.BOX 24445, SEATTLE, WA 98124 | TPA Water | TPA Water | Unknown | |
| SECURITY SERVICES (BAHAMAS) LTD. dba STAPL | P.O.BOX N 4499 NASSAU, BAHAMAS | Stand Down Service | Stand Down Service | Unknown | |

| | | | | | |
|---|---|---|---|---|---|
| STAPLES ADVANTAGE | P.O. BOX 105748, ATLANTA, GA, 30348-5748 | Supplies | Supplies | Unknown | |
| THE ACCOUNTANT GENERAL/ CIVIL AVIATION DI | Island Auto Supplies Building, 2nd Floor, Bird Rock Commu | Landing Permit | Landing Permit | Unknown | |
| THE AIRPORT AUTHORITY | PO BOX AP-59222, Lynden Pindling International Airport, N | Secutiry Screening Fees and VAT | Secutiry Screening Fees and VAT | ACH/ICH Periodically Billing | |
| The Airport Authority - FAMILY ISLAND AIRPORTS | The Airport Authority 2nd Floor, Terminal B, Lynden Pindlin | Space Rent/Landing Fees | Space Rent/Landing Fees | Unknown | |
| THE BAHAMAS MINISTRY OF TOURISM, INVESTMI | No. 1 Bay Street, , Bahamas | Tourism Enhancement Levy | Tourism Enhancement Levy | ACH/ICH Periodically Billing | |
| THE BVI AIRPORTS AUTHORITY LTD | PO BOX 4416, ROAD TOWN, TORTOLA | Employee Parking Fees/Concession | Employee Parking Fees/Concession | Unknown | |
| TREASURE CAY AVIATION SUPPORT Co | P.O.Box B 22214, Treasure Cay, Abaco, BS | GSE Tractor Rental | GSE Tractor Rental | Monthly | |
| WINAIR | Airport Boulevard #69, Simpson Bay, St. Maarten, Dutch C | Aircraft Handling | Aircraft Handling | Monthly / NA | |
| WBAT FOR AVIATION SAFETY INC. - FUZION SAFE | 950 NORTH KINGS HIGHWAY, SUITE 208, Cherry Hill, NJ, 0 | FAA-supported Safety Managemen | FAA-supported Safety Management | Quarterly Subscription | |
| AVIEM INTERNATIONAL, INC. | 12540 BROADWELL ROAD, SUITE 2201, MILTON, GA, 3000 | Disaster Support Services/Internat | Disaster Support Services/Internati | | 11 |
| MIS Choice, Inc. - APTAERO | 300 N. Martingale Rd., Suite 250, Schaumburg, IL, 60173 | TSA AEV Submission Platform Billir | TSA AEV Submission Platform Billin | Unknown | |
| SABRE | 3150 Sabre Drive, Southlake, TX 76092 | GDS Fees/Communication Circuits | GDS Fees/Communication Circuits | ACH/ICH Periodically Billing | |
| AMADEUS | Salvador de Madariaga, 1 - 12th Floor, Edificio Herre, Madr | GDS Distribution Fees | GDS Distribution Fees | ACH/ICH Periodically Billing | |
| UNITED AIRLINES | 233 SOUTH WACKER DRIVE - HDQCT, 14TH FLOOR, CHIC | FF Miles/Amadeus/Sabre/Travelpo | FF Miles/Amadeus/Sabre/Travelpor | ACH/ICH Periodically Billing | |
| ATPCO | 2340 DULLES CORNER BLVD, HERNDON, Virginia, 20171 | Community Participation Fee/PIPP | Community Participation Fee/PIPP | ACH/ICH Periodically Billing | |
| Zulu Airline Systems, Inc. | 1266 W. Paces Ferry Rd NW #411, Atlanta, GA, 30327 | Platform SaaS /AWS & Data Hostin | Platform SaaS /AWS & Data Hosting | | 3 |
| AIRLINE DATA INC | 5310 HARVEST HILL ROAD, SUITE 242, DALLAS, TX 75230 | T100, O&D, Schedules, OTP & Forn | T100, O&D, Schedules, OTP & Form | | 5 |
| UNITED HEALTHCARE INS. CO. | 3100 SW 145 Avenue, Miramar, FL, 33027 | Employee Health Insurance | Employee Health Insurance | | 11 |
| AETNA LIFE INSURANCE COMPANY | 151 FARMINGTON AVENUE, HARTFORD, CT | HIP Premium | HIP Premium | | 23 |
| ATLANTIC MEDICAL INSURANCE | ATLANTIC HOUSE, 2ND TERRACE & COLLINS AVE, PO BOX | Employee Insurance | Employee Insurance | | 9 |
| DELTA DENTAL OF PUERTO RICO, INC | 14 CALLE 2, SUITE 200, GUAYNABO , PR 00968 | SIJU Employee Insurance | SIJU Employee Insurance | | 1 |
| MEDICAL CARD SYSTEM (MCS) LIFE INSURANCE | GPO BOX 193310, SAN JUAN, PR, 00936-3310 | Employee Benefits | Employee Benefits | | 1 |
| THE HARTFORD | P O BOX 783690, PHILADELPHIA , PA , 9178-3690 | Employee Premium | Employee Premium | | 13 |
| UNUM LIFE INSURANCE COMPANY OF AMERICA | PO BOX 406990 Atlanta, GA 30384 | Employee Group Benefits | Employee Group Benefits | | 11 |
| Oracle America, Inc. | 500 Oracle Parkway, Redwood Shores, CA , 94065 | Netsuite ERP software system | Provides Access to Netsuite ERP so | | 3 |
| Paramount Technologies, Inc. DBA Paltsoft | 382 NE 191st Street PMB 58356, Miami, , FL, 33179 | Docupeak AP Management Softwar | Provides Access Docupeak AP Mana | | 8 |
| Procurify Technologies Inc. | 500-455 Granville Street, Vancouver, BC, V6C1T1 | Procurify Procurement Software | Provides Access to Procurify Procur | | 11 |
| TRAX USA CORP. | 2811 Ponce de Leon Blvd., Suite 300, Miami, FL, 33134-69 | Trax AC Parts & PO Management S | Provides Access Trax AC Parts & PO | Monthly / NA | |
| SABENA TECHNICS DNR | Aeroport de Dinard-Pleurtuit-Saint Malo, B.P 90154 - 3580 | REPAIR & BER / POOL ACCESS / ME | Provides REPAIR & BER / POOL ACC | | 53 |
| AVIOVISION N.V. / AVIOBOOK | Herkenrodesingel 8 D/3.01, Hasselt, Belgium , 3500 | EFB software solution for pilots | Provides EFB software solution for p | | 11 |
| AQT Solutions, Inc. | 6518 Lonetree Blvd., Rocklin, CA , 95765 | Software is utilized for Training Rec | Software is utilized for Training Rec | Recurring subscription | |
| Freshworks Inc | 2950 S. Delaware St, San Mateo, CA , 94403 | The company provides cloud-base | The company provides cloud-based | | 8 |
| PLANITAS AIRLINE SYSTEMS | PLAZA 256 SUITE 8, BLANCHARDSTOWN CORP PARK 2, DI | Business Intelligence and Revenue | Business Intelligence and Revenue | Unknown | |
| Progress Software Corp | 15 Wayside Rd, Suite 400, Burlington, MA, 01803 | Sitefinity Cloud Enterprise Cloud In | Provides access for Sitefinity Cloud | | 6 |
| Constant Contact, Inc. | 1601 Trapelo Road Waltham, MA 02451 | Direct Marketing Continuity Subscr | Direct Marketing Continuity Subscri | Monthly Subscription | |
| LUFTHANSA INDUSTRY SOLUTIONS GMBH & CO. | Am Messeplatz 1, Raunheim, GERMANY, 65479 | MyIDTravel Buddy Pas System | MyIDTravel Buddy Pas System | ACH/ICH Monthly | |
| INVENTORY LOCATOR SERVICE, LLC | 8001 Centerview Parkway, Suite 400, Memphis, TN, 38018 | Commercial Av Services Hub Acces | Commercial Av Services Hub Acces | Recurring subscription | |
| ACCESS - INTERNATIONAL DATA DEPOSITORY | P. O. BOX 101048, ATLANTA, GA, 30392-1048 | Container storage / Digital Records | Container storage / Digital Records | Monthly / NA | |
| PAYFLEX SYSTEMS USA, INC. / Inspira Financial H | 10802 FARNAM DRIVE, SUITE 100, OMAHA, NE, 68154 | Monthly HSA Account Fee | Monthly HSA Account Fee | Monthly / NA | |
| eREV | Rene Perez & Associates, Inc., 9990 SW 77th AVE PH9, Mia | Training, support and access to the | Provides training, support and acce | | 6 |

**Schedule 4.6**

**Real Property Leases**

| Address | Contract Title | Counterparty | Contract Date |
|---|---|---|---|
| 2850 Greene Street, Hollywood, Florida 33020 | Lease Agreement | KD Properties Group LLC[1] | 10/16/2019 |
| 6190 Cargo RD., Orlando, Florida, 32827 | Hangar Facility Lease Agreement | GREATER ORLANDO AVIATION AUTH. | 09/03/2014 |
| Caribbean Airport Facilities, Inc 150 Sector Central, Suite 3 Carolina, PR 00797 | Lease Agreement | CARIBBEAN AIRPORT FACILITIES, INC. | 05/25/2018 |

---

[1] Purchaser's Comment - This is the counterparty provided by Seller, however, the lease agreement provided by Seller for the corresponding address names Avid Asset Properties, LLC.

**Schedule 4.7(i)**

**<u>Intellectual Property</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule

**Schedule 4.7(ii)**

**Registered Intellectual Property**

Seller has failed to provide as of the Closing Date. Information provided below is based on Purchaser's own due diligence. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

| Mark | Mark Owner | USPTO Serial No. | USPTO Registration No. |
|------|-----------|-----------------|------------------------|
| SILVER AIRWAYS | Silver | 85980426 | 4452646 |

**Schedule 4.8(i)**

**<u>Permits</u>**

| Station | Effective | Expires | Docs Sent | Payment Status | POC | Comments |
|---------|-----------|---------|-----------|----------------|-----|----------|
| CAA-B | 1-Feb-25 | 31-Jan-26 | 5-Feb-25 | Paid | atl@caabahamas.com | BIM,GGT,ELH,MHH,GHB,FPO |
| EIS | 1-Jan-25 | 1-Jan-26 | 24-Oct-24 | Paid | monique.dennis@silverairways.com | EIS only |
| SKB | 1-Sep-24 | 31-Aug-26 | 15-May-25 | Paid | civilaviation@gov.kn | SKB only. Permit extended through August 2026. |

Information above is as provided by Seller. Purchaser requested the Seller provide the party issuing the permit and permit number so it can identify the referenced permit. Seller failed to respond to the request as of the Closing Date. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.8(ii)**

**<u>Pending Permits</u>**

| Station | Effective | Expires | Docs Sent | Payment Status | POC | Comments |
|---------|-----------|---------|-----------|----------------|-----|----------|
| SXM | N/A | N/A | N/A | Pending Response | maritimesxm@sintmaartengov.org | Request sent 15 May 2025. Awaiting Response. |

Information above is as provided by Seller. Purchaser requested the Seller provide the party issuing the permit and permit number so it can identify the referenced permit. Seller failed to respond the request as of the Closing Date. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.8(iii)**

**<u>Additional Permits</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.9(i)**

**<u>Employee Benefit Plans</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.9(ii)**

**<u>Employee Census</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.10**

**Labor Relations**

| CBA Title | Counterparty | Contract Date | Contract Description |
|---|---|---|---|
| Collective Bargaining Agreement | TEAMSTERS LOCAL 1224 | 10/01/2020 | Pilot Union |
| Letter of Agreement by and Between Silver and The International Brotherhood of Teamsters Local Union No. 1224 | | 12/28/2023 | |
| Collective Bargaining Agreement | COMMUNICATIONS WORKERS OF AMERICA | 01/01/2023 | Flight Attendant Union |

## Schedule 4.12(i)

## Insurance

| Insurer | Policy Type | Policy Period | Policy No. |
|---|---|---|---|
| Certain Ins. Companies and Lloyds of London Sydicates | War Risk 2025 | 12/15/23 - 12/15/24[2] | B0509AVNAN2450088 |
| Starr Surplus Lines Insurance Company & Following Insurers | Hull & Liability 2025 | 12/15/24 - 12/15/25 | 3066557786 |
| Starr Specialty Insurance Company | Worker's Comp - Silver | 12/15/24 - 12/15/25 | 1000003990 |
| Corporacion del Fondo del Seguro del Estado | Worker's Comp SJU - Silver | 07/01/24 - 06/30/25 | 1918005845_2025 |
| Department of Finance Government Insurance Funds | USVI - Workers Comp Insurance Silver | 01/01/25 - 12/31/25 | 55678 |
| Westfield Specialty Insurance Company | Side A D&O 2024-2025 | 12/07/24 - 12/07/25 | 20241207BINDER |
| Federal Insurance Company | Blended D&O, EPL, FLI, Crime 2024-2025 | 12/07/24 - 12/07/25 | 20241209BINDER |
| Endurance Assurance Corporation | Excess D&O 2024-2025 | 12/07/24 - 12/07/25 | 20241219BINDER |
| Berkley Environmental | Pollution Policy Apr 24 - Feb 26 | 04/24/24 - 03/24/26 | 100001481980001 |
| Starr Indemnity & Liability Company/Bridgeway Insurance Company | Auto and Property Policy | 12/15/24 - 12/15/25 | 7EA7PP100225502-2025 |
| Starr Indemnity & Liability Company/Bridgeway Insurance Company | Auto and Property Policy | 12/15/24 - 12/15/25 | 1110323 |
| Universal Insurance Company | Puerto Rico Property Policy Financing | 03/27/25 - 03/27/26 | Q77674935 |

[2] Purchaser's Comment - Policy is expired. Purchaser requested that Seller indicate if the expired policy was renewed, replaced or lapsed. Seller failed to provide as of the Closing Date. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.12(ii)**

**<u>Terminated Insurance</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.13**

**<u>Brokers</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.14**

**<u>Litigation</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.16(i)**

**Compliance with Laws**

**FAA**

Case No.: 2023SO950010

Drug & Alcohol pre-employment violations.

Status – Negotiating settlement of Proposed Civil penalty

Records discrepancy regarding airworthiness directive 2023-19-07 described in AMOC of May 23, 2025.

**TSA**

TSA #2025STX0003 – Notice of Proposed Civil Penalty received 12/27/2024 -On 11/27/2024 STX Station failed to provide Security training evidence.

Status – Informal Conference Requested by Silver on 1/27/25

**TSA Case File No.**: 2023STT0005

Silver Airways LLC -FAA Claimed Respondent violated 49 C.F.R. Section 1544.101(a), 49 C.F.R. § 1544.203 (f)(2)(ii), and Aircraft Operator Standard Security Program, Chapter 6, Section 6.7.A. in that Respondent did not ensure that the firearm was properly packaged inside a hard sided container prior to placing the declaration tag in the checked bag.

Status – Negotiating settlement following informal conference.

**23-TSA-0569 -** Status: Settled for $500

**Customs and Border Patrol**

  2024521030012401, CBP: 08/15/2023 a Pax arrives from GGT to FLL without valid entry document. Notice Date: 1/17/2024.

  2024180820005001, CBP: 01/24/2024 MCO Station fail to provide CBP with a list of employees with security access seal. Notice Date: 4/12/2024.

  2024520330014301, CBP: 07/17/2024 FLL Station Regulated Garbage violation. Notice Date: 07/18/2024.

   2024491320001601, CBP: 08/07/2024 SJU Station fail to provide CBP with a list of employees with security access seal. Notice Date: 08/08/2024.

2025521030005401, CBP: 10/05/2024 FLL pax arrived from MHH without valid entry documents. Notice Date: 11/06/2024. Response sent 12/04/2024. Waiting for CBP response.

2024521030023101,201,301, CBP: 12/16/2023 FLL aircraft arrives from NAS without a notice of arrival. Notice Date: 3/05/2024.

**Schedule 4.16(ii)**

**<u>Notice of Violation</u>**

See Schedule 4.16(i).

**Schedule 4.18**

**<u>Taxes</u>**

1. The Debtor owes Federal Excise taxes and sales taxes to:

   - U.S. Department of Treasury

   - Florida Department of Revenue

2. The Debtor owes passenger facility charges, airport fees, 9/11 fees, and customs fees to:

   - Transportation Security Administration

   - U.S. Department of Agriculture

   - U.S. Department of Homeland Security

   - Federal Aviation Administration

   - Anguilla Air & Sea Ports Authority

   - Antigua and Barbuda International Airport

   - Government of Commonwealth of Dominica

   - Princess Juliana International Airport

   - British Virgin island Authority Ltd

   - St Christopher Air & Sea Port Authority

   - Freeport Airport Development Company

   - Nassau Airport Development

   - Civil Aviation Authority of the Bahamas

   - Bimini Airport Development Partners

The information above is as provided by Seller. Purchaser requested that Seller indicate the particular debtor (Silver vs. Seaborne), the time periods and the amounts of the delinquent taxes. Seller failed provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.19**

**<u>Accounts Receivable</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.21(a)**

**<u>Airline Fees and Charges</u>**


Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.21(b)**

**<u>Station Leases</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.21(c)**

**<u>Ground Equipment Leases</u>**

Seller has failed to provide as of the Closing Date; Purchaser does not waive any rights or claims as to the information sought by this Schedule.

**Schedule 4.21(d)**

**<u>Owned Station Items</u>**

See attached.

| LOCATION | EQUIP TYPE | ASSET NAME | 3M QR | SERIAL NUMBER |
|---|---|---|---|---|
| EIS | AIR CART/GPU | AERO GROUND SUPP   - A/C HEATER UNIT | QR#2TN31DBDS7QDH | |
| SJU | AIR CART/GPU | Davco A/C Unit (US Bank) | QR#3FW6KY7DNGEWH | |
| SJU | AIR CART/GPU | Davco A/C Unit (Time Payment Corp) | QR#36G2CZF9CWT5I | |
| SJU | AIR CART/GPU | Davco A/C Unit (Time Payment Corp) | QR#UTSCYWGIH3Y3 | |
| SJU | AIR CART/GPU | Davco A/C Unit (Axis) | QR#IV1J091QR8GM | |
| STX | AIR CART/GPU | A/C Unit DAC200-DPE | QR#1JO719CIYYFPP | |
| TLH | AIR CART/GPU | DAVCO AIRCART | QR#1AQXM9D7MY28J / SN#12574 | |
| EYW | BAG CART | AERO GROUND SUPP  - EYW - BAGGAGE CART | QR#IATO7KG70I7T | |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#2OF2FS053I8BH | |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#22P9PKWY92BNA | |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#3K5Z2YI3UGBOT | |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#KBSHCB9VAYJA | |
| FLL | BAG CART | AERO GROUND SUPP  -FLL- BAGGAGE CART | QR# 218HEIOYKN1VV | |
| FLL | BAG CART | AERO GROUND SUPP  -FLL- BAGGAGE CART | QR# 35EZC2SPHNHMW | |

| GGT | BAG CART | GGT Bag Cart 02 | QR#1W5XL6IU7V055 | |
|-----|----------|-----------------|------------------|---|
| PNS | BAG CART | AERO GROUND SUPP  - PNS - BAGGAGE CART | QR#13Z445VW5QI4A | |
| PNS | BAG CART | AERO GROUND SUPP  - PNS - BAGGAGE CART | QR#21VVOZEFNKHLC | |
| SJU | BAG CART | BAG CART | QR#2G7EI24XYWM6X | |
| SJU | BAG CART | BAG CART | QR#3Q7VNXEQ34217 | |
| SJU | BAG CART | BAG CART | QR#264MMKUAAUVHT | |
| SJU | BAG CART | BAG CART | QR#2R3R3JHMD9VC | |
| SJU | BAG CART | BAG CART | QR#PDUS7PLEUIV0 | |
| SJU | BAG CART | BAG CART | QR#BCVXUBKOR4SH | |
| SJU | BAG CART | BAG CART | QR#3P6HN8BR7RITA | |
| SJU | BAG CART | BAG CART | QR#1YFJWC55BUGYX | |
| SJU | BAG CART | BAG CART | QR#19TF08FBQXODF | |
| SJU | BAG CART | BAG CART | QR#1K9I6W658FH3R | |
| STT | BAG CART | BAG CART | QR#1DSZKPAPJ57Y2 | |
| STT | BAG CART | BAG CART | QR#209U0DB4Y85MK | |
| STT | BAG CART | BAG CART | QR#IO9I9NNS2XTZ | |
| STX | BAG CART | BAG CART | QR#2FQL0UBYVPBV5 | |
| STX | BAG CART | BAG CART | QR#O0U2QDGBR7NT | |
| STX | BAG CART | BAG CART | QR#1I43VI99HVJS9 | |
| STX | BAG CART | BAG CART | QR#2P0TWFK9Y03EE | |

| TPA | BAG CART | AERO GROUND SUPP - TPA- BAGGAGE CART | QR#29A0KS4PERXX0 | |
| TPA | BAG CART | AERO GROUND SUPP - TPA- BAGGAGE CART | QR#3DK0MHWEOQUPR | |
| TPA | BAG CART | TPA - BAGGAGE TUG | QR#3W4B64I96O9TV | |
| SJU | CATERING CART | CATERING CART | QR#1GP2LE1X1TCU2 | |
| GSO | CHAIR | Aisle Transfer Chair Jessica New Station (GSO) | | |
| FLL | FACILITY | FLL OPS ICE Freezer | | |
| MCO | FACILITY | MTX Shelving for MCO Hangar | | |
| MCO | FACILITY | PO 236063 / HALON 674 FIRE EXTINGUISHER 150LB ON WHEELS | | |
| HDQ | FURNITURE | Orw Workplace, Inc 76 Work Stations | | |
| SJU | FURNITURE | 10/14/24-Desk, Headset and monitors desk mount for the Call Center in CAF. | | |
| FLL | GOLF CART | 2013 CLUB CAR PRECEDENT GAS GOLF CART - SN PR1315-359245 | QR# 2E55VR3MCQYM0 / SN#PR1315-359245 | SN PR1315-359245 |
| SJU | GOLF CART | GOLF CART | QR#2INY7W9GDOTRX | |
| SJU | GOLF CART | GOLF CART | QR#3BSDJDGI2TI4W | |
| SJU | GOLF CART | GOLF CART | QR#1MW6RN3SRCZGJ | |
| SJU | GOLF CART | GOLF CART | QR#2N5BLSY12TSK1 | |
| SJU | GOLF CART | GOLF CART | QR#24KDG6ZJQGH9F | |
| SJU | GOLF CART | GOLF CART | QR#3ESVK1PJ9QIM6 | |
| SJU | GOLF CART | GOLF CART | QR#28PYK74AQB0CQ | |

| TPA | GOLF CART | Golf Cart DS Beige 2 Pass Cart #5000 | QR#225HXV1Q0W7JN / SN#AQ1034-121229 | AQ1034-121229 |
|---|---|---|---|---|
| EIS | GPU | AERO GROUND SUPP - GENERATOR | QR#1NUVM05EA050P | |
| MCO | GPU | AERO GROUND SUPP  - GENERATOR | QR#IJIOYQ9HFVPQ / SN#312091 | |
| PNS | GPU | Gpu-Hobart Diesel JETEX6D | QR#2X0SQ3OIFPSRT / SN#115PS20279 | 115PS20279 |
| SJU | GPU | 3/29 AEROMOTIVE GROUND SUPPORT INV.11004 GENERATOR | QR#3UZ00R18AL4GA / SN#296PS01219 | |
| SJU | GPU | AERO GROUND SUPP  - GENERATOR | QR#QJU7T20ICR4K | |
| SJU | GPU | AERO GROUND SUPP - GENERATOR | QR#39OUJ6R7RJIV9 | |
| STT | GPU | GPUs | QR#22J59SWGEEW4A | |
| STT | GPU | GPUs | QR#2BAC5RA7KZXXX | |
| STX | GPU | 3/26 AEROMOTIVE GROUND SUPPORT INC. INV.10990-HOBA | QR#2OJUHC67X74AB | |
| TLH | GPU | Jetx4D Gpu | QR#EYU7VP7WZS15 / SN#100PS04411 | 100PS04411 |
| TLH | GPU | AERO GROUND SUPP  - GENERATOR | QR#2927A3QIDW6CN | |
| TPA | GPU | AERO GROUND SUPP  - VALET CART | QR#J6M7KSN6HM5Z | |
| FLL | LAV CART | FLL Lavatory LC3579 | QR# 1L4QDPEOSC2SQ / SN# 311312 | |
| MCO | LAV CART | Tronair 10-4036-0010 Lav Cart | QR#DMTKDMJHLTX1 | |
| PNS | LAV CART | PNS Lavatory Cart LAV-01 (LAV 08) | QR#NWKYXTBR4FYM | |

| SJU | LAV CART | 12/10 AEROMOTIVE GROUND SUPPORT- DAVCO LAV CART | QR#3G3392PK39V4U | |
| SJU | LAV CART | 12/10 AEROMOTIVE GROUND SUPPORT- DAVCO LAV CART | QR#K7LAO2METYZD | |
| TPA | LAV CART | TPA Lavatory Cart LC3025 | QR#1A451P52OWD4Q | |
| SJU | LIFT/MTX | TOYOTA GAS FORKLIFT | QR#291V416V1RLVS | |
| SJU | LIFT/MTX | LIFT/MTX* | QR#96APO477JA1O | |
| MCO | LOAD BANK | 3-28 CANNON LOAD BANK | QR#1UR4F2XK8IYJR / SN#8997 | 8997 |
| SJU | LOAD BANK | PO 245146 / INV 24401 / SJU - LOAD BANK SN 15269 | QR#1ZU1JTZ11MFYV / SN#15269 | 15269 |
| FLL | MX TOOLING | Oxygen Booster & Transport Cart | | |
| FLL | MX TOOLING | Head Adapter - Extinguisher Bottle | | ECA007 |
| FLL | MX TOOLING | STATIC ADAPTER | | 340067 |
| FLL | MX TOOLING | STATIC ADAPTER | | 340066 |
| FLL | MX TOOLING | Extractor Spinner | | OXY057 |
| FLL | MX TOOLING | Go / No Go Gauge Pitot Probe | | SA 1070 |
| FLL | MX TOOLING | Seal Expander | | 106673 |
| FLL | MX TOOLING | Split Ring | | SA 1056 |
| FLL | MX TOOLING | Filling And Purge Skydrol Tool | | 10013 |
| FLL | MX TOOLING | MLG Jack Adapter | | 0176 |
| FLL | MX TOOLING | Jack: Axle | | 2352180313 |

| FLL | MX TOOLING | Extractor Spinner | | OXY069 |
|-----|-----------|-------------------|--|--------|
| FLL | MX TOOLING | EXTRACTOR SPINNER | | OXY062 |
| FLL | MX TOOLING | Extractor Spinner | | OXY067 |
| FLL | MX TOOLING | Extractor Spinner | | OXY068 |
| FLL | MX TOOLING | PITOT TEST ADAPTOR | | |
| FLL | MX TOOLING | TOOL I F ADC-VACUUM PUMP | | ECA007 |
| FLL | MX TOOLING | PO 239661 / INV 430121017 / FLIGHT CONTROL ENGINE PINS  SN SRM-221-00005 | | SRM-221-00005 |
| FLL | MX TOOLING | RIGGING PINS-HMU/PCU(NACELLE) | | DCM0016 |
| FLL | MX TOOLING | PO 240049 / INV 430122488 / NLG JACK ADAPTER  SN SRM-219-00185 | | SRM-219-00185 |
| FLL | MX TOOLING | PO 251251 / INV 3100481610 / MCO - TOOLING COMPACE FLASH CARD (MEMORY MODULES)  SN 819 & 820 | | 819 |
| FLL | MX TOOLING | PO 251251 / INV 3100481610 / MCO - TOOLING COMPACE FLASH CARD (MEMORY MODULES)  SN 819 & 820 | | 820 |
| FLL | MX TOOLING | DAT001 DATO ELECTRIC INC - INV PROPOSAL9850 - BATTERY CHARGER | | |
| HSV | MX TOOLING | Jack: Axle,HYD 12 ton | | 0998171007 |
| MCO | MX TOOLING | Oxygen Booster & Transport Cart | | |
| MCO | MX TOOLING | STATIC ADAPTER | | 340053 |
| MCO | MX TOOLING | STATIC ADAPTER | | 340064 |

| MCO | MX TOOLING | PO 233706 / INV 430099452 / NLGM JACK ADAPTER | | SRM-219-00143 |
|-----|------------|---|---|---|
| MCO | MX TOOLING | ATR NOSE JACK | | 1208080701 |
| MCO | MX TOOLING | Battery Charger & Analyzer | | 80P77208 |
| MCO | MX TOOLING | Kit Accessories- Air Data | | 2179 |
| MCO | MX TOOLING | Engine Sling | | 0137 |
| MCO | MX TOOLING | Washcart | | 07-5352-1 |
| MCO | MX TOOLING | Charger: Combo, SuiteCase | | 80Q58010 |
| MCO | MX TOOLING | Nlg Jack Adapter | | 0187 |
| MCO | MX TOOLING | Nlg Jack Adapter | | SRM-218-00225 |
| MCO | MX TOOLING | O2 CART, 3 BOT REMOTE | | T59817 |
| MCO | MX TOOLING | NDT MACHINE | | 200054702 |
| MCO | MX TOOLING | ENGINE COMPRESSOR WASHER & GUIDE TUBE | | 2724191003 |
| MCO | MX TOOLING | MLG JACK ADAPTER | | 0191 |
| MCO | MX TOOLING | PO 246185 / AFW - RH CABLE INTERFACE (SN J009) | | J009 |
| MCO | MX TOOLING | PO 241512 / INV 24231 / FLEXIBLE WRENCH FUEL MANIFOLD | | 0520122709 |
| MCO | MX TOOLING | PO 246404 / INV 430135482 / INCLINOMETER  AN ECA02/21 | | |
| MCO | MX TOOLING | PO 245526 / MCO - CABLE INTERFACE RH | | 059086-9 |
| MCO | MX TOOLING | PO 243080 / INV 430129639 / BLADE SEAL COMPRESSR | | |

| MCO | MX TOOLING | EXT STATIC PORT CONNECTION | | ECA101/18 |
|-----|------------|----------------------------|--|-----------|
| MCO | MX TOOLING | PO 242624 / INV 430132335 / AFW - BRAKE PRESSURE GAUGE  SN FSB035816-01 | | FSB035816-01 |
| MCO | MX TOOLING | SYNCHRO READER TOOL | | 072 |
| MCO | MX TOOLING | PO 245526 / INV 430137352 / INTERFACE CABLE TANK SN 050260-02 | | 050260-02 |
| MCO | MX TOOLING | PO 240006 / INV 107466 / NLG WHEEL AXLE ADAPTER TOOL, ADAPTER, LIFT JACKS | | C11504 |
| MCO | MX TOOLING | PO 240006 / INV 107466 / NLG WHEEL AXLE ADAPTER TOOL, ADAPTER, LIFT JACKS | | D17428 |
| MCO | MX TOOLING | PO 240049 / INV 430122486 / ELT PROGRAMMER | | SA1303 |
| MCO | MX TOOLING | PO 246404 / INV 430135482 / FLIGHT CONTROL ENGINE PINS  SN SRM-222-00054 | | SRM-222-00054 |
| MCO | MX TOOLING | PO 240044 / INV 430122356 / SEAT TRACKS CHECK TOOL SN 1089902 | | 1089902 |
| MCO | MX TOOLING | PO 252118 / INV 430147017 / MCO - SPINNER EXTRACTOR  SN DCM0010 | | DCM0010 |
| MCO | MX TOOLING | PO 243431 / INV 430130387 / SEAT TRACKS CHECK TOOL SN 108989 | | 1089896 |
| MCO | MX TOOLING | PO 244340 / AFW - TURBINE TEMPERATURE TESTER  SN 6355 | | 6355 |
| MCO | MX TOOLING | ADAPTER  OXYGEN REFILLING | | 24.04.0241Q2 |
| MCO | MX TOOLING | PO 240208 / INV 228001244 / BRAKE PRESSURE GAUGE SN  FSB035816 | | FSB035816-04 |

| MCO | MX TOOLING | PROP ASSU ANTI TIPPING | | |
|-----|-----------|-----------------------|---|---|
| MCO | MX TOOLING | PO 240044 / INV 430122351 / NLG JACK ADAPTER | | SRM-219-00182 |
| MCO | MX TOOLING | PO 240044 / INV 430122351 / NLG JACK ADAPTER | | SRM-219-002184 |
| MCO | MX TOOLING | PO 239329 / INV 4441 / FUEL TEST SET FOR TPA | | J451 |
| MCO | MX TOOLING | PO 240677 / INV INVC27085 / TOOL I F ADC VACUUM PUMP, AIR DATA KIT ACCESSORIES | | 5993 |
| MCO | MX TOOLING | PO 240646 / INV 430124096 / AIR DATA KIT ACCESSORIES SN 7347 | | 7347 |
| MCO | MX TOOLING | PO 242624 / INV 430132875 / AFW - BRAKE PRESSURE GAUGES | | DCM0003 |
| MCO | MX TOOLING | PO 243816 / INV SO3551211 / MCO - RI FIXTURE ENG OR PROP | | 22295801 |
| MCO | MX TOOLING | PO 252337 / MCO - ENGINE DOLLY SN 0223 | | 0223 |
| MCO | MX TOOLING | PO 249780 / INV 21985 / HAND HELD PORTABLE VIDEOSCOPE | | MBBEJA0075 |
| MCO | MX TOOLING | PO 249780 / INV 21985 / HAND HELD PORTABLE VIDEOSCOPE | | MBBCJB0046 |
| MCO | MX TOOLING | PO 251179 / INV 121834 / MCO - PROP BALANCER TOOL SN 1487 | | 1487 |
| MCO | MX TOOLING | PO 252336 / INV 430147471 / MCO - DOLLY ENGINE (FOLDING) SN DCM0002 | | DCM0002 |

| MCO | MX TOOLING | PO 245580 / INV 430134459 / PORTABLE DATA LOADER SN 7250 | | 6620 |
|---|---|---|---|---|
| MCO-SAL AERO RO 250379 | MX TOOLING | Jack: Axle | | 2352180310 |
| MCO-TECH MX RO 245492 | MX TOOLING | Nitrogen Replenishing Kit | | 864191 |
| PNS | MX TOOLING | Oxygen Booster & Transport Cart | | |
| PNS | MX TOOLING | Mlg Jack Adapter | | 0183 |
| PNS | MX TOOLING | Nlg Jack Adapter | | SRM-218-00229 |
| PNS | MX TOOLING | Nitrogen Replenishing Kit | | 00095 |
| SJU | MX TOOLING | NLG Jack Adapter | | SRM-217-00139 |
| SJU | MX TOOLING | Flight Control Engine Pins | | 01-215-00267 |
| SJU | MX TOOLING | Jack: Axle,HYD 12 ton | | 2352180312 |
| SJU | MX TOOLING | Nlg Jack Adapter | | SRM-218-00231 |
| SJU | MX TOOLING | Calibrator Pitot Static | | 2501 |
| SJU | MX TOOLING | PO 239436 / INV 430122561 / ADAPTER CABLES FCU  SN 116570-02 | | SN 116570-02 |
| SJU | MX TOOLING | PO 240648 / INV INVC27063 / NLG JACK ADAPTER  SN SRM-218-00224 | | SRM-218-00224 |

| SJU | MX TOOLING | PO 244945 / RUBBER ROLLER (SJU TOOL) | | |
|-----|-----------|--------------------------------------|---|---|
| SJU | MX TOOLING | PO 240044 / INV 430122350 / EXTRACTOR - SPINNER  SN OXY053 | | OXY053 |
| SJU | MX TOOLING | PO 239436 / INV 430122562 / INTERFACE CABLE TANK SN 103489-08 | | 103489-08 |
| SJU | MX TOOLING | PO 245526 / INV 430135650 / INTERFACE CABLE TANK SN 044303-02 | | 044303-02 |
| SJU | MX TOOLING | PO 245526 / INV 430134402 / MCO - INTERFACE CABLE TANK  SN 116097-05 | | 116097-05 |
| SJU | MX TOOLING | PO 252053 / INV 430146900 / SJU - ADAPTER - NLG SH ABS FILLCHARGE | | SN DCM0009 |
| SJU | MX TOOLING | ADAPTER  OXYGEN REFILLING | | N/A |
| SJU | MX TOOLING | PO 239436 / INV 430122560 / INTERFACE CABLE TANK SN 210659DELTA5-04 | | 210659DELTA5-04 |
| SJU | MX TOOLING | PO 243964 / INV 430131696 / INTERFACE CABLE TANK SN 109556-04 | | 109556-04 |
| SJU | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 05I1BI |
| SJU | MX TOOLING | PO 246404 / INV 430135482 / PORTABLE SYNCHRO READER SN 314 | | 314 |
| SJU | MX TOOLING | PO 240645 / INV 430124084 / AIR DATA KIT ACCDESSORIES  SN 7349 | | 7349 |
| SJU | MX TOOLING | PROPELLER STAND | | 0129 |

| | | | | |
|---|---|---|---|---|
| SJU | MX TOOLING | PO 257368 / INV 430158886 / MCO - RH ELEV TAB POSITION JIG  SN FSB064225-03, LH ELEV TAB POSITION JIG  SN FSB062972-02 | | |
| SJU | MX TOOLING | VC DISPLAYS INC - OUTFLOW VALVE TEST SET | | 071079-153 |
| TPA | MX TOOLING | Oxygen Booster & Transport Cart | | |
| TPA | MX TOOLING | Mlg Jack Adapter | | 0184 |
| TPA | MX TOOLING | Nitrogen Replenishing | | 0093 |
| TPA | MX TOOLING | PO 237987 / INV 3938 / RUDDER CHECKING JIG | | 14 |
| TPA | MX TOOLING | PO 239661 / INV 430121018 / PORTABLE SYNCHRO READER  SN 316 | | 316 |
| TPA | MX TOOLING | PO 250758 / INV 430143415 / BRAKE PRESSURE GAUGE SN DCM0012 | | DCM0012 |
| TPA | MX TOOLING | PO 240014 - CRIMPER KIT - CONNECTORS SYSTEM | | 1154971 |
| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0144 |
| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0145 |
| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0148 |
| TPA | MX TOOLING | PO 240647 / INV 430124095 / AIR DATA KIT ACCESSORIES SN 7348 | | 7348 |
| TPA | MX TOOLING | PO 242624 / INV 430132875 / AFW - BRAKE PRESSURE GAUGES | | DCM0002 |

| EYW | PAX LIFT | MOBILIFT AX-80 (WHEEL CHAIR LIFT) | QR#2UOCKD1658M46 | |
| PNS | PAX LIFT | Wheelchair lift | QR#IBJU4GBWEFFJ | |
| STT | PAX LIFT | PAX LIFT | QR#22IWM8HT6UB3S | |
| STX | PAX LIFT | MOBILIFT AX-80 (WHEEL CHAIR LIFT) | QR#2COL4ZFBDPS7K | |
| FLL | RAMP | PO 241388 / INV 1145893 / EXPRESS RAMP - FLL / ADA RAM FLL | QR# 15JBRLAHM0QTN | |
| MCO | RAMP | Jet Way Ramp Maodel 2025 | QR#3H563T5CA23K2 / SN#60129 | |
| MCO | RAMP | KCI JETWAY RAMP | QR#16AHSWXB50BUK / SN#60122 | |
| SJU | RAMP | JetBridge Ramp (JWR2025) | QR#3E2DVEQ9E0IWK | |
| TLH | RAMP | PO 251679 / SJU - PASSENGER LOADING RAMP | QR#CEXO7GJ8N7PZ | |
| FLL | STAIRS | Passenger Stairs (A05430D) | QR# W5IAKXZ222DU | |
| MCO | STAIRS | STAIRS | QR#8SHKWW2XRZQ5 | |
| EYW | TOW BAR | Tow Bar | QR#1BTPTYVB6FI77 | 1955404 |
| EYW | TOW BAR | PO 240264 / INV INVC26874 / TPA - TOW BAR  SN 1995402 | QR#35JPZJ44QYPDP | 1995402 |
| EYW | TOW BAR | TPA - ATR TOWBAR FOR TAMPA | QR#3AFE4UNVTIPM6 | |
| FLL | TOW BAR | New Tb1 Aluminum Towbar / Cl3R Towbar Head | QR#3CUUA3NMTGZX3 / SN#T4938 | T4938 |
| FLL | TOW BAR | Tow Bar | QR# YXBJVUP8BK0R | 1836303 |
| FLL | TOW BAR | Tow Bar | QR# 2FHGZSXGKTE5M | 1836304 |
| FLL | TOW BAR | Tow Bar | QR# 2NVVU4AY4RACA | 1955403 |

| MCO | TOW BAR | Tow Bar | QR#2SKK3CITKZR8X | 1801408 |
|---|---|---|---|---|
| MCO | TOW BAR | Tow Bar | QR#TYQDT1Q8312W | 1955405 |
| MCO | TOW BAR | Towbar & Towbar Head | QR#1YHGX9PJZ9RRJ / SN#T772556 | T772556 |
| PNS | TOW BAR | Tow Bar | QR#1S9QIALM1V6CB | 1704424 |
| SJU | TOW BAR | Tow Bar | | 1955409 |
| TLH | TOW BAR | Tow Bar | | 1801407 |
| TLH | TOW BAR | Towbar | QR#VO1P8Q8QI5KC | |
| TPA | TOW BAR | Tow Bar | QR#216PXHOV6Q4X6 / SN#1718010 | 1718010 |
| MCO HANGAR | TRAILER | PO 243387 / TRAILER FOR AFW - VIN # 7H2BE1424PD048958 - MAKE = 2023 ROCK SOLID | QR#3P7QUZXOV2DKU | 7H2BE1424P D048958 |
| FLL | TRASH CART | CMC 4000 4x8 Standard Axle Cart - TRASH CART | QR#373VMSNXT4NF6 | |
| EYW | TUG | Tug MA-30 | QR#2DUACUAJXMNZ1 | |
| EYW | TUG | Tug MA-30 | QR#31RY8TBQT8E96 | |
| FLL | TUG | 2014 Aircraft Tug AP8750-AL-700 | QR# 5JS4JIHF5AOV | |
| FLL | TUG | 2014 Lektro Model AP8700C AC Tug | QR# 2OOEW6KC20YEW | |
| MCO | TUG | Tug MA-30 | QR#2GWZ4JBMT9U2D / SN#446 | |
| MCO | TUG | Tug MA-30 | QR#35WOVGHWZEA76 / SN#6392 | |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3KWKX4LHL5DMM | |

| MCO | TUG | MCO - BAGGAGE TUG | QR#18MROH9TPHA0L | |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3H1INQOT8I68D | |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3SH43WG01BLNZ | |
| MCO | TUG | 2014 Lektro Aircraft AP8850SDA-AL-100 | QR#238T4QTOAJQJ3 / SN#A84599-315A | |
| MCO | TUG | MCO Tug 738 (Hangar Push Back) | QR#1HOUMHDMQ4KGO | |
| MCO | TUG | MCO Tug 01 Ramp Pushback | QR#2LUZ9EVHEAXUF / SN#12914 | |
| MHH | TUG | BAGGAGE TUG | QR#1HPW45ROSV8BF | |
| MHH | TUG | BAGGAGE TUG | QR#1LH2GULW72KO2 | |
| MHH | TUG | MHH Tug 051 | QR#3UL2YSCVKBX45 | |
| PNS | TUG | Tug MA-30 | QR#MDRRT238MNG3 | |
| PNS | TUG | Tug MA-30 | QR#58J5XIKI1Y56 | |
| PNS | TUG | PNS - BAGGAGE TUG | QR#3AP7LUZSZI5IY | |
| PNS | TUG | PNS - BAGGAGE TUG | QR#1I36KUM04TSQB | |
| SJU | TUG | Bag Tractor / TUG INC MA-50 ( BB ASSET TAG 776) | QR#14GW1YXU9N98O | |
| SJU | TUG | Bag TRactor / TUG INC MA-50 ( BB ASSET TAG 777) | QR#3TYCF1Z4F1LPW | |
| SJU | TUG | Bag Tractor / TUG Inc MA-50 ( BB ASSET TAG 780) | QR#36IDMG09Z2665 | |
| SJU | TUG | Baggage Tractor / Tug INC - MA-50 ( BB ASSET TAG 769) | QR#2NTL2EP1IZFJR | |
| SJU | TUG | Tug | QR#PEMVF1IZ7LUN | |
| STT | TUG | TUG MA30 | QR#2LH9FL4076DLN | |

| STT | TUG | Baggage Tractor / TUG INC MA-50 ( BB ASSET TAG 771) | QR#YMKK24DTB7Y0 | |
|---|---|---|---|---|
| STX | TUG | Baggage Tractor / TUG INC MA-50 ( BB ASSET TAG 772) | QR#TNCH8PRJDUNP | |
| STX | TUG | Tug | QR#QG67GSPFOWB4 | |
| TLH | TUG | BAGGAGE TUG | QR#KR1JRB4L409E | |
| TLH | TUG | BAGGAGE TUG | QR#22G9FFJ7KQ6GD | |
| TLH | TUG | BAGGAGE TUG | QR#RZNNO9VOHMWX | |
| TLH | TUG | BAGGAGE TUG | QR#30QNNORPJA08W | |
| TLH | TUG | TLH Tug G4 | QR#112EO3HC7CNSU | |
| TPA | TUG | Tug MA-30 | QR#13X7SM895QTCX | |
| TPA | TUG | TPA TUG T-62 | QR#FO1UJ1E3ZEA7 | |
| TPA | TUG | TPA TUG 63 | QR#1GQTLXXQOKK1O | |
| MCO | VALET CART | AERO GROUND SUPP  - VALET CART | QR#30VYON3QEOR96 | |
| TLH | VALET CART | AERO GROUND SUPP  - VALET CART | QR#3EI2R0Y47M1KD | |
| FLL CREW VAN | VEHICLE | 2013 Ford F 350 | QR# 1C0FEWJTKI8QF | VIN 1FBNE3BL4 DDA11067 |
| FLL MX VAN | VEHICLE | 2001 FORD E350 ECONOLINE CLUB WAGON | QR# IH746B6PKQKZ / VIN#1FTSE34L91HA33081 | VIN 1FTSE34L91 HA33081 |
| FLL RAMP | VEHICLE | 2015 Nissan Frontier SV | QR# 2UGX0SQNSH55L / VIN#1N6AD0ER3FN756605 | VIN 1N6AD0ER8 FN756605 |

| MCO HANGAR | VEHICLE | 2011 Ford F 250 | QR#25BEKSEPYD06X / VIN#1FTNS2EW6BDA15 106 | VIN 1FTNS2EW6 BDA15106 |
|---|---|---|---|---|
| MCO MX | VEHICLE | 2009 Ford Super Dute F 350 | QR#31NKKGXDS22FA / VIN#1FDWF36Y19EA396 97 | VIN 1FDWF36Y1 9EA39697 |
| SJU MX | VEHICLE | 2006 FORD F150 | QR#11T4LMSR4JDIE / VIN#IFTRF12246NA2268 5 | VIN IFTRF12246N A22685 |
| SJU SHUTTLE BUS | VEHICLE | FORD | QR#NK2LPL4HMEZL / VIN#IFDXE45F0IHA6099 3 | VIN IFDXE45F0I HA60993 |
| SJU SWAT VAN | VEHICLE | Utilimaster/General Motor | QR#1BRB35Y30JM7M / VIN#J8DB4T1K4R700968 7 | VIN J8DB4T1K4R 7009687 |
| SJU TOW TRUCK | VEHICLE | FORD | QR#2NDUGNKTJ6YXO | |
| TPA | VEHICLE | 2008 Dodge Ram 1500 | QR#3T7CEMBLLG96R / VIN#1D7HU18N68S51641 5 | VIN 1D7HU18N68 S516415 |
| TPA MX VAN | VEHICLE | 2007 FORD E250 | QR#3GRGXQ456GID2 / VIN#1FTNE24L57DB289 41 | VIN 1FTNE24L57 DB28941 |
| WO - TOTALED 12/2024 | VEHICLE | 2017 Nissan Frontier | QR#TCKOM9Q1UHN2 / VIN#1N6AD0ER1HN7010 61 | VIN 1N6AD0ER1 HN701061 |

| SJU | WATER CART | WATER CART - STD-PC 110E (LEASE TO BUY) | QR#30ZFMSDRU77XS / SN#6157 | |
|-----|-----------|-----------------------------------------|-----------------------------|--|

**Schedule 4.21(e)**

**<u>Owned Station Items Condition</u>**

See attached as provided by Seller. Purchaser requested Seller provide explanation as to why condition of the vast majority of equipment was unknown. Seller failed to provide as of the Closing Date. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

| LOCATION | EQUIP TYPE | ASSET NAME | 3M QR | SERIAL NUMBER | CONDITION |
|---|---|---|---|---|---|
| EIS | AIR CART/ GPU | AERO GROUND SUPP   - A/C HEATER UNIT | QR#2TN31DBDS7QDH | | NEEDS REPAIR |
| EIS | GPU | AERO GROUND SUPP - GENERATOR | QR#1NUVM05EA050P | | UNKNOWN |
| EYW | TOW BAR | Tow Bar | QR#1BTPTYVB6FI77 | 1955404 | UNKNOWN |
| EYW | TOW BAR | PO 240264 / INV INVC26874 / TPA - TOW BAR  SN 1995402 | QR#35JPZJ44QYPDP | 1995402 | UNKNOWN |
| EYW | TOW BAR | TPA - ATR TOWBAR FOR TAMPA | QR#3AFE4UNVTIPM6 | | UNKNOWN |
| EYW | TUG | Tug MA-30 | QR#2DUACUAJXMNZ1 | | UNKNOWN |
| EYW | TUG | Tug MA-30 | QR#31RY8TBQT8E96 | | UNKNOWN |
| EYW | PAX LIFT | MOBILIFT AX-80 (WHEEL CHAIR LIFT) | QR#2UOCKD1658M46 | | UNKNOWN |
| EYW | BAG CART | AERO GROUND SUPP  - EYW - BAGGAGE CART | QR#IATO7KG70I7T | | UNKNOWN |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#2OF2FS053I8BH | | UNKNOWN |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#22P9PKWY92BNA | | UNKNOWN |

| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#3K5Z2YI3UGBOT | | UNKNOWN |
| EYW | BAG CART | AERO GROUND SUPP  - BAGGAGE CART | QR#KBSHCB9VAYJA | | UNKNOWN |
| FLL | TOW BAR | New Tb1 Aluminum Towbar / Cl3R Towbar Head | QR#3CUUA3NMTGZ X3 / SN#T4938 | T4938 | UNKNOWN |
| FLL | MX TOOLING | Oxygen Booster & Transport Cart | | | UNKNOWN |
| FLL | MX TOOLING | Head Adapter - Extinguisher Bottle | | ECA007 | UNKNOWN |
| FLL | MX TOOLING | STATIC ADAPTER | | 340067 | UNKNOWN |
| FLL | MX TOOLING | STATIC ADAPTER | | 340066 | UNKNOWN |
| FLL | MX TOOLING | Extractor Spinner | | OXY057 | UNKNOWN |
| FLL | MX TOOLING | Go /  No Go Gauge Pitot Probe | | SA 1070 | UNKNOWN |

| FLL | MX TOOLING | Seal Expander | | 106673 | UNKNOWN |
|-----|-----------|---------------|---|--------|---------|
| FLL | MX TOOLING | Split Ring | | SA 1056 | UNKNOWN |
| FLL | MX TOOLING | Filling And Purge Skydrol Tool | | 10013 | UNKNOWN |
| FLL | MX TOOLING | MLG Jack Adapter | | 0176 | UNKNOWN |
| FLL | MX TOOLING | Jack: Axle | | 2352180313 | UNKNOWN |
| FLL | TOW BAR | Tow Bar | QR# YXBJVUP8BK0R | 1836303 | UNKNOWN |
| FLL | TOW BAR | Tow Bar | QR# 2FHGZSXGKTE5M | 1836304 | UNKNOWN |
| FLL | TOW BAR | Tow Bar | QR# 2NVVU4AY4RACA | 1955403 | UNKNOWN |
| FLL | MX TOOLING | Extractor Spinner | | OXY069 | UNKNOWN |

| FLL | MX TOOLING | EXTRACTOR SPINNER | | OXY062 | UNKNOWN |
|-----|-----------|-------------------|--|--------|---------|
| FLL | MX TOOLING | Extractor Spinner | | OXY067 | UNKNOWN |
| FLL | MX TOOLING | Extractor Spinner | | OXY068 | UNKNOWN |
| FLL | MX TOOLING | PITOT TEST ADAPTOR | | | UNKNOWN |
| FLL | MX TOOLING | TOOL I F ADC-VACUUM PUMP | | ECA007 | UNKNOWN |
| FLL | MX TOOLING | PO 239661 / INV 430121017 / FLIGHT CONTROL ENGINE PINS  SN SRM-221-00005 | | SRM-221-00005 | UNKNOWN |
| FLL | MX TOOLING | RIGGING PINS-HMU/PCU(NACELLE) | | DCM0016 | UNKNOWN |
| FLL | MX TOOLING | PO 240049 / INV 430122488 / NLG JACK ADAPTER  SN SRM-219-00185 | | SRM-219-00185 | UNKNOWN |
| FLL | FACILITY | FLL OPS ICE Freezer | | | UNKNOWN |

| FLL | MX TOOLING | PO 251251 / INV 3100481610 / MCO - TOOLING COMPACE FLASH CARD (MEMORY MODULES)  SN 819 & 820 | | 819 | UNKNOWN |
|-----|-----------|---|---|---|---|
| FLL | MX TOOLING | PO 251251 / INV 3100481610 / MCO - TOOLING COMPACE FLASH CARD (MEMORY MODULES)  SN 819 & 820 | | 820 | UNKNOWN |
| FLL | RAMP | PO 241388 / INV 1145893 / EXPRESS RAMP - FLL / ADA RAM FLL | QR# 15JBRLAHM0QTN | | UNKNOWN |
| FLL | GOLF CART | 2013 CLUB CAR PRECEDENT GAS GOLF CART - SN PR1315-359245 | QR# 2E55VR3MCQYM0 / SN#PR1315-359245 | SN PR1315-359245 | UNDER REPAIR |
| FLL | BAG CART | AERO GROUND SUPP  -FLL- BAGGAGE CART | QR# 218HEIOYKN1VV | | UNKNOWN |
| FLL | BAG CART | AERO GROUND SUPP  -FLL- BAGGAGE CART | QR# 35EZC2SPHNHMW | | UNKNOWN |
| FLL | MX TOOLING | DAT001 DATO ELECTRIC INC - INV PROPOSAL9850 - BATTERY CHARGER | | | UNKNOWN |
| FLL | TUG | 2014 Aircraft Tug AP8750-AL-700 | QR# 5JS4JIHF5AOV | | UNKNOWN |
| FLL | TUG | 2014 Lektro Model AP8700C AC Tug | QR# 2OOEW6KC20YEW | | UNKNOWN |
| FLL | STAIRS | Passenger Stairs (A05430D) | QR# W5IAKXZ222DU | | UNKNOWN |
| FLL | TRASH CART | CMC 4000 4x8 Standard Axle Cart - TRASH CART | QR#373VMSNXT4NF6 | | UNKNOWN |

| FLL | LAV CART | FLL Lavatory LC3579 | QR# 1L4QDPEOSC2SQ / SN# 311312 | | UNKNOWN |
| FLL CREW VAN | VEHICLE | 2013 Ford F 350 | QR# 1C0FEWJTKI8QF | VIN 1FBNE3BL4D DA11067 | UNKNOWN |
| FLL MX VAN | VEHICLE | 2001 FORD E350 ECONOLINE CLUB WAGON | QR# IH746B6PKQKZ / VIN#1FTSE34L91HA3 3081 | VIN 1FTSE34L91H A33081 | UNKNOWN |
| FLL RAMP | VEHICLE | 2015 Nissan Frontier SV | QR# 2UGX0SQNSH55L / VIN#1N6AD0ER3FN7 56605 | VIN 1N6AD0ER8F N756605 | UNKNOWN |
| GGT | BAG CART | GGT Bag Cart 02 | QR#1W5XL6IU7V055 | | UNKNOWN |
| GSO | CHAIR | Aisle Transfer Chair Jessica New Station (GSO) | | | UNKNOWN |
| HDQ | FURNITURE | Orw Workplace, Inc 76 Work Stations | | | UNKNOWN |
| HSV | MX TOOLING | Jack: Axle,HYD 12 ton | | 0998171007 | UNKNOWN |
| MCO | TOW BAR | Tow Bar | QR#2SKK3CITKZR8X | 1801408 | UNKNOWN |

| MCO | MX TOOLING | Oxygen Booster & Transport Cart | | | UNKNOWN |
|---|---|---|---|---|---|
| MCO | TOW BAR | Tow Bar | QR#TYQDT1Q8312W | 1955405 | UNKNOWN |
| MCO | MX TOOLING | STATIC ADAPTER | | 340053 | UNKNOWN |
| MCO | MX TOOLING | STATIC ADAPTER | | 340064 | UNKNOWN |
| MCO | MX TOOLING | PO 233706 / INV 430099452 / NLGM JACK ADAPTER | | SRM-219-00143 | UNKNOWN |
| MCO | MX TOOLING | ATR NOSE JACK | | 1208080701 | UNKNOWN |
| MCO | MX TOOLING | Battery Charger & Analyzer | | 80P77208 | UNKNOWN |
| MCO | MX TOOLING | Kit Accessories- Air Data | | 2179 | UNKNOWN |
| MCO | MX TOOLING | Engine Sling | | 0137 | UNSERVICEABLE |

| MCO | MX TOOLING | Washcart | | 07-5352-1 | UNKNOWN |
|-----|-----------|----------|---|----------|---------|
| MCO | MX TOOLING | Charger: Combo, SuiteCase | | 80Q58010 | UNKNOWN |
| MCO | MX TOOLING | Nlg Jack Adapter | | 0187 | UNKNOWN |
| MCO | MX TOOLING | Nlg Jack Adapter | | SRM-218-00225 | UNKNOWN |
| MCO | TOW BAR | Towbar & Towbar Head | QR#1YHGX9PJZ9RRJ / SN#T772556 | T772556 | UNKNOWN |
| MCO | MX TOOLING | O2 CART, 3 BOT REMOTE | | T59817 | UNKNOWN |
| MCO | MX TOOLING | NDT MACHINE | | 200054702 | UNKNOWN |
| MCO | MX TOOLING | ENGINE COMPRESSOR WASHER & GUIDE TUBE | | 2724191003 | UNKNOWN |
| MCO | MX TOOLING | MLG JACK ADAPTER | | 0191 | UNKNOWN |

| MCO | MX TOOLING | PO 246185 / AFW - RH CABLE INTERFACE (SN J009) | | J009 | UNKNOWN |
|-----|-----|-----|-----|-----|-----|
| MCO | MX TOOLING | PO 241512 / INV 24231 / FLEXIBLE WRENCH FUEL MANIFOLD | | 0520122709 | UNKNOWN |
| MCO | MX TOOLING | PO 246404 / INV 430135482 / INCLINOMETER  AN ECA02/21 | | | UNKNOWN |
| MCO | MX TOOLING | PO 245526 / MCO - CABLE INTERFACE RH | | 059086-9 | UNKNOWN |
| MCO | MX TOOLING | PO 243080 / INV 430129639 / BLADE SEAL COMPRESSR | | | UNKNOWN |
| MCO | MX TOOLING | EXT STATIC PORT CONNECTION | | ECA101/18 | UNKNOWN |
| MCO | MX TOOLING | PO 242624 / INV 430132335 / AFW - BRAKE PRESSURE GAUGE  SN FSB035816-01 | | FSB035816-01 | UNKNOWN |
| MCO | MX TOOLING | SYNCHRO READER TOOL | | 072 | UNKNOWN |
| MCO | MX TOOLING | PO 245526 / INV 430137352 / INTERFACE CABLE TANK SN 050260-02 | | 050260-02 | UNKNOWN |

| MCO | MX TOOLING | PO 240006 / INV 107466 / NLG WHEEL AXLE ADAPTER TOOL, ADAPTER, LIFT JACKS | | C11504 | UNKNOWN |
|---|---|---|---|---|---|
| MCO | MX TOOLING | PO 240006 / INV 107466 / NLG WHEEL AXLE ADAPTER TOOL, ADAPTER, LIFT JACKS | | D17428 | UNKNOWN |
| MCO | MX TOOLING | PO 240049 / INV 430122486 / ELT PROGRAMMER | | SA1303 | UNKNOWN |
| MCO | MX TOOLING | PO 246404 / INV 430135482 / FLIGHT CONTROL ENGINE PINS  SN SRM-222-00054 | | SRM-222-00054 | UNKNOWN |
| MCO | MX TOOLING | PO 240044 / INV 430122356 / SEAT TRACKS CHECK TOOL  SN 1089902 | | 1089902 | UNKNOWN |
| MCO | MX TOOLING | PO 252118 / INV 430147017 / MCO - SPINNER EXTRACTOR  SN DCM0010 | | DCM0010 | UNKNOWN |
| MCO | MX TOOLING | PO 243431 / INV 430130387 / SEAT TRACKS CHECK TOOL SN 108989 | | 1089896 | UNKNOWN |
| MCO | MX TOOLING | PO 244340 / AFW - TURBINE TEMPERATURE TESTER SN 6355 | | 6355 | UNKNOWN |
| MCO | MX TOOLING | ADAPTER  OXYGEN REFILLING | | 24.04.0241Q2 | UNKNOWN |

| MCO | MX TOOLING | PO 240208 / INV 228001244 / BRAKE PRESSURE GAUGE SN FSB035816 | | FSB035816-04 | UNKNOWN |
|---|---|---|---|---|---|
| MCO | MX TOOLING | PROP ASSU ANTI TIPPING | | | UNSERVICEABLE |
| MCO | MX TOOLING | PO 240044 / INV 430122351 / NLG JACK ADAPTER | | SRM-219-00182 | UNKNOWN |
| MCO | MX TOOLING | PO 240044 / INV 430122351 / NLG JACK ADAPTER | | SRM-219-002184 | UNKNOWN |
| MCO | MX TOOLING | PO 239329 / INV 4441 / FUEL TEST SET FOR TPA | | J451 | UNSERVICEABLE |
| MCO | MX TOOLING | PO 240677 / INV INVC27085 / TOOL I F ADC VACUUM PUMP, AIR DATA KIT ACCESSORIES | | 5993 | UNKNOWN |
| MCO | MX TOOLING | PO 240646 / INV 430124096 / AIR DATA KIT ACCESSORIES  SN 7347 | | 7347 | UNSERVICEABLE |
| MCO | MX TOOLING | PO 242624 / INV 430132875 / AFW - BRAKE PRESSURE GAUGES | | DCM0003 | UNKNOWN |
| MCO | MX TOOLING | PO 243816 / INV SO3551211 / MCO - RI FIXTURE ENG OR PROP | | 22295801 | UNKNOWN |

| MCO | MX TOOLING | PO 252337 / MCO - ENGINE DOLLY SN 0223 | | 0223 | UNKNOWN |
| MCO | MX TOOLING | PO 249780 / INV 21985 / HAND HELD PORTABLE VIDEOSCOPE | | MBBEJA0075 | UNKNOWN |
| MCO | MX TOOLING | PO 249780 / INV 21985 / HAND HELD PORTABLE VIDEOSCOPE | | MBBCJB0046 | UNKNOWN |
| MCO | MX TOOLING | PO 251179 / INV 121834 / MCO - PROP BALANCER TOOL  SN 1487 | | 1487 | UNKNOWN |
| MCO | MX TOOLING | PO 252336 / INV 430147471 / MCO - DOLLY ENGINE (FOLDING)  SN DCM0002 | | DCM0002 | UNKNOWN |
| MCO | FACILITY | MTX Shelving for MCO Hangar | | | UNKNOWN |
| MCO | MX TOOLING | PO 245580 / INV 430134459 / PORTABLE DATA LOADER SN 7250 | | 6620 | UNKNOWN |
| MCO | LOAD BANK | 3-28 CANNON LOAD BANK | QR#1UR4F2XK8IYJR / SN#8997 | 8997 | UNKNOWN |
| MCO | TUG | Tug MA-30 | QR#2GWZ4JBMT9U2D / SN#446 | | UNKNOWN |
| MCO | TUG | Tug MA-30 | QR#35WOVGHWZEA76 / SN#6392 | | NEEDS REPAIR |

| MCO | LAV CART | Tronair 10-4036-0010 Lav Cart | QR#DMTKDMJHLTX 1 | | UNKNOW N |
|-----|-----|-----|-----|-----|-----|
| MCO | RAMP | Jet Way Ramp Maodel 2025 | QR#3H563T5CA23K2 / SN#60129 | | UNKNOW N |
| MCO | GPU | AERO GROUND SUPP  - GENERATOR | QR#IJIOYQ9HFVPQ / SN#312091 | | UNKNOW N |
| MCO | VALET CART | AERO GROUND SUPP  - VALET CART | QR#30VYON3QEOR9 6 | | UNKNOW N |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3KWKX4LHL5D MM | | UNKNOW N |
| MCO | TUG | MCO - BAGGAGE TUG | QR#18MROH9TPHA0 L | | UNKNOW N |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3H1INQOT8I68D | | UNKNOW N |
| MCO | TUG | MCO - BAGGAGE TUG | QR#3SH43WG01BLN Z | | UNKNOW N |
| MCO | TUG | 2014 Lektro Aircraft AP8850SDA-AL-100 | QR#238T4QTOAJQJ3 / SN#A84599-315A | | UNKNOW N |
| MCO | FACILI TY | PO 236063 / HALON 674 FIRE EXTINGUISHER 150LB ON WHEELS | | | UNKNOW N |
| MCO | RAMP | KCI JETWAY RAMP | QR#16AHSWXB50BU K / SN#60122 | | UNKNOW N |
| MCO | STAIRS | STAIRS | QR#8SHKWW2XRZQ 5 | | UNKNOW N |

| MCO | TUG | MCO Tug 738 (Hangar Push Back) | QR#1HOUMHDMQ4KGO | | UNKNOWN |
| MCO | TUG | MCO Tug 01 Ramp Pushback | QR#2LUZ9EVHEAXUF / SN#12914 | | UNKNOWN |
| MCO HANGAR | TRAILER | PO 243387 / TRAILER FOR AFW - VIN # 7H2BE1424PD048958 - MAKE = 2023 ROCK SOLID | QR#3P7QUZXOV2DKU | 7H2BE1424PD048958 | UNKNOWN |
| MCO HANGAR | VEHICLE | 2011 Ford F 250 | QR#25BEKSEPYD06X / VIN#1FTNS2EW6BDA15106 | VIN 1FTNS2EW6BDA15106 | UNKNOWN |
| MCO MX | VEHICLE | 2009 Ford Super Dute F 350 | QR#31NKKGXDS22FA / VIN#1FDWF36Y19EA39697 | VIN 1FDWF36Y19EA39697 | UNKNOWN |
| MCO-SAL AERO RO 250379 | MX TOOLING | Jack: Axle | | 2352180310 | UNKNOWN |
| MCO-TECH MX RO 245492 | MX TOOLING | Nitrogen Replenishing Kit | | 864191 | UNKNOWN |
| MHH | TUG | BAGGAGE TUG | QR#1HPW45ROSV8BF | | UNKNOWN |
| MHH | TUG | BAGGAGE TUG | QR#1LH2GULW72KO2 | | UNKNOWN |
| MHH | TUG | MHH Tug 051 | QR#3UL2YSCVKBX45 | | UNKNOWN |

| PNS | MX TOOLING | Oxygen Booster & Transport Cart | | | UNKNOWN |
|---|---|---|---|---|---|
| PNS | MX TOOLING | Mlg Jack Adapter | | 0183 | UNKNOWN |
| PNS | MX TOOLING | Nlg Jack Adapter | | SRM-218-00229 | UNKNOWN |
| PNS | GPU | Gpu-Hobart Diesel JETEX6D | QR#2X0SQ3OIFPSRT / SN#115PS20279 | 115PS20279 | UNKNOWN |
| PNS | MX TOOLING | Nitrogen Replenishing Kit | | 00095 | UNKNOWN |
| PNS | TOW BAR | Tow Bar | QR#1S9QIALM1V6CB | 1704424 | UNKNOWN |
| PNS | TUG | Tug MA-30 | QR#MDRRT238MNG3 | | UNKNOWN |
| PNS | TUG | Tug MA-30 | QR#58J5XIKI1Y56 | | UNKNOWN |
| PNS | BAG CART | AERO GROUND SUPP  - PNS - BAGGAGE CART | QR#13Z445VW5QI4A | | UNKNOWN |
| PNS | BAG CART | AERO GROUND SUPP  - PNS - BAGGAGE CART | QR#21VVOZEFNKHLC | | UNKNOWN |
| PNS | TUG | PNS - BAGGAGE TUG | QR#3AP7LUZSZI5IY | | UNKNOWN |

| PNS | TUG | PNS - BAGGAGE TUG | QR#1I36KUM04TSQB | | UNKNOWN |
| PNS | PAX LIFT | Wheelchair lift | QR#IBJU4GBWEFFJ | | UNKNOWN |
| PNS | LAV CART | PNS Lavatory Cart LAV-01 (LAV 08) | QR#NWKYXTBR4FYM | | UNKNOWN |
| SJU | TOW BAR | Tow Bar | | 1955409 | UNKNOWN |
| SJU | MX TOOLING | NLG Jack Adapter | | SRM-217-00139 | UNKNOWN |
| SJU | MX TOOLING | Flight Control Engine Pins | | 01-215-00267 | UNKNOWN |
| SJU | MX TOOLING | Jack: Axle,HYD 12 ton | | 2352180312 | UNKNOWN |
| SJU | MX TOOLING | Nlg Jack Adapter | | SRM-218-00231 | UNKNOWN |
| SJU | MX TOOLING | Calibrator Pitot Static | | 2501 | UNKNOWN |
| SJU | MX TOOLING | PO 239436 / INV 430122561 / ADAPTER CABLES FCU SN 116570-02 | | SN 116570-02 | UNKNOWN |

| SJU | MX TOOLING | PO 240648 / INV INVC27063 / NLG JACK ADAPTER  SN SRM-218-00224 | | SRM-218-00224 | UNKNOWN |
|-----|-----------|------|--|--|--|
| SJU | MX TOOLING | PO 244945 / RUBBER ROLLER (SJU TOOL) | | | UNKNOWN |
| SJU | MX TOOLING | PO 240044 / INV 430122350 / EXTRACTOR - SPINNER SN OXY053 | | OXY053 | UNKNOWN |
| SJU | MX TOOLING | PO 239436 / INV 430122562 / INTERFACE CABLE TANK SN 103489-08 | | 103489-08 | UNKNOWN |
| SJU | MX TOOLING | PO 245526 / INV 430135650 / INTERFACE CABLE TANK SN 044303-02 | | 044303-02 | UNKNOWN |
| SJU | MX TOOLING | PO 245526 / INV 430134402 / MCO - INTERFACE CABLE TANK  SN 116097-05 | | 116097-05 | UNKNOWN |
| SJU | MX TOOLING | PO 252053 / INV 430146900 / SJU - ADAPTER - NLG SH ABS FILLCHARGE | | SN DCM0009 | UNKNOWN |
| SJU | MX TOOLING | ADAPTER  OXYGEN REFILLING | | N/A | UNKNOWN |
| SJU | MX TOOLING | PO 239436 / INV 430122560 / INTERFACE CABLE TANK SN 210659DELTA5-04 | | 210659DELTA5-04 | UNKNOWN |

| SJU | MX TOOLING | PO 243964 / INV 430131696 / INTERFACE CABLE TANK SN 109556-04 | | 109556-04 | UNKNOWN |
|---|---|---|---|---|---|
| SJU | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 05I1BI | UNKNOWN |
| SJU | MX TOOLING | PO 246404 / INV 430135482 / PORTABLE SYNCHRO READER SN 314 | | 314 | UNKNOWN |
| SJU | MX TOOLING | PO 240645 / INV 430124084 / AIR DATA KIT ACCDESSORIES  SN 7349 | | 7349 | UNKNOWN |
| SJU | MX TOOLING | PROPELLER STAND | | 0129 | UNKNOWN |
| SJU | LOAD BANK | PO 245146 / INV 24401 / SJU - LOAD BANK SN 15269 | QR#1ZU1JTZ11MFYV / SN#15269 | 15269 | UNKNOWN |
| SJU | MX TOOLING | PO 257368 / INV 430158886 / MCO - RH ELEV TAB POSITION JIG  SN FSB064225-03, LH ELEV TAB POSITION JIG  SN FSB062972-02 | | | UNKNOWN |
| SJU | MX TOOLING | VC DISPLAYS INC - OUTFLOW VALVE TEST SET | | 071079-153 | UNKNOWN |
| SJU | LIFT/MTX | TOYOTA GAS FORKLIFT | QR#291V416V1RLVS | | UNKNOWN |

| SJU | LAV CART | 12/10 AEROMOTIVE GROUND SUPPORT- DAVCO LAV CART | QR#3G3392PK39V4U | | UNKNOWN |
| SJU | LAV CART | 12/10 AEROMOTIVE GROUND SUPPORT- DAVCO LAV CART | QR#K7LAO2METYZD | | UNKNOWN |
| SJU | GPU | 3/29 AEROMOTIVE GROUND SUPPORT INV.11004 GENERATOR | QR#3UZ00R18AL4GA / SN#296PS01219 | | UNKNOWN |
| SJU | GPU | AERO GROUND SUPP  - GENERATOR | QR#QJU7T20ICR4K | | NEEDS REPAIR |
| SJU | GPU | AERO GROUND SUPP - GENERATOR | QR#39OUJ6R7RJIV9 | | UNKNOWN |
| SJU | RAMP | JetBridge Ramp (JWR2025) | QR#3E2DVEQ9E0IWK | | UNKNOWN |
| SJU | AIR CART/ GPU | Davco A/C Unit (US Bank) | QR#3FW6KY7DNGEWH | | UNKNOWN |
| SJU | AIR CART/ GPU | Davco A/C Unit (Time Payment Corp) | QR#36G2CZF9CWT5I | | OUT OF SERVICE |
| SJU | AIR CART/ GPU | Davco A/C Unit (Time Payment Corp) | QR#UTSCYWGIH3Y3 | | OUT OF SERVICE |
| SJU | AIR CART/ GPU | Davco A/C Unit (Axis) | QR#IV1J091QR8GM | | UNKNOWN |
| SJU | TUG | Bag Tractor / TUG INC MA-50 ( BB ASSET TAG 776) | QR#14GW1YXU9N98O | | UNKNOWN |

| SJU | TUG | Bag TRactor / TUG INC MA-50 ( BB ASSET TAG 777) | QR#3TYCF1Z4F1LPW | | UNKNOWN |
| SJU | TUG | Bag Tractor / TUG Inc MA-50 ( BB ASSET TAG 780) | QR#36IDMG09Z2665 | | UNKNOWN |
| SJU | TUG | Baggage Tractor / Tug INC - MA-50 ( BB ASSET TAG 769) | QR#2NTL2EP1IZFJR | | UNKNOWN |
| SJU | TUG | Tug | QR#PEMVF1IZ7LUN | | UNKNOWN |
| SJU | BAG CART | BAG CART | QR#2G7EI24XYWM6X | | UNKNOWN |
| SJU | BAG CART | BAG CART | QR#3Q7VNXEQ34217 | | UNKNOWN |
| SJU | BAG CART | BAG CART | QR#264MMKUAAUVHT | | UNKNOWN |
| SJU | BAG CART | BAG CART | QR#2R3R3JHMD9VC | | NEEDS REPAIR |
| SJU | BAG CART | BAG CART | QR#PDUS7PLEUIV0 | | NEEDS REPAIR |
| SJU | BAG CART | BAG CART | QR#BCVXUBKOR4SH | | NEEDS REPAIR |
| SJU | BAG CART | BAG CART | QR#3P6HN8BR7RITA | | NEEDS REPAIR |
| SJU | BAG CART | BAG CART | QR#1YFJWC55BUGYX | | UNKNOWN |

| SJU | BAG CART | BAG CART | QR#19TF08FBQXODF | | UNKNOWN |
| SJU | BAG CART | BAG CART | QR#1K9I6W658FH3R | | UNKNOWN |
| SJU | CATERING CART | CATERING CART | QR#1GP2LE1X1TCU2 | | UNKNOWN |
| SJU | GOLF CART | GOLF CART | QR#2INY7W9GDOTRX | | OUT OF SERVICE |
| SJU | GOLF CART | GOLF CART | QR#3BSDJDGI2TI4W | | UNKNOWN |
| SJU | GOLF CART | GOLF CART | QR#1MW6RN3SRCZGJ | | OUT OF SERVICE |
| SJU | GOLF CART | GOLF CART | QR#2N5BLSY12TSK1 | | OUT OF SERVICE |
| SJU | GOLF CART | GOLF CART | QR#24KDG6ZJQGH9F | | UNKNOWN |
| SJU | GOLF CART | GOLF CART | QR#3ESVK1PJ9QIM6 | | OUT OF SERVICE |
| SJU | GOLF CART | GOLF CART | QR#28PYK74AQB0CQ | | UNKNOWN |
| SJU | LIFT/MTX | LIFT/MTX* | QR#96APO477JA1O | | UNKNOWN |
| SJU | WATER CART | WATER CART - STD-PC 110E (LEASE TO BUY) | QR#30ZFMSDRU77XS / SN#6157 | | UNKNOWN |

| | | | | | |
|---|---|---|---|---|---|
| SJU | FURNI TURE | 10/14/24-Desk, Headset and monitors desk mount for the Call Center in CAF. | | | UNKNOW N |
| SJU MX | VEHIC LE | 2006 FORD F150 | QR#11T4LMSR4JDIE / VIN#IFTRF12246NA2 2685 | VIN IFTRF12246N A22685 | UNKNOW N |
| SJU SHUTTLE BUS | VEHIC LE | FORD | QR#NK2LPL4HMEZL / VIN#IFDXE45F0IHA6 0993 | VIN IFDXE45F0IH A60993 | UNKNOW N |
| SJU SWAT VAN | VEHIC LE | Utilimaster/General Motor | QR#1BRB35Y30JM7 M / VIN#J8DB4T1K4R700 9687 | VIN J8DB4T1K4R 7009687 | UNKNOW N |
| SJU TOW TRUCK | VEHIC LE | FORD | QR#2NDUGNKTJ6YX O | | UNKNOW N |
| STT | TUG | TUG MA30 | QR#2LH9FL4076DLN | | UNKNOW N |
| STT | GPU | GPUs | QR#22J59SWGEEW4 A | | UNKNOW N |
| STT | GPU | GPUs | QR#2BAC5RA7KZXX X | | UNKNOW N |
| STT | TUG | Baggage Tractor / TUG INC MA-50 ( BB ASSET TAG 771) | QR#YMKK24DTB7Y0 | | UNKNOW N |
| STT | BAG CART | BAG CART | QR#1DSZKPAPJ57Y2 | | UNKNOW N |

| STT | BAG CART | BAG CART | QR#209U0DB4Y85MK | | UNKNOWN |
| STT | BAG CART | BAG CART | QR#IO9I9NNS2XTZ | | UNKNOWN |
| STT | PAX LIFT | PAX LIFT | QR#22IWM8HT6UB3S | | OUT OF SERVICE |
| STX | PAX LIFT | MOBILIFT AX-80 (WHEEL CHAIR LIFT) | QR#2COL4ZFBDPS7K | | UNKNOWN |
| STX | AIR CART/ GPU | A/C Unit DAC200-DPE | QR#1JO719CIYYFPP | | NEEDS REPAIR |
| STX | GPU | 3/26 AEROMOTIVE GROUND SUPPORT INC. INV.10990-HOBA | QR#2OJUHC67X74AB | | UNKNOWN |
| STX | TUG | Baggage Tractor / TUG INC MA-50 ( BB ASSET TAG 772) | QR#TNCH8PRJDUNP | | UNKNOWN |
| STX | TUG | Tug | QR#QG67GSPFOWB4 | | OUT OF SERVICE |
| STX | BAG CART | BAG CART | QR#2FQL0UBYVPBV5 | | UNKNOWN |
| STX | BAG CART | BAG CART | QR#O0U2QDGBR7NT | | UNKNOWN |
| STX | BAG CART | BAG CART | QR#1I43VI99HVJS9 | | UNKNOWN |
| STX | BAG CART | BAG CART | QR#2P0TWFK9Y03EE | | UNKNOWN |

| TLH | TOW BAR | Tow Bar | | 1801407 | UNKNOWN |
|-----|---------|---------|---|---------|---------|
| TLH | GPU | Jetx4D Gpu | QR#EYU7VP7WZS15 / SN#100PS04411 | 100PS04411 | UNKNOWN |
| TLH | RAMP | PO 251679 / SJU - PASSENGER LOADING RAMP | QR#CEXO7GJ8N7PZ | | UNKNOWN |
| TLH | TUG | BAGGAGE TUG | QR#KR1JRB4L409E | | UNKNOWN |
| TLH | TUG | BAGGAGE TUG | QR#22G9FFJ7KQ6GD | | UNKNOWN |
| TLH | TUG | BAGGAGE TUG | QR#RZNNO9VOHM WX | | UNKNOWN |
| TLH | TUG | BAGGAGE TUG | QR#30QNNORPJA08 W | | UNKNOWN |
| TLH | VALET CART | AERO GROUND SUPP - VALET CART | QR#3EI2R0Y47M1KD | | UNKNOWN |
| TLH | GPU | AERO GROUND SUPP - GENERATOR | QR#2927A3QIDW6CN | | UNKNOWN |
| TLH | AIR CART/ GPU | DAVCO AIRCART | QR#1AQXM9D7MY2 8J / SN#12574 | | NEEDS REPAIR |
| TLH | TOW BAR | Towbar | QR#VO1P8Q8QI5KC | | UNKNOWN |
| TLH | TUG | TLH Tug G4 | QR#112EO3HC7CNS U | | UNKNOWN |

| TPA | MX TOOLING | Oxygen Booster & Transport Cart | | | UNKNOWN |
|-----|-----------|----------------------------------|---|---|----------|
| TPA | GOLF CART | Golf Cart DS Beige 2 Pass Cart #5000 | QR#225HXV1Q0W7JN / SN#AQ1034-121229 | AQ1034-121229 | UNKNOWN |
| TPA | TOW BAR | Tow Bar | QR#216PXHOV6Q4X6 / SN#1718010 | 1718010 | UNKNOWN |
| TPA | MX TOOLING | Mlg Jack Adapter | | 0184 | UNKNOWN |
| TPA | MX TOOLING | Nitrogen Replenishing | | 0093 | UNKNOWN |
| TPA | MX TOOLING | PO 237987 / INV 3938 / RUDDER CHECKING JIG | | 14 | UNKNOWN |
| TPA | MX TOOLING | PO 239661 / INV 430121018 / PORTABLE SYNCHRO READER  SN 316 | | 316 | UNKNOWN |
| TPA | MX TOOLING | PO 250758 / INV 430143415 / BRAKE PRESSURE GAUGE SN DCM0012 | | DCM0012 | UNKNOWN |
| TPA | MX TOOLING | PO 240014 - CRIMPER KIT - CONNECTORS SYSTEM | | 1154971 | UNKNOWN |

| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0144 | UNKNOWN |
|-----|-----------|-----|-----|-----|-----|
| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0145 | UNKNOWN |
| TPA | MX TOOLING | PO 240049 / INV 430122490 / NLG STEERING ALIGNMENT | | 0148 | UNKNOWN |
| TPA | MX TOOLING | PO 240647 / INV 430124095 / AIR DATA KIT ACCESSORIES  SN 7348 | | 7348 | UNKNOWN |
| TPA | MX TOOLING | PO 242624 / INV 430132875 / AFW - BRAKE PRESSURE GAUGES | | DCM0002 | UNKNOWN |
| TPA | VEHICLE | 2008 Dodge Ram 1500 | QR#3T7CEMBLLG96R / VIN#1D7HU18N68S516415 | VIN 1D7HU18N68S516415 | UNKNOWN |
| TPA | TUG | Tug MA-30 | QR#13X7SM895QTCX | | UNKNOWN |
| TPA | BAG CART | AERO GROUND SUPP  - TPA- BAGGAGE CART | QR#29A0KS4PERXX0 | | UNKNOWN |
| TPA | BAG CART | AERO GROUND SUPP  - TPA- BAGGAGE CART | QR#3DK0MHWEOQUPR | | UNKNOWN |

| | | | | | |
|---|---|---|---|---|---|
| TPA | GPU | AERO GROUND SUPP  - VALET CART | QR#J6M7KSN6HM5Z | | UNKNOWN |
| TPA | BAG CART | TPA - BAGGAGE TUG | QR#3W4B64I96O9TV | | UNKNOWN |
| TPA | LAV CART | TPA Lavatory Cart LC3025 | QR#1A451P52OWD4Q | | UNKNOWN |
| TPA | TUG | TPA TUG T-62 | QR#FO1UJ1E3ZEA7 | | UNKNOWN |
| TPA | TUG | TPA TUG 63 | QR#1GQTLXXQOKK1O | | UNKNOWN |
| TPA MX VAN | VEHICLE | 2007 FORD E250 | QR#3GRGXQ456GID2 / VIN#1FTNE24L57DB28941 | VIN 1FTNE24L57DB28941 | UNKNOWN |
| WO - TOTALED 12/2024 | VEHICLE | 2017 Nissan Frontier | QR#TCKOM9Q1UHN2 / VIN#1N6AD0ER1HN701061 | VIN 1N6AD0ER1HN701061 | OUT OF SERVICE |

**Schedule 4.21(i)**

**<u>Service Agreements</u>**

See attached as delivered by Seller.  Purchaser rejects this schedule as it is in a format that makes confirming the corresponding contract difficult, and in some instances impossible.  Seller failed to respond to such objection. Purchaser does not waive any rights or claims as to the information sought by this Schedule.

| Other Party | Address | Description | Nature of Interest | Remaining Term (months) |
|---|---|---|---|---|
| GREATER ORLANDO AVIATION AUTH. | P.O. BOX 946634, ATLANTA, GA, 30394-6634 | Orlando International Airport Hanga | Silver is Leasing Hangar Space | 1 |
| AVIATION SPECTRUM RESOURCES, INC. | M&T BANK ,P.O. BOX 62113, BALTIMORE, MD 21264 | ASRI GROUND STATION ADMINISTF | Aviation Spectrum Resources, Inc. ( | Recurring subscription |
| AEROSTAR AIRPORT HOLDINGS, LLC. | P.O. BOX 38085, San Juan,, PR, 00937-1085 | Puerto Rico  Airport | Fees incurred includes : landing, ten | Unknown |
| Bimini Airport Development Partners Ltd. | 101 E Kennedy Blvd, Suite 1470, Tampa,, FL, 33602 | Bimini Aiport | Fees incurred includes : landing, ten | Unknown |
| BROWARD COUNTY AVIATION DEPT. | ATTN: FINANCE DIVISION, 320 TERMINAL DRIVE, SUITE 200 | Fort Lauderdale Airport | Fees incurred includes : landing, ten | 20 |
| BROWARD COUNTY AVIATION DEPT. (Parking) | 400 Terminal Drive, Box 50, Fort Lauderdale, FL, 33315 | Fort Lauderdale Airport | Fees incurred includes : landing, ten | 20 |
| CITY OF TALLAHASSEE | APS-Accounting Services Division - A/R, C/O BOX A-4, City I | Tallahassee Airport | Fees incurred includes : landing, ten | Unknown |
| Civil Aviation Authority of The Bahamas | #1 Bay Street, Unit 202, 2nd Floor, British Colonial Centre o | Civil Aviation Authority of The Baham | Bahamas passenger levy fees | Unknown |
| COUNTY OF MONROE - KEY WEST INTERNATIONA | KEY WEST INTERNATIONAL AIRPORT, 3491 S. ROOSEVELT E | Key West Aiprot | Fees incurred includes : landing, ten | 14 |
| FREEPORT AIRPORT DEVELOPMENT | FREEPORT AIRPORT DEVELOPMENT, GB  P.O. BOX F40916 | Freeport Ground Handling services | Freeport Ground Handling services | 4 |
| Freeport Airport Development- Company | Airport Road, Freeport, Grand Bahama, Freeport, BAHAMAS | Freeport Ground Handling services | Freeport Ground Handling services | 4 |
| G2 SECURE STAFF, LLC | P.O. BOX 674159, DALLAS, TX, 75267-4159 | Provide passenger assistance | Wheelchair services in Tampa and C | Unknown |
| HILLSBOROUGH COUNTY AVIATION AUTHORITY | P.O. BOX 919730, ORLANDO, FL, 32891-9730 | Tampa Aiport | Fees incurred includes : landing, ten | Unknown |
| ISDS BENTORIK N.V DBA ECRU SECURITY | ST ROSE LANE #3, COLE BAY, SX | Security Services/PIE Concession F | Security Services/PIE Concession Fe | Unknown |
| MANAGEMENT AVIATION SERVICES | 20582 SW 2ND ST, PEMBROKE PINES, FL 33029 | Wheelchair Services/HQ Cleaning/E | Wheelchair Services/HQ Cleaning/B | Unknown |
| NASSAU FLIGHT SERVICES LIMITED | P.O. BOX AP-59203, NASSAU, Bahamas | Ground Handling/Security Services/ | Ground Handling/Security Services/ | Unknown |
| PENSACOLA INTERNATIONAL AIRPORT | 2430 AIRPORT BLVD., SUITE 225, PENSACOLA, FL, 32504-8 | Fixed Rent/Joint Use Space Rent/La | Fixed Rent/Joint Use Space Rent/Lar | Unknown |
| PRINCESS JULIANA INTERNATIONAL AIRPORT | Netherlands Antilles Airport Authority, PO Box 2027, St. Mai | Departure Fees/ Landing Fees/Secu | Departure Fees/ Landing Fees/Secu | ACH/ICH Periodically Billing |
| SECURITY SERVICES (BAHAMAS) LTD. dba STAPLE | P.O.BOX N 4499 NASSAU, BAHAMAS | Stand Down Service | Stand Down Service | Unknown |
| THE ACCOUNTANT GENERAL/ CIVIL AVIATION DIV | Island Auto Supplies Building, 2nd Floor, Bird Rock Comme | Landing Permit | Landing Permit | Unknown |
| THE AIRPORT AUTHORITY | PO BOX AP-59222, Lynden Pindling International Airport, N | Secutiry Screening Fees and VAT | Secutiry Screening Fees and VAT | ACH/ICH Periodically Billing |
| The Airport Authority - FAMILY ISLAND AIRPORTS A | The Airport Authority 2nd Floor, Terminal B, Lynden Pindling | Space Rent/Landing Fees | Space Rent/Landing Fees | Unknown |
| THE BAHAMAS MINISTRY OF TOURISM, INVESTME | No. 1 Bay Street, , Bahamas | Tourism Enhancement Levy | Tourism Enhancement Levy | ACH/ICH Periodically Billing |
| THE BVI AIRPORTS AUTHORITY LTD | PO BOX 4416, ROAD TOWN, TORTOLA | Employee Parking Fees/Concession | Employee Parking Fees/Concession | Unknown |
| WINAIR | Airport Boulevard #69, Simpson Bay, St. Maarten, Dutch Ca | Aircraft Handling | Aircraft Handling | Monthly / NA |

**Schedule 5.4**

**<u>Purchaser Consents</u>**

1. US Department of Transportation

2. Federal Aviation Administration

**Schedule 6.1(c)**

**<u>Pre-Closing Operations</u>**

None.

**Schedule 6.1(c)(viii)**

## **Pre-Closing Contracts**

None.